Steven L. Wittels (SLW-8110)
**SANFORD WITTELS & HEISLER, LLP**
440 West Street
Fort Lee, New Jersey 07024
Telephone: (201) 585-5288
Facsimile: (201) 585-5233

Katherine M. Kimpel, D.C. Bar No. 493028
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7777
Facsimile:  (202) 742-7776

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave. NW, Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7783
Facsimile: (202) 742-7776

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **VICTORIA BARGHOUT, JENNIFER CHRISTIANSEN, BARBARA FERINGA, JENNIFER MUSUMECI, LAURA REILLY and KAREN SALOMON, individually and on behalf of a class of similarly-situated female employees,**<br><br>**Plaintiffs,**<br><br>**-- against --**<br><br>**BAYER HEALTHCARE PHARMACEUTICALS, BAYER CORPORATION, HERM CUKIER, DENISE D'AGOSTINO, SUSAN HERSTER, SEAN KOLB-HUNT, DUNCAN LAMB, LESLIE NORTH, STEFAN OELRICH, ROBERT ROSEN, and TODD WILLIAMSON.**<br><br>**Defendants.** | **No. _____**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

      1.    Plaintiffs Victoria Barghout ("Ms. Barghout"), Jennifer Christiansen ("Ms. Christiansen"), Barbara Feringa ("Ms. Feringa") Jennifer Musumeci ("Ms. Musumeci"), Laura Reilly ("Ms. Reilly") and Karen Salomon ("Ms. Salomon") (collectively "Plaintiffs" or "Class Representatives"), through their attorneys Sanford Wittels & Heisler, LLP, bring this action in their individual capacities and on behalf of a class of women defined below to redress gender discrimination in employment.

1

## I.   <u>INTRODUCTION</u>

2.     This action arises out of Defendants Bayer Corporation and Bayer HealthCare Pharmaceuticals' (collectively, "the Company" or "Bayer") systematic, company-wide discriminatory treatment of its female employees on the basis of (1) their gender, (2) their taking federally and state-protected leave, and (3) their status as pregnant women or primary-caregiving mothers.

3.     On information and belief, men greatly outnumber women in management positions.  Bayer HealthCare Pharmaceuticals' Executive Committee, which represents the highest level of management attainable within the Company, exemplifies this disparity: only three of approximately eleven permanent committee members are women.

4.     In fact, Bayer itself has acknowledged the underrepresentation of women, saying "it's true that the proportion of women in executive positions at Bayer is too small."

5.     The dearth in female leadership at the Company is both a contributing factor to and a cause of the ongoing and pervasive discrimination against female employees at Bayer.

6.     High ranking company officials within the predominantly-male management team foster an environment hostile to the success and advancement of female employees.

7.     In its own publications, the Company has commented on the paucity of female leadership.  For example, in its "Executive News Summary," which was published to employees in October 2010, the Executive Committee distributed an article that suggested the superiority of men for management roles.  Labeling women "the fairer sex," the article described women as prone to "mood swings," "indecision," and "backstabbing."

8.      The article stated that a majority of men and women polled prefer to work for a male manager because men are "easier to deal with" and "much less likely to have a hidden agenda, suffer mood swings or get involved in office politics."

9.      The article concluded that "women with power are 'loose canons' who often feel threatened by colleagues."

10.     When female employees have complained to upper-level management about discrimination, they have been told, "You know better. The Company won't do anything about that."  Corroborating this lack of concern, the Company's Human Resources Department ("HR") has responded to complaints by characterizing gender discrimination as "a grey area" that should be handled by the employee, not the Company.

11.     In attempting to seek resolution through HR, female employees have met a common refrain: "This is just the way it is, deal with it."

12.     Bayer has created a workplace in which Vice Presidents can announce with impunity that they are "never hiring another woman over 40 again.  They're all crazy!" or can dictate that the only kind of working mothers who can succeed are ones who hire full-time nannies or otherwise abdicate their child-rearing responsibilities.  In fact, a senior manager has announced that he "needed to stop hiring women of reproductive age."

13.     Members of Human Resources have explicitly stated that the Company considers having young children a liability when considering advancement opportunities.  In fact, a Vice President has specifically indicated that because a female employee availed herself of maternity leave, she was not promoted to a Director-level position.

14.     The few women who have advanced beyond the director level and into the highest echelon of management have achieved this rank by sacrificing their personal lives and

3

abandoning work-life balance. Female Vice President of Global Health Economics and Outcomes Research Kathleen Gondek is unmarried with no children, female Senior Director Susan Herster has no children, and female Vice Presidents Shannon Campbell and Leslie North have others who serve as primary care-givers for their children.

15.    Indeed, VP North frequently expressed her hostility to childcare issues, threatening employees that she is not amenable to childcare concerns being raised "as an excuse."

16.    In addition, Bayer management feels empowered to belittle or otherwise disparage its female employees in the most extreme ways. For example, in 2009, a Vice President cornered a female employee and questioned her at length about her Jewish heritage, making comments such as "Why would a Jew like you work for a German company [like Bayer]," and demanding that the employee "explain herself."

17.    Even the most high-performing of women are ultimately frustrated in this environment, garnering some recognition but not enough to shatter the glass ceilings or maternal walls that discriminatorily constrain their opportunities.

18.    High-ranking company officials within the predominantly-male management team exercise the excessive subjectivity afforded to them in order to impede the advancement of female employees. For example, they utilize a highly subjective "bidding" process for internal employees who wish to be considered for upper management promotional opportunities. This "bidding" process equates to a "tap on the shoulder" by which the overwhelmingly male upper-management pool taps other male employees for advancement opportunities. To this end, high-ranking male employees groom their junior male colleagues for leadership position by granting them disproportionate access to resources and exposure to decision-makers.

4

19.     Bayer discriminates against its female employees through, *inter alia*: (a) discriminatory policies, practices and/or procedures in selection, promotion and advancement; (b) disparate pay; (c) differential treatment; (d) gender hostility; (f) pregnancy discrimination; and (g) retaliation in the workplace, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 (Fair Pay Act), Title 42 U.S.C. 2000e, *et. seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; and the New Jersey Law Against Discrimination, N.J. Stat. § 10:5-1, *et. seq.*

20.     Bayer has known or should have known that its business practices—including but not limited to its highly subjective promotion, discipline, demotion, evaluation, and compensation practices—have an illegal disparate impact on female employees, employees with family responsibilities, and pregnant employees.  Despite this knowledge, Bayer has failed to take measures to rectify such legal disparate impact.

21.     The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

22.     Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; backpay; front pay; compensatory, nominal and punitive damages; and attorney's fees, costs and expenses to redress Bayer's pervasive and discriminatory employment practices, policies and/or procedures.

## II.     <u>JURISDICTION AND VENUE</u>

23.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action is based on Title VII, the EPA and FMLA, which are federal statutes. This Court has supplemental jurisdiction over Plaintiffs' New Jersey state law claims under 28

U.S.C. § 1367.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendants Bayer HealthCare Pharmaceuticals and Bayer Corporation are headquartered in and transact a substantial portion of their business in New Jersey.

25.    A substantial part of the events or omissions giving rise to the claims set forth herein, including the discriminatory denial of pay and promotions, occurred in the State of New Jersey.

26.    Class Representatives have standing to bring this suit as they have duly filed their administrative charge before the Equal Employment Opportunity Commission and are in the process of perfecting their Right to Sue.

**III.    THE PARTIES**

27.    At all times relevant to this action, **PLAINTIFF VICTORIA BARGHOUT** has worked in Wayne, New Jersey.  Ms. Barghout has been employed at Bayer since April 2008.  In September 2010, Ms. Barghout began Long Term Disability leave on account of complications arising from her pregnancy.

28.    At all times relevant to this action, **PLAINTIFF JENNIFER CHRISTIANSEN** has worked in Wayne, New Jersey.  Ms. Christiansen was employed by Bayer from September 2009 to December 2010.

29.    At all times relevant to this action, **PLAINTIFF BARBARA FERINGA** has worked in Wayne, New Jersey.  Ms. Feringa has been employed by Bayer since May 2007.

30.    At all times relevant to this action, **PLAINTIFF JENNIFER MUSUMECI** has worked in Wayne, New Jersey.  She was employed at Bayer from September 2007 to March 2010.

31.     At all times relevant to this action, **PLAINTIFF LAURA REILLY** has worked in Wayne, New Jersey. Ms. Reilly has been employed by Bayer since July 2005.

32.     At all times relevant to this action, **PLAINTIFF KAREN SALOMON** has worked in Wayne, New Jersey.  Ms. Salomon has been employed at Bayer since April 2006.

33.     At all times relevant to this action, **DEFENDANT BAYER HEALTHCARE PHARMACEUTICALS** is and has been a company incorporated under the laws of Delaware and headquartered in Wayne, New Jersey.

34.     At all times relevant to this action, **DEFENDANT BAYER CORPORATION** is and has been a multi-national company incorporated under the laws of Indiana and headquartered in Pittsburgh, Pennsylvania and conducts substantial business in New Jersey.

35.     **DEFENDANT HERM CUKIER** ("Defendant Cukier") is Vice President of Brand Management for Long-Acting Contraception in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

36.     Upon information and belief, Defendant Cukier actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

37.     **DEFENDANT DENISE D'AGOSTINO** ("Defendant D'Agostino") is Director of Human Resources at Bayer HealthCare Pharmaceuticals.

38.     Upon information and belief, Defendant D'Agostino actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

39.     **DEFENDANT SUSAN HERSTER** ("Defendant Herster") is Senior Director of Market Research in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

40.     Upon information and belief, Defendant Herster actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

41.     **DEFENDANT SEAN KOLB-HUNT** ("Defendant Hunt") is Vice President of Human Resources at Bayer HealthCare Pharmaceuticals.

42.     Upon information and belief, Defendant Kolb-Hunt actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

43.     **DEFENDANT DUNCAN LAMB** ("Defendant Lamb") is Vice President of Business Analytics in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

44.     Upon information and belief, Defendant Lamb actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

45.     **DEFENDANT LESLIE NORTH** ("Defendant North") is Vice President of Brand Management for Short-Term Contraception in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

46.     Upon information and belief, Defendant North actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

47.     **DEFENDANT STEFAN OELRICH** ("Defendant Oelrich") is Vice President and General Manager of Women's Healthcare at Bayer HealthCare Pharmaceuticals.

48.     Upon information and belief, Defendant Oelrich actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

49.     **DEFENDANT ROBERT ROSEN** ("Defendant Rosen") is Vice President of Global Oncology at Bayer HealthCare Pharmaceuticals.

50.     Upon information and belief, Defendant Rosen actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

51.     **DEFENDANT TODD WILLIAMSON** ("Defendant Williamson") is Vice President for Health Economics and Outcomes Research at Bayer HealthCare Pharmaceuticals.

52.     Upon information and belief, Defendant Williamson actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

## IV.    FACTUAL ALLEGATIONS

### A.    MS. BARGHOUT'S FACTUAL ALLEGATIONS

53.     Ms. Barghout is a current employee of Bayer.  She holds the title of Director of the Oncology Division for Health Economics and Outcomes Research.

54.     Ms. Barghout has consistently achieved superior performance results.  She received multiple Excellence Awards and was nominated for the prestigious Success Together Achieves Results ("STAR") and Special Recognition Award ("SRA") Awards.

55.     In addition, she has been asked to lead initiatives for the Executive Committee of the Company, which reports directly to the President of Bayer HealthCare Pharmaceuticals—a responsibility granted to only a handful of the Company's most valued employees.

56.     Despite her obvious skills and qualifications, Ms. Barghout has been discriminated against on account of her gender, her pregnancy, and her family responsibilities. She has been denied promotional opportunities, subjected to unfair and unwarranted disciplinary measures, discriminatorily demoted, given unfair performance evaluations, and subjected to discriminatory actions that have stalled her career and harmed her professional reputation.

**1.     Ms. Barghout's Educational And Work Background Prior To Her Employment At Bayer**

57.      Ms. Barghout obtained a Bachelors of Science Degree from Loyola University Maryland.

58.     Ms. Barghout obtained a Masters of Science Degree in Public Health from the University of North Carolina School of Public Health.

59.     After obtaining her Masters degree, Ms. Barghout worked for twelve years in the pharmaceutical industry as a health economist.  During this period, her work was published in dozens of peer reviewed publications and received attention from numerous media outlets.

**2.     Ms. Barghout's Employment With Bayer**

**a.     Oncology Division for Health Economics and Outcomes Research – Deputy Director: April 2008 to June of 2008, Wayne, New Jersey**

60.     Ms. Barghout began her employment with Bayer as April 2008 as a Deputy Director of the Oncology Division for Health Economics and Outcomes Research ("HEOR") at Bayer's Wayne, New Jersey location.  During her three months in that position, Ms. Barghout reported to Director for HEOR Joanne Chang ("Director Chang").

> **b.    Oncology Division for Health Economics and Outcomes Research – Interim Director and Director: June 2008 to January 2010, Wayne, New Jersey**

61.    In June 2008, Director Chang left the company. At that time, Ms. Barghout acted as Interim Director for HEOR.

62.    During her time as Interim Director, Ms. Barghout was nominated for a STAR Award for her instrumental role in moving the company forward.

63.    Due to her superior performance as Interim Director, Ms. Barghout permanently assumed the Director position in December 2008.

64.    Ms. Barghout remains in this position, although she is currently on leave.

> **3.    Bayer's Retaliatory and Discriminatory Acts Against Ms. Barghout**

> **a.    Discriminatory Denial of Promotion**

65.    After Ms. Barghout became Director, Vice President of Medical Affairs Paul MacCarthy created a new position one level higher than the Director position, called Vice President for HEOR.

66.    Based on her success and experience within HEOR, Ms. Barghout applied for the Vice President position.

67.    The Company considered two candidates for the Vice President position: Ms. Barghout and Defendant Williamson.  Unlike Ms. Barghout, who had worked for the Company for several months, Defendant Williamson was an outside candidate who had never worked for Bayer.

68.    Normally, the Company gives internal candidates priority over external candidates.  As Ms. Barghout's qualifications were at least equal to those of Defendant

11

Williamson, her internal tenure at the Company should have resulted in her selection for the position.

69.     In January 2009, Ms. Barghout learned that Bayer awarded the Vice President position to Defendant Williamson and that he would serve as her supervisor.

70.     At the time, Ms. Barghout had primary caretaking responsibility for her young daughter and had expressed interest to her supervisors in having more children.

71.     Upon information and belief, the Vice Presidents responsible for the hiring decision, including Vice President of Global HEOR Kathleen Gondek, Vice President of Oncology and General Medicine Pam Cyrus, and Vice President of Medical Affairs Paul MacCarthy, did not support her candidacy for the position on the basis of her gender and her family responsibilities.

### b.     Discriminatory Disciplinary Measures

72.     Following the discriminatory denial of promotion of January 2009, Ms. Barghout began to work as Director for HEOR under Defendant Williamson.  At this time, she informed him that she was pregnant.

73.     In the following months, Ms. Barghout received several awards from the Company for her achievement with the Leukine Initiative.  She received Excellence Awards in February 2009 and March 2009.  Additionally, in recognition of her strong performance, she was asked in February 2009 to lead the Women's Healthcare Portfolio, the largest and most lucrative portfolio at Bayer.

74.     When Leukine was sold to another company later in 2009, Ms. Barghout was charged with its transfer.  She received an award in May or June 2009 for her successful

completion of the transfer as well as her superior performance throughout her time working on the Leukine Initiative.

75.     From January 2009 to June 2009, Ms. Barghout secured a substantial amount of press coverage regarding significant industry publications and conferences related to Bayer products.  She was recognized by the Company as the first employee within HEOR at Bayer to achieve this level of success in promoting its products.

76.     Despite this success, Defendant Williamson became increasingly hostile to Ms. Barghout over the course of the year.  Ms. Barghout, confused by this hostility in light of her superior performance, nonetheless attempted to meet and exceed every expectation set for her and to otherwise maintain a professional and positive attitude at work.

77.     However, due to Defendant Williamson's undue levels of criticism and hostility, Ms. Barghout began experiencing a great deal of stress and anxiety.  In March 2009, she experienced a miscarriage and took one week of sick time.

78.     On August 24, 2009, without warning, Defendant Williamson issued a warning letter to Ms. Barghout.  He gave two bases for this warning letter: (1) lack of "teamwork and cooperation" with global colleagues, and (2) "noncompliance" with Company processes. Specifically, the warning stated that she failed to obtain legal, medical, and regulatory approval for particular documents.

79.     Ms. Barghout responded to the first allegation by citing emails from colleagues and recent awards evidencing her high reviews for teamwork.  She also reminded Defendant Williamson that she had been selected by the Company to lead several teams, including the Leukine Initiative and two Executive Committee initiatives for the President of Company, precisely because of her strong collaborative skills.

80.     Ms. Barghout responded to the second allegation by pointing out that the documents in question did not require legal, medical, and regulatory approval. She also pointed out that a male colleague, Ronald Preblick, followed the same procedure as her for similar documents but that he did not receive any warning letter.

81.     Following the delivery of this warning letter, Ms. Barghout contacted Defendant Kolb-Hunt to express her concerns regarding the unwarranted allegations in the letter. Although the two had never met, Defendant Kolb-Hunt launched into a lecture regarding how Ms. Barghout had "behavioral problems" and failed to respect authority.  Defendant Kolb-Hunt stated, "I know women like you!"  Upon information and belief, Defendant Kolb-Hunt's criticisms were based on a perception that Ms. Barghout did not adequately conform to gendered ideas about femininity and how a woman ought to behave in the workplace.

82.     Defendant Kolb-Hunt refused to explain the requirements of the warning letter or address Ms. Barghout's concerns regarding its appropriateness.

83.     On August 25, 2009, Ms. Barghout notified Defendant Williamson that she was pregnant again.

84.     During the same time period, Ms. Barghout learned that Defendant Williamson and male employee John O'Connell were contacting her vendors to question them regarding her performance and contracts.  Upon information and belief, such contact is not a typical part of the performance evaluation process, and the purpose of such contact was to try to build a record against Ms. Barghout for the purpose of terminating her employment.

85.     In October 2009, during a meeting with Defendant Williamson, Defendant Kolb-Hunt, and HR Representative Sandra James ("Ms. James"), Ms. Barghout learned that the

14

warning letter would be removed from her file. Upon information and belief, this was in recognition that its inclusion was unfounded and improper.

86.     Nonetheless, at the same meeting, Defendant Kolb-Hunt and Ms. James persisted in discussing ways Ms. Barghout should "improve her relationships" with global colleagues.

87.     During this conversation, Ms. Kolb-Hunt became condescending and confrontational, baselessly accusing Ms. Barghout of failing to respect authority figures and of "behavioral problems."

88.     Although Defendant Kolb-Hunt committed to working with Ms. Barghout to "overcome" these alleged problems, and despite Ms. Barghout's numerous attempts to follow up with her, Ms. Barghout did not receive any direction from anyone at HR regarding these alleged problems. Rather, representatives at HR responded to her questions by stating that they were "too busy" to provide such direction.

89.     In addition, representatives at HR rebuffed Ms. Barghout's attempts to propose proactive solutions. For example, her proposal for an executive coach to assist her in working through the alleged "behavioral problems" was denied. In fact, Ms. Barghout did not receive any direction or assistance from HR until a pretextual email was sent five months later, shortly before the beginning of her maternity leave in March 2010.

90.     Shortly after the October 2009 meeting in which the "behavioral problems" were alleged, the Company once again recognized Ms. Barghout's strong performance by further enlarging her work responsibilities. Specifically, a vice president tasked Ms. Barghout as the lead HEOR employee to review two due diligence projects that Bayer was interested in purchasing.

### c.   Discriminatory Demotion

91.     Despite her record of award-winning success, in January 2010, Defendant Williamson demoted Ms. Barghout from the Director position to the Deputy Director position. Defendant Williamson stated that the demotion resulted not from performance issues but from "restructuring" within the Company. Specifically, he stated—falsely—that her position was eliminated because she "lacked direct reports."

92.     Immediately following that meeting, Ms. Barghout provided to Defendant Williamson a list of numerous Directors within the Company lacking direct reports, none of whom were affected by the purported restructuring.  At that time, Defendant Williamson gave a different reason for Ms. Barghout's demotion, stating vaguely that it was an "equity issue."

93.     Ms. Barghout also spoke with Vice President of Managed Markets Alex Santini ("VP Santini"), who led restructuring initiatives at the Company.  VP Santini stated that there had been no restructuring within HEOR and that Bayer was, in fact, preparing to increase the number of employees within HEOR.

94.     Around this time, Defendant Williamson made threatening statements to Ms. Barghout regarding the status of her employment. Specifically, he stated that she had "no future within the Company" and that she would "not be succeeding."

95.     This discriminatory demotion adversely affected Ms. Barghout's compensation and benefits, including her annual salary, annual bonus target, long-term bonus target, vacation days, and her stock options.

### d.   Discriminatory Evaluation

96.      In February 2010, Defendant Williamson conducted Ms. Barghout's annual performance review for her performance in 2009.  He characterized her performance as "poor"

16

on both scales of the evaluation: business side and behavioral side.  Specifically, he assigned the rating "partial meets" to both scales.

97.    During the *same time period covered by the annual performance review*, Ms. Barghout maintained two of the largest and most lucrative portfolios at the Company (Oncology and Women's Health), led two major initiatives for the Executive Committee, received numerous awards, and secured several publications.  Ms. Barghout subsequently learned that all other employees within HEOR received "meets" ratings or higher on their annual performance reviews for their performance in 2009.

98.    On information and belief, none of these employees were pregnant.

99.    Due to the performance evaluation and compensation structures at Bayer, this discriminatory performance evaluation rating affected Ms. Barghout's standing at the Company as well as her compensation.  Specifically, she experienced a substantial decrease in her bonus for that year and received a minimal merit salary increase.

100.   On the same day that Defendant Williamson delivered this discriminatory performance review, Ms. Barghout suffered from cramping and premature contractions as a result of the stress that she was experiencing from Defendant Williamson's harassment and discrimination.  At that time, she saw her OB-GYN, who prescribed one week of bed rest to address this stress.

101.   The following day, Ms. Barghout was nominated for the SRA Award for outstanding teamwork and superior results with managed markets.

102.   Following the delivery of the discriminatory performance evaluation, Ms. Barghout met with VP Santini to discuss her concerns regarding the unfair rating.  VP Santini advised her to dispute the unfair rating by collecting letters with positive feedback from her

colleagues and stakeholders.  During the month of February 2010, she collected dozens of letters from employees at all levels of the Company, including the top-ranking executives in the Oncology division.  These materials conclusively demonstrated that Ms. Barghout should receive an "exceeds" rating – just as she had in prior years.

103.    Upon receiving these materials, Defendant Williamson changed her rating from "partial meets" to "meets," but refused to further increase the rating to reflect her superior performance.  As a result, her compensation and bonus were reset to a "meets" level, which was still substantially lower than what it would have and should have earned for an "exceeds" rating.

104.    During this period of time, Ms. Barghout approached Defendant D'Agostino regarding her concerns that Defendant Williamson was not rating her performance fairly.  During their meeting, Defendant D'Agostino spoke with Ms. Barghout regarding her options.  Specifically, rather than sharing Ms. Barghout's concerns or offering recourse, Defendant D'Agostino stated, "this is just the way it is, deal with it."

### e.    Pretextual "Promotional" Opportunity

105.    Ms. Barghout was scheduled to begin her maternity leave under Short Term Disability at the end of March 2010.  In late March, Defendant Williamson informed her that a Director position in the field force was opening.  He stated that this position would provide an opportunity to reverse her demotion and return to the Director level.

106.    Ms. Barghout submitted an application for the open position and completed a round of interviews on her final day of office work prior to maternity leave.

107.    During Ms. Barghout's interview, Vice President of Medical Affairs Pam Cyrus ("VP Cyrus") stated, "I'm really surprised that you're applying for this position."  At the time, Ms. Barghout did not understand the comment.

108.    However, directly following her interview, Ms. Barghout received notice from Defendant Williamson that the open position had been offered to and accepted by a male employee named Brian Seal ("Mr. Seal") who was hired from a different company.  VP Cyrus' comment, coupled with the timing of this announcement, suggested that Mr. Seal received an offer for the position before Ms. Barghout even completed the interview process.   Upon information and belief, Defendant Williamson suggested the position to Ms. Barghout with no intent for her actually to be considered for the position.

### f.       Disability Leave and Professional Disparagement

109.    After Ms. Barghout began her leave and directly before she delivered her child, she was diagnosed with breast cancer.   Her OB-GYN and Oncologist explained that her diagnosis was "breast cancer associated with pregnancy," and that stress can play a major role in the development of this kind of cancer.

110.    Ms. Barghout began Long Term Disability on September 30, 2010.  She recently underwent a double mastectomy as a part of the treatment for her breast cancer and continues to undergo chemotherapy.

111.    While on leave, Ms. Barghout has learned from a colleague that male employees at the Company have made inaccurate statements harmful to her professional reputation during her leave.  For example, a male employee asked other employees within the Company what was *really* wrong with Ms. Barghout, implying that she was making excuses to extend her leave.

112.    Ms. Barghout also learned that several employees associated with her position who might vouch for her excellent and dedicated work history, including her administrative assistant and her consultant, have been terminated.

113.    Defendant Williamson selected Mr. Seal to assume some of Ms. Barghout's work

responsibilities during her leave.  On information and belief, Mr. Seal made comments to Ms. Barghout's colleagues and other pharmaceutical professionals undermining her work.  These unfounded statements have caused significant harm to her professional reputation.

114.    Ms. Barghout remains on disability leave and continues to undergo chemotherapy. She is concerned that the discrimination she faced prior to her leave at the Company will only escalate upon her return.

**B.    JENNIFER CHRISTIANSEN'S FACTUAL ALLEGATIONS**

115.    Ms. Christiansen is a former employee of Bayer.  She was unlawfully terminated during her maternity leave in December 2010.  Prior to that time, she held the title of Associate Director of Consumer Marketing in the Women's Healthcare Division.

116.    While at Bayer, Ms. Christiansen consistently achieved strong performance results, receiving the Employee of the Month Award in June 2010, which included a cash bonus and an opportunity to lead the Women's Healthcare Division monthly meeting.

117.    Despite her strong performance, she was subjected to a hostile work environment and wrongfully terminated on account of her pregnancy.

**1.    Ms. Christiansen's Educational And Work Background Prior To Her Employment At Bayer**

118.    Ms. Christiansen received a Bachelor of Arts degree from Loyola University Maryland.

119.    Prior to joining Bayer, she worked in brand marketing at a pharmaceutical company for three years and in advertising for ten years.

2.      **Ms. Christiansen's Employment with Bayer**

a.      **Consumer Marketing, Women's Healthcare Division – Associate Director: September 2009 – December 2010, Wayne, New Jersey**

120.    Ms. Christiansen began her employment with Bayer in September 2009 as a contract employee serving as Associate Director of Consumer Marketing in the Women's Healthcare Division.  In February 2010, she was hired as a full-time employee into that position.

121.    Ms. Christiansen reported to Director of Consumer Marketing in Women's Healthcare Samuel Trujillo ("Director Trujillo") and subsequently to Deputy Director of Brand Marketing in Women's Healthcare Beth Bell ("Deputy Director Bell").

3.      **Bayer's Retaliatory and Discriminatory Acts Against Ms. Christiansen**

a.      **Hostile Work Environment**

122.    Throughout her employment, Ms. Christiansen's male supervisors subjected her and her female colleagues to harsher criticism than that directed at male counterparts.  Her male managers made disparaging comments about the commitment and ability of female employees of reproductive age.

123.    In January 2010, Ms. Christiansen informed Deputy Director Bell that she was pregnant with her first child.  Although Manager Bell was supportive of her, Ms. Christiansen hesitated to share her pregnancy with other supervisors as they had expressed their preference for employees without childcare responsibilities.

124.    As she feared, after Ms. Christiansen announced her pregnancy and her maternity leave, she experienced hostile treatment directed from high-ranking officers within the Company.

125.    In July 2010, Ms. Christiansen led the monthly Women's Healthcare Division staff meeting as recognition for the Employee of the Month Award presented to her in June 2010.  During that meeting, which took place approximately one week prior to the start of her maternity leave, Defendant Oelrich inappropriately commented on her pregnancy.

126.    Specifically, when Ms. Christiansen rose from her chair and approached the podium with her laptop computer, Defendant Oelrich commented to the full staff that she did not need to use the podium because her belly was so large.  Ms. Christiansen felt humiliated and uncomfortable that Defendant Oelrich brought attention to her physical appearance. Furthermore, she was deeply upset that Defendant Oelrich made the comment in such a way that made it clear he disapproved of her pregnancy and that he tried to undermine her contributions to the meeting by bringing attention to that fact.

127.    Although Ms. Christiansen wanted to report Defendant Oelrich's comment to HR, she declined to make a report because she feared retaliation and because she believed that HR was ineffective.   When Ms. Christiansen had contacted HR with questions regarding her maternity leave, HR Representative Marilyn Hundley ("Ms. Hundley") did not address her questions, instead directing her to a website with general maternity leave information that did not respond to the specific inquiries raised by Ms. Christiansen.  Based on this interaction, as well as a sense among her peers that complaints directed at high-ranking officers often result in retaliation, Ms. Christiansen did not report Defendant Oelrich's comment.

128.    Ms. Christiansen took maternity leave as Short Term Disability from July 2010 to October 2010.  Because she was not eligible for maternity leave under the Family Medical Leave Act, she extended her maternity leave by taking unpaid leave starting in October 2010.

129.    In October 2010, she went to the Company's offices in Wayne, NJ to introduce her infant son to several of her colleagues.  She visited with another female employee who had recently returned from maternity leave, Ms. Feringa.  During their visit, Defendant Oelrich passed them in the hallway and commented, "There are babies everywhere. I need to stop hiring women of reproductive age."

130.    A reasonable employee would understand Defendant Oelrich's comments as a clear expression of his preference for male employees or for female employees without children.

### b.    Discriminatory Denial of JobShare Opportunities

131.    Leading up to her maternity leave, Ms. Christiansen spoke with Deputy Director Bell regarding JobShare opportunities.  In June 2010, she notified Deputy Director Bell that she would be interested in exploring JobShare opportunities when she returned from leave.

132.    Initially, Deputy Director Bell was supportive of Ms. Christiansen's interest; however, she later told Ms. Christiansen that Defendant Oelrich had responded to Ms. Christiansen's request for JobShare by stating that he was "no longer doing or approving JobShare."  He provided no further explanation for his denial of this JobShare opportunity, but made clear that whatever the written policy, the practice would be that she could not pursue a JobShare.

133.    Defendant Oelrich's flat denial of Ms. Christiansen's request for JobShare despite her excellent record and general qualifications for a JobShare was further discrimination based on her family responsibilities.  His decision to deny the JobShare was consistent with his comment regarding preferring employees who are not women of reproductive age or women with child-rearing responsibilities, and was designed to make it more difficult for Ms. Christiansen or other women like her to remain at the Company.

23

### c.    Retaliation and Wrongful Termination

134.    In November 2010, during her unpaid leave, Ms. Christiansen was contacted by Defendant North.  During their telephone call, Defendant North informed her that the Company was undergoing a "reorganization" during her maternity leave.  She stated that Ms. Christiansen would report to Deputy Director Heidi Schnell upon return from leave.

135.    During this telephone call, Defendant North made it clear that she believed Ms. Christiansen would not be committed to her job after returning from maternity leave. Specifically, she stated emphatically that the new position was *not* a JobShare position but instead was a "serious job."  She also told Ms. Christiansen that working for her would not be a "nine-to-five job."   She spoke to Ms. Christiansen in a condescending tone during this conversation, and generally implied that she believed Ms. Christiansen would be an unreliable or invaluable employee.

136.    Defendant North has a reputation within the Company for preferring employees without primary childcare responsibilities.  She has stated on multiple occasions her belief that children should be raised by nannies and that having a nanny is the solution to work being first. She has also selected less-qualified employees in her hiring decisions rather than more-qualified employees with primary childcare responsibilities.

137.    Shortly after this conversation, Ms. Christiansen learned about a JobShare opportunity on another brand within the Women's Healthcare Division.  Specifically, she learned that an equivalent position at another brand in the Women's Healthcare Division would become available at the time that she planned to return to work.

138.    In November 2010, Ms. Christiansen emailed Defendant Herm Cukier regarding this opportunity.  Defendant Cukier responded with an email stating that he had "no plans to

make any staffing changes."  Defendant Cukier copied Defendant Oelrich, Defendant North, and Ms. Hundley on this correspondence.

139.    Because Defendant Cukier's email provided no explanation for the denial of another JobShare opportunity, Ms. Christiansen contacted HR at the end of November 2010.  In response to her questions about the decision to deny her JobShare request, the HR Representative stated that the decision "was up to Stefan Oelrich and not to HR."

140.    Ms. Christiansen received no further explanation for the denial, and HR did not offer any assistance or investigate the matter further.

141.    On December 1, 2010, during her unpaid leave, Ms. Christiansen received a call from Defendant North and Ms. Hundley.  During this call, Defendant North stated that the brand to which Ms. Christiansen had recently been reassigned was not doing well.  Defendant North announced that the Company was eliminating consumer marketing for that brand and therefore Ms. Christiansen's position.

142.    However, this excuse was nothing more than pretext.  Upon information and belief, Ms. Christiansen was the only employee who was terminated as part of the "elimination" of consumer marketing for this brand.

143.    Ms. Christiansen's termination clearly constitutes unlawful discrimination based on her gender, pregnancy, and family responsibilities as well as retaliation for her protected activities of being pregnant, availing herself of maternity leave, and requesting JobShare.

C.    **BARBARA FERINGA'S FACTUAL ALLEGATIONS**

144.     Ms. Feringa is a current employee of Bayer.  She holds the title of Deputy Director of Marketing for Mirena in the Women's Healthcare Division.

145.    Throughout her tenure at Bayer, Ms. Feringa has consistently achieved strong performance results, receiving "meets expectations" or "exceeds expectations" on performance reviews for every year of her employment.  She has received multiple awards, including the SRA in 2009.  This award recognized her extraordinary contributions in 2008, including her leadership in serving as interim Director of Marketing for Mirena.

146.    Despite her strong performance, her career has stalled due to pervasive discrimination on the basis of her gender, family responsibilities, and pregnancy.

147.    Company management has, among other things, subjected her to discrimination and retaliation by paying her less than similarly-situated male employees, denying her career-enhancing opportunities and promotional opportunities in favor of less-qualified male employees, and subjecting her to increased scrutiny.

### 1.    Ms. Feringa's Educational And Work Background Prior To Her Employment At Bayer

148.    Ms. Feringa graduated with highest distinction from University of North Carolina at Chapel Hill.  She obtained a Masters Degree in Public Health and a Masters Degree in International Affairs from Columbia University.

149.    Prior to joining the Company, Ms. Feringa worked as a public health contractor for the United States Government for seven years.  Additionally, she held a marketing position at a healthcare company for five years.

### 2.    Ms. Feringa's Employment with Bayer

#### a.    Mirena Division, Women's Healthcare – Assistant Director: May 2007 – August 2008, Wayne, New Jersey

150.    Ms. Feringa began her employment with Bayer in May 2007 as Assistant Director of Marketing for Mirena in Women's Healthcare at Bayer's Wayne, New Jersey location.

26

**b.      Mirena Division, Women's Healthcare – Associate Director: August 2008 – December 2008, Wayne, NJ**

151.    In August 2008, Ms. Feringa was mapped into the position of Associate Director of Marketing for Mirena in Women's Healthcare at Bayer's Wayne, New Jersey location.

**c.      Mirena Division, Women's Healthcare – Deputy Director: December 2008 – Present, Wayne, NJ**

152.    In December 2008, Ms. Feringa received the position of Deputy Director of Marketing for Mirena in Women's Healthcare at Bayer's Wayne, New Jersey location.  Ms. Feringa continues to hold this title.

**3.   Bayer's Discriminatory and Retaliatory Acts Against Ms. Feringa**

**a.      Discriminatory Compensation**

153.    During her employment at Bayer, Ms. Feringa's supervisors denied her pay equal to that of her male counterparts and refused to timely address pay disparities.

154.    Bayer's base compensation system is highly subjective and lacks transparency. Bayer has taken advantage of its highly subjective compensation practices by paying female employees less than similarly-situated male employees.

155.    In May 2007, Ms. Feringa was hired by Bayer for the position of Assistant Director of Marketing for Mirena in the Women's Healthcare Division.  The hiring manager was Director of Marketing for Mirena in the Women's Healthcare Division Catherine Holtz ("Director Holtz"), and the recruiter was Jennifer Hinkle ("Ms. Hinkle").

156.    Prior to joining Bayer, Ms. Feringa held the position of Marketing Director, Worldwide, Gynecology at another healthcare company.  In that position, she earned an annual base salary of approximately $135,000.

27

157.    The original employment offer extended by Director Holtz and Ms. Hinkle included an annual base salary of approximately $119,000.  Ms. Feringa was hesitant to accept this offer as both the title and compensation were inferior to her title and compensation with her previous employer.

158.    When Ms. Feringa expressed this hesitation to Ms. Hinkle and worked to negotiate a higher annual base salary, she was told that the position would soon undergo a reclassification during which she would be promoted to an Associate Director position and receive a salary increase.  Director Holtz and Ms. Hinkle acknowledged that the position and compensation were "lower than what [Ms. Feringa] deserved" and promised to reclassify her at the earliest opportunity.  In addition, Director Holtz stated that she wanted to hire Ms. Feringa because Ms. Feringa would be qualified to assume the Director title when Director Holtz moved to a higher position within the Company.

159.    Based on these representations from Director Holtz and Ms. Hinkle, Ms. Feringa accepted an offer at an annual base salary of approximately $125,600.

160.    Contrary to the representations from Director Holtz and Ms. Hinkle regarding an immediate reclassification, Ms. Feringa was not reclassified to an Associate Director position until approximately August 2008, or about 15 months after her date of hire.

161.    Additionally, although Director Holtz told Ms. Feringa on numerous occasions that she had attempted to secure a salary increase for her from Vice President of Marketing for Women's Healthcare Paul Bedard ("VP Bedard"), Ms. Feringa later learned from him that Director Holtz had never approached him regarding Ms. Feringa's compensation concerns.

162.    Ms. Feringa achieved outstanding performance results during her first year at the Company.  During Ms. Feringa's annual review meeting in February or March 2008, Director

28

Holtz stated that she wanted to rate Ms. Feringa's performance as exceeding expectations but was "required" to assign a "meets expectations" rating.

163.    During that meeting, Ms. Feringa learned that she would receive a minimal merit increase.   Ms. Feringa was told that she was hired at the "high end" of the salary range for her job level (VS 1.2) and that the Company's compensation guidelines "required" this minimal merit increase to keep her salary within range for her job level.  However, Ms. Feringa later learned that the cap of the salary range for her job level was approximately $5,000 greater than what Director Holtz had told her it was and that her merit increase could and should have been greater.

164.    Based on Ms. Feringa's experience during her first several months at Bayer, she learned that her responsibilities far exceeded those of her peers in the VS 1.2 job level.  In fact, the majority of her colleagues assumed that Ms. Feringa was an Associate Director, which is a level above Assistant Director and classified at a VS 1.3 job level.  Ms. Feringa's counterpart in the Yaz marketing team held the title Associate Director and the job level VS 1.3 with accompanying higher earning potential.

165.    In 2010, the Women's Healthcare Division was assigned a new HR Representative, Ms. Hundley.  During a meeting with Ms. Hundley in February 2010, Ms. Feringa repeated her concerns that her salary remained below the range or at the bottom end of the range for her position and job level.

166.    Nearly a year after this conversation, in December 2010, Defendant Cukier called Ms. Feringa into his office.  He told Ms. Feringa that HR had completed a salary analysis and confirmed that her salary was lower than similarly-situated employees.  He explained that Ms. Feringa would receive an equity adjustment, bringing her salary to approximately $165,000.

167.    Following this meeting, Ms. Feringa received a call from Ms. Hundley regarding the equity adjustment.  Ms. Huntley told Ms. Feringa that she had pushed for the Company to grant a retroactive salary adjustment as Ms. Feringa's salary had been below range for a long period of time.  Ms. Hundley explained that her request was denied and that she could not provide a retroactive adjustment.

168.    This conversation as well as the equity adjustment confirmed Ms. Feringa's concerns regarding disparate pay throughout her employment at the Company.  In addition, upon information and belief, Ms. Feringa continues to be underpaid.

### b.    Discriminatory Denial of Career-Enhancing Opportunities

169.    Ms. Feringa worked under the supervision of Director Holtz until she vacated the Director position in June 2008.  For the year during which Ms. Feringa worked under Director Holtz, she was denied numerous career-enhancing opportunities.

170.    During this timeframe, Ms. Feringa repeatedly asked Director Holtz for opportunities to display her skills and to gain visibility with the senior management team.

171.    Although Director Holtz had committed to preparing her for the Director position, Director Holtz repeatedly denied Ms. Feringa opportunities to advance her career.

172.    Furthermore, although Director Holtz claimed that she would speak with VP Bedard regarding Ms. Feringa's qualifications and potential for advancement, Ms. Feringa later learned from VP Bedard that Director Holtz never did so.

### c.    Discriminatory Denial of Promotional Opportunities

173.    During Ms. Feringa's employment at Bayer, the predominantly male senior management has denied her promotional opportunities for which she was qualified in favor of

male employees.  Specifically, these managers have utilized a highly subjective "bidding" process to tap other male employees for advancement opportunities.

174.    When Director Holtz vacated her position in June 2008, Ms. Feringa expected to be considered for the Director position based on representations made by Director Holtz during and subsequent to the time of her hire.

175.    When Ms. Feringa spoke with VP Bedard regarding the Director position, he informed her that she would not be invited to bid for the position.  When Ms. Feringa questioned his decision and referenced her superior performance in serving as interim director for several months, VP Bedard replied that the director position was "too high profile" for Ms. Feringa.  At that time, Ms. Feringa had served as interim director for several months.

176.    The Director position was given to Russell Barrans ("Director Barrans").  Ms. Feringa was passed over for the position despite having qualifications superior to him in educational background, strategic marketing experience, and medical device expertise.  In fact, Director Barrans commented at a later date that Ms. Feringa "could have taken the job" based on her qualifications.

177.    During this timeframe, in August 2008, Ms. Feringa was mapped to the position of Associate Director, which fell within a job level of VS 1.3.  Ms. Feringa received a minimal salary increase, bringing her annual base salary to approximately $133,000.  If Ms. Feringa had instead received the Director position for which she was qualified, she would have received a significant base salary increase.

178.    Shortly after Ms. Feringa was mapped to the Associate Director position, the Company announced a major reorganization scheduled for December 2008.

179.   During the reorganization, Ms. Feringa's Associate Director position was eliminated and she was permitted to bid for the Deputy Director of Professional Marketing position (job level of VS 2.0).  Although Ms. Feringa received the Deputy Director position, she was offered a minimal salary increase to an annual base salary of approximately $139,000 for this higher job level.

180.   Based on this minimal salary increase and her ongoing compensation concerns, Ms. Feringa rejected the original offer and attempted to negotiate a higher salary.  Director Barrans confirmed her concerns, stating that this salary was below the median for the salary range for a VS 2.0 position.

181.   As a result of her efforts and the efforts of Director Barrans to negotiate a higher salary, Ms. Feringa was subsequently offered an annual base salary of approximately $145,000 for the Deputy Director position.

> **d.    Discriminatory Actions Related to Pregnancy and Maternity Leave**

182.   The work environment at Bayer represents a hostile work environment in which women, no matter how well they perform, can never feel comfortable or secure in their jobs.

183.   Throughout her employment, Ms. Feringa's supervisors have subjected her and her female colleagues to harsh criticism and have made disparaging comments about the commitment and ability of female employees, pregnant employees, and employees with childcare responsibilities.

184.   From 2007 through 2009, Ms. Feringa tried to become pregnant and underwent fertility treatments.  She was reluctant to share this information with the senior management, including Director Holtz, because of a corporate culture that discourages women from becoming pregnant.

185.   All of the women in Director positions in the Women's Healthcare Division had full-time childcare providers or did not have children.   Accordingly, Ms. Feringa felt that she would not be able to advance her career if she became pregnant and assumed primary childcare responsibilities.

186.   Several male and female managers have made negative comments regarding pregnancy and motherhood.   For example, Defendant Leslie North frequently warns employees not to "use childcare as an excuse."

187.   Similar statements have been directed by representatives of HR.   Specifically, contracted HR Representative Patty Gallagher ("Ms. Gallagher") made a presentation regarding career development in February or March 2009.   During the presentation, Ms. Gallagher presented a slide stating that "ability to travel to meet the needs of the position" represented a major consideration in certain selection decisions.   She further stated that the Company would take into consideration whether employees seeking advancement opportunities had young children when assessing this ability.

188.   In October 2009, Ms. Feringa underwent in vitro fertilization treatment and became pregnant.

189.   In December 2009, she met with Defendant Oelrich to tell him that she was pregnant.   Ms. Feringa explained that her pregnancy was "high risk" due to her age and explained that complications could require her to take extended leave during her pregnancy.

190.   During this timeframe, Ms. Feringa also discussed her career goals with Defendant Oelrich.   As Ms. Feringa was speaking with Defendant Oelrich, he interrupted to ask whether she even planned on returning to Bayer following her maternity leave.   He acknowledged that he "probably should not be asking that question," but nonetheless quizzed

her, implying that her pregnancy and her motherhood would compromise her commitment to the job.

191.   Later, Defendant Oelrich made comments about Ms. Feringa, stating that she needed to "do whatever was needed" regardless of her pregnancy.  Such comments led Ms. Feringa to understand that Defendant Oelrich was hostile to her pregnancy and her impending leave.

192.   To the contrary, Ms. Feringa assumed more responsibilities and took on more work during the period she was pregnant and before going on leave.  To that end, effective in late January 2010, Ms. Feringa began serving as Interim Director.

193.   The Company decided that rather than hire a permanent Director, it would create a Vice President position.  Although Ms. Feringa expressed interest in this position and was qualified for the role as she handled the responsibilities as interim director, she was not invited to bid for the position.  Instead, the position was given to a man from a different pharmaceutical company, Defendant Cukier.

194.   Ms. Feringa took maternity leave from June 2010 until September 2010.  When she returned from maternity leave, she began reporting to Defendant Cukier.

195.   In October 2010, Ms. Feringa received an announcement stating that a male employee named Jan Georg Moeller had received a Director position within strategic planning. Ms. Feringa was never made aware of this position, nor was she invited to bid for the position.

196.   Despite her continued superior performance, Defendant Cukier has undermined Ms. Feringa's commitment and abilities following her return from maternity leave.  For example, Defendant Cukier called Ms. Feringa after she returned from leave to discuss an upcoming reorganization that would expand her responsibilities.

34

197.   When Ms. Feringa thanked Defendant Cukier for demonstrating confidence in her abilities by adding new responsibilities, Defendant Cukier responded that Ms. Feringa's reputation within the Company was generally positive, but he was concerned that Ms. Feringa was "still in mommy mode."  Based on the context of the comment and the manner in which it was delivered, Ms. Feringa understood that Defendant Cukier was surprised that her reputation remained positive because he believed that her childcare responsibilities had reduced her competencies.

198.   Furthermore, immediately following Ms. Feringa's return from leave, Defendant Cukier excluded her from several important meetings related to major strategic decisions for the brand.

199.   In October or November 2010, Ms. Feringa spoke with Defendant Oelrich regarding her concerns about how she saw her treatment having changed subsequent to her taking leave.  In an attempt to reassure Ms. Feringa that she was valued within the Company, Defendant Oelrich stated that Ms. Feringa was so highly regarded that she would have been promoted to a Director position within a different brand if she had not been "away over the summer" – referring to her protected activity of availing herself of maternity leave.

### e.      Retaliation

200.   As a result of this ongoing and escalating discrimination and retaliation, Ms. Feringa filed a Charge with the Equal Employment Opportunity Commission on January 27, 2011.

201.   Subsequent to this filing, Ms. Feringa was notified that Bayer's management has disparagingly discussed her Charge with current and former employees.  Ms. Feringa was

further notified that either current or former management is threatening that she will become "damage goods" if she continues to pursue her claims.

### D.   JENNIFER MUSUMECI'S FACTUAL ALLEGATIONS

202.   Ms. Musumeci is a former employee of Bayer.   As a result of escalating discrimination and retaliation, Ms. Musumeci resigned her position in March 2010.  Prior to that time, she held the title of Deputy Director of Market Intelligence.

203.   During her tenure at Bayer, Ms. Musumeci consistently excelled and received numerous accolades.  In 2008, she became President Circle Winner and received the "On-the-Spot Award for Going Above and Beyond."  In 2009, she received President of the Company Mark Trudeau's nomination for the SRA Award and was selected for the Executrack Talent Management Program and the Diversity and Inclusion Counsel.

204.   Despite her outstanding performance, she was subjected to continuous discrimination on account of her gender.  Specifically, Bayer denied her pay equal to her male counterparts and subjected her to increased scrutiny and a hostile work environment.

### 1.   Ms. Musumeci's Educational And Work Background Prior To Her Employment At Bayer

205.   Ms. Musumeci completed a Masters degree in Human Development and worked within the healthcare industry for seven years prior to joining Bayer.

### 2.   Ms. Musumeci's Employment With Bayer

#### a.   Market Research in Women's Healthcare – Associate Director: September 2007 – December 2009, Wayne, New Jersey

206.   Ms. Musumeci joined Bayer in September 2007 as an Associate Director of Market Research in the Women's Healthcare Division in Wayne, New Jersey.  In that position,

she reported to Deputy Director of Market Research in Women's Healthcare Jack Morrison ("Deputy Director Morrison").

### b. Market Intelligence – Deputy Director: December 2009 – March 2010, Wayne, New Jersey

207. In December 2009, the Company underwent a reorganization. During that reorganization, Ms. Musumeci's title changed from Associate Director of Market Research in Women's Healthcare to Deputy Director of Market Intelligence.

### 3. Bayer's Discriminatory Acts Against Ms. Musumeci

### a. Discriminatory Pay

208. During her employment at Bayer, Ms. Musumeci's supervisors denied her pay equal to that of her male counterparts and refused to address pay disparities. Throughout her tenure as an Associate Director from September 2007 to December 2009, Ms. Musumeci spoke with Deputy Director Morrison on numerous occasions regarding her concern that her base salary was lower than the base salary of her counterparts.

209. Although Deputy Director Morrison acknowledged that her base salary was lower than that of her male counterparts, he refused to correct the disparity in a timely fashion through an immediate salary adjustment. Instead, Deputy Director Morrison claimed that he would attempt to bring her salary in line through sizeable merit increases.

210. Ms. Musumeci never received any substantial increases to her base salary.

211. After the Company's reorganization in December 2009, Ms. Musumeci learned that her base salary was significantly lower than the base salaries of Oguz Bakkal, Jack Morrison, Joseph Accumano, and Joseph Genuardi, male employees in comparable deputy director positions. Specifically, she learned that these male employees received base salaries of approximately $150,000.00. At that time, her base salary was approximately $120,000.00.

212.   In December 2009, she approached Defendant Lamb regarding this pay disparity. During their discussion, Defendant Lamb made it clear that regardless of when or how Ms. Musumeci raised concerns about her pay, nothing would be done to address the gender disparity.  In the course of the conversation, Defendant Lamb offered pretextual excuses for the unaddressed pay disparity, including that adjustments had to be made in 5% increments, and that adjustments could not be made for at least six months.

213.   Following this conversation, in February 2010, Ms. Musumeci approached Defendant Oelrich regarding disparate pay and Defendant Lamb's comments.   Defendant Oelrich also made it clear that he would not do anything to correct the situation.  Instead, he claimed that only Defendant Lamb could correct her salary and that Defendant Lamb had the discretion to request from HR a salary adjustment greater than 5%.  Defendant Oelrich would not acknowledge the gender disparity and did not offer to help.

**b.      Hostile Work Environment**

214.   Throughout her employment, Ms. Musumeci's male supervisors subjected her and her female colleagues to harsh criticism on the basis of their professional and personal activities, including but not limited to making disparaging comments about the commitment and ability of female employees.

215.   In late 2008, VP Bedard stated that he would not invest in the career development of a female employee because any female employee would inevitably lose interest in and commitment to her career advancement after taking maternity leave and having children.  These comments left Ms. Musumeci with the distinct impression that he would prioritize the advancement of male employees in his selection decisions.

216.   Ms. Musumeci's male managers constantly and unfairly criticized her in condescending and unprofessional ways.  For example, Director Trujillio frequently stated that she was incompetent, that she did not know what she was doing, and that she was not committed to her work in response to minor or nonexistent infractions.

217.   In fact, Director Trujillio's comments were baseless.  During her tenure at the Company, Ms. Musumeci consistently achieved superior performance results and received numerous awards for her outstanding performance.

218.   In addition, Executive Management Trainee Ron Wang ("Mr. Wang") constantly undermined Ms. Musumeci's work by inserting himself into her job responsibilities and pressuring her to take his advice.  Whenever Ms. Musumeci declined Mr. Wang's advice, he responded that she was violating the Company's values and standards of behavior by "questioning his authority."

219.   In 2008, Ms. Musumeci contacted HR regarding this treatment by Mr. Wang, Director Trujillio, and other male managers and coworkers.  After she described the hostile work environment, Ms. Gallagher stated that "harassment is a grey area" and suggested that Ms. Musumeci should handle the problems by herself.   On information and belief, Ms. Gallagher did not take any immediate steps to address the hostile work environment, and the hostility continued until Ms. Musumeci's resignation.

220.   From 2009 to 2010, Ms. Musumeci served on the Diversity and Inclusion Council.  Her work with the Council focused on the lack of diversity within the work force and the lack of female representation within leadership positions.  Although she had hoped to address the Company's hostile treatment of female employees through her work on the Council, she was instructed that the Council was not designed to affect policy change or involve itself in

HR processes or decisions regardless of the problems that it identified.  In fact, the Council was specifically instructed to overlook gender disparities and was prevented from offering programming on gender issues.

221.   In March 2010, after years of being subjected to pay discrimination and a hostile work environment created by her male managers, Ms. Musumeci made the decision to resign from her position at Bayer.  She left because of the lack of growth opportunities and the hostile work environment created by her male managers.

222.   Prior to leaving the Company, Ms. Musumeci completed an exit interview with Defendant D'Agostino.  During the interview, Ms. Musumeci shared with Ms. D'Agostino her frustrations regarding the lack of growth opportunities and the hostile work environment.

223.   In response, Defendant D'Agostino echoed the same dismissive language that Ms. Gallagher had used.  Defendant D'Agostino stated that she knew that a lack of growth opportunities for women was a problem and that the Company was "immature in its policy and ability to address employee development."   She also stated that she recognized that the Women's Healthcare Division was a "politically-charged unit."

### E.   LAURA REILLY'S FACTUAL ALLEGATIONS

224.   Ms. Reilly is a current employee of Bayer.  She holds the title of Director of New Product Planning and Business Development in the Oncology Division.

225.   Throughout her tenure at Bayer, Ms. Reilly has consistently achieved strong performance results, receiving "meets expectations" or "exceeds expectations" for every year of her employment. She has received multiple awards, including a team recognition award in 2006 for work with Nexavar and the prestigious President's Circle Award in 2009.

226.    Despite her strong performance, her career has stalled due to pervasive gender discrimination.  Company management has, among other things, subjected her to a hostile work environment and retaliated against her for drawing the company's attention to the hostile work environment by subjecting her to unwarranted disciplinary measures, increasing scrutiny, denying her promotion, and reducing her work responsibilities.

### 1.    Ms. Reilly's Educational Background

227.    Ms. Reilly received a Bachelors of Science Degree in Nursing from Molloy College.   She obtained a Masters in Business Administration Degree in marketing and management from New York University.

228.    Prior to joining the Company, Ms. Reilly was licensed as a Registered Nurse in oncology clinical nursing.   She also served as a Managing Director within the pharmaceutical advertising industry for six years.

### 2.    Ms. Reilly's Employment with Bayer

#### a.    Marketing for Nexavar – Director: July 2005 – January 2007, West Haven, CT

229.    Ms. Reilly began her employment with Bayer in July 2005 as Director of Marketing for Nexavar in West Haven, CT.

#### b.    New Product Planning and Business Development for Oncology – Director: January 2007 – Present, Wayne, New Jersey

230.    In January 2007, the Company underwent a restructuring and Ms. Reilly assumed the position of Director of New Product Planning and Business Development in Oncology.

### 3.    Bayer's Retaliatory and Discriminatory Acts Against Ms. Reilly

#### a.    Hostile Work Environment

231.   Throughout her employment, Ms. Reilly's male supervisors have subjected her and her female colleagues to harsh criticism on the basis of their professional and personal activities. Her male managers have made disparaging comments about the commitment and ability of female employees.

232.   During an investigator meeting at a conference in Phoenix, Arizona in 2006, a male executive made inappropriate and sexist comments to a group of employees and consulting physicians.  Specifically, Defendant Rosen announced the hiring of a male employee for the head of the oncology medical science group.  He stated, "I'm never hiring another woman over 40 again.  They're all crazy!"

233.   Hiding her offense to the remark, Ms. Reilly attempted to defuse the situation by replying to Defendant Rosen, "Come on, Rob!  That means that you'd never hire me!" Defendant Rosen responded to Ms. Reilly's statement by confirming that she was correct and that he would never have hired her.

234.   Immediately following this incident, Ms. Reilly reported Defendant Rosen's inappropriate and discriminatory comments to HR. She also expressed concerns that Defendant Rosen had offended and alienated important consulting physicians.

235.   Following this report to HR, Ms. Reilly never heard anything from anyone at HR regarding the status of her complaint.

236.   However, it became apparent that HR violated Company policy by sharing Ms. Reilly's confidential communication with Defendant Rosen.  Soon after her contact with HR,

Ms. Reilly was approached by Defendant Rosen, who stated that HR had told him about her complaint and subsequently gave her an insincere apology for offending her with his comment.

### b.        Retaliation

237.    After Defendant Rosen confronted Ms. Reilly, he began subjecting Ms. Reilly to a campaign of retaliation that continues to the present.

238.    This retaliatory treatment has included subjecting her to unwarranted disciplinary measures, increased scrutiny, denial of promotion, reduction of work responsibilities, and an increasingly hostile work environment.

239.    For example, a few months after Ms. Reilly's complaint to HR regarding Defendant Rosen's statements, Defendant Rosen called a one-on-one meeting with her in her office.  During that meeting, Defendant Rosen berated her for approximately thirty minutes.  During his rant, he stated that she "sucked" and that she was "terrible."  He further stated, "You haven't done a damn thing" and "I don't know why we're paying you."

240.    Defendant Rosen's comments regarding Ms. Reilly's work product and work ethic were baseless.  Since joining the Company in July 2005, she had made outstanding progress in marketing her brand.  She prepared for two launch meetings and moved forward as soon as approval from the Food and Drug Administration was granted.  During the first year, she did not taken a single vacation day and worked several nights and weekends.

241.  However, Defendant Rosen recruited other managers and employees for assistance in building a case against Ms. Reilly and creating an uncomfortable work environment for her in an effort to push her out of the Company.

242.    For example, after Bayer underwent restructuring in January 2007, Ms. Reilly began reporting to General Manager Craig Phillips ("Manager Phillips").  Soon after, she

learned that he was trying to "phase out" a female employee in his division named Carol Pohlod ("Ms. Pohlod").   On information and belief, in order to accomplish this goal, he paired Ms. Pohlod and her together because he expected that they would not work well together and that he could use their disharmony as cause to terminate both of them.

243.   Contrary to these expectations, Ms. Pohlod and Ms. Reilly worked together effectively and achieved strong performance results during this period of time, from 2007 to 2008.

244.   Thereafter, Manager Phillips subjected Ms. Pohlod and Ms. Reilly to an increasingly hostile work environment.   He made vague and unreasonable requests, he dismissed all of their work product as poor, and he withheld their performance evaluations for 2007.   These actions affected their standing within the Company and negatively affected their compensation and advancement opportunities.

245.   On information and belief, Manager Phillips did not subject male employees to this treatment.   Rather, he specifically targeted Ms. Pohlod and Ms. Reilly on the basis of their gender.

246.   In 2007, Ms. Reilly's division was involved in a launch meeting for the second launch of Nexavar.   Leading up to that meeting, Manager Phillips reduced her work responsibilities.   For example, Defendant Phillips barred her from attending the launch meeting.

247.   When Ms. Reilly asked him why she could not attend a launch meeting, Manager Phillips stated that he was "cutting travel costs."   However, Defendant Phillips allowed numerous other employees to attend the meeting, including lateral employees and employees who reported to Ms. Reilly such as her administrative assistant.

248.   Upon information and belief, Manager Phillips' financial concerns were nothing

but strained pretexts for excluding her from this meeting on the basis of her gender and in retaliation for her reports to HR.

249.   Manager Phillips left the Company in mid-2008, at which time Shannon Campbell ("VP Campbell") assumed his position.   At that time, VP Campbell's previous position of Vice President of Marketing came open.

250.   In prior discussions with VP Campbell regarding Ms. Reilly's career advancement, Ms. Reilly was led to believe that she would be elevated to a VP position when VP Campbell received a promotion.   VP Campbell indicated that Ms. Reilly was qualified for the role of Vice President of Marketing.

251.   However, when Ms. Reilly approached VP Campbell regarding the open position, VP Campbell instructed Ms. Reilly not to apply and stated that she could not support Ms. Reilly's candidacy "because of VP Phillips."

252.   Upon information and belief, Ms. Reilly was ultimately denied the Vice President position because Defendant Phillips—motivated by a discriminatory intent—actively undermined her.

253.   In January 2010, Ms. Reilly began working with Defendant Rosen again in the context of membership of a global leadership team for new products.

254.   Defendant Rosen announced that he would select two employees to oversee the global launch.   Although Ms. Reilly was ideally qualified for this position, Defendant Rosen selected one male employee from Germany and one female employee from New Jersey, Shubh Goel.

255.   Ms.  Goel lacked Ms. Reilly's qualifications and experience for this position.  For example, Ms. Reilly had completed 10 major launches, whereas Ms. Goel had not completed

any launches.

256.   Upon information and belief, Ms. Goel has never made a complaint to HR regarding Defendant Rosen.

257.   Upon information and belief, Defendant Rosen overlooked Ms. Reilly's candidacy for the position due to her complaint to HR regarding him in 2006.

258.   Since January 2010, Defendant Rosen and Ms. Goel have worked together to undermine Ms. Reilly's contributions to the global launch team.  Whenever Ms. Reilly asked questions of Ms. Goel or tried to provide helpful feedback, Ms. Goel would report to Defendant Rosen that Ms. Reilly is "not being a team player" and "not falling in line."

259.   In July 2010, Defendant Rosen and Ms. Goel prepared a conduct memorandum regarding Ms. Reilly's alleged "behavior" and "performance" deficiencies.

260.   A conduct memorandum represents a disciplinary action, and its placement within an employee's personnel file can affect her standing with the Company, her compensation, and her advancement opportunities.

261.   Ms. Reilly learned of this conduct memorandum when Defendant Rosen forwarded it to VP Campbell and told her that he planned to take it to the President of the Company in order to secure her termination.  VP Campbell advised Ms. Reilly to write a rebuttal to each point in the conduct memorandum in order to save her job.

262.   Each point contained in the conduct memorandum was untrue.  In fact, there was only one point for which Ms. Reilly did not have conclusive documentary evidence to rebut the accusations.

263.   Ms. Reilly provided her rebuttal document to VP Campbell, who shared it with Defendant Rosen during a dinner meeting in August 2010.  VP Campbell told Ms. Reilly that

Defendant Rosen realized during the meeting that he lacked cause to "take this forward" and terminate her employment.

264.   As a result of Defendant Rosen's concerted efforts to terminate her employment without cause, Ms. Reilly has come to fear the security of her job and her standing with the Company.   Although Ms. Reilly was supported by VP Campbell in this instance, senior management and HR routinely ignore or contribute to the hostile work environment.

265.   As a result of this ongoing and escalating discrimination and retaliation, Ms. Reilly filed a Charge with the Equal Employment Opportunity Commission on January 10, 2011.

266.   Subsequent to this filing, Ms. Reilly was notified that Bayer's management has disparagingly discussed her Charge with current and former employees.   Ms. Reilly was further notified that Defendant Rosen has made disparaging comments regarding her claims and her motivations from bringing this action.   Specifically, in reference to Ms. Reilly, Defendant Rosen stated to another employee that he was "pissed" and demanded to know "who she thinks she is."

### F.   MS. SALOMON'S FACTUAL ALLEGATIONS

267.   Ms. Salomon is a current employee of Bayer.   She holds the title of Associate Director of Market Intelligence in Business Intelligence Development and Innovation.

268.    Throughout her employment with Bayer, Ms. Salomon has consistently achieved strong performance results ranging from "meets expectations" to "exceeds expectations" on performance reviews for every year of her employment.   She received an award in 2008 for outstanding performance on a brand marketing job.

269.    Despite her exemplary performance, her career has stalled on account of Bayer's discriminatory employment practices.  Over the course of her employment, the Company has denied her pay comparable to that of her male counterparts, taken unfair and unwarranted disciplinary measures against her, subjected her to increase scrutiny and the hostile work environment, and denied her career enhancement opportunities.

### 1.    Ms. Salomon's Educational And Work Background Prior To Her Employment At Bayer

270.   Ms. Salomon received her Bachelors of Science Degree from Dickinson College. Prior to joining the Company, She worked in primary and secondary market research for 26 years.

### 2.    Ms. Salomon's Employment With Bayer

#### a.    Market Research – Manager/Associate Director: April 2006 – January 2010, Wayne, NJ

271.   Ms. Salomon began her employment with a Bayer predecessor company, Berlex, in April 2006 as Senior Manager.

#### b.    Market Intelligence – Deputy Director: January 2010 – October 2010, Wayne, New Jersey

272.   During a reorganization in January 2010, Ms. Salomon was promoted to Deputy Director of Market Research.

#### c.    Market Intelligence – Associate Director: October 2010 – Present, Wayne, New Jersey

273.   In October 2010, Ms. Salomon was demoted to the position of Associate Director of Market Research.  She currently holds this position.

### 3.      Bayer's Retaliatory and Discriminatory Acts Against Ms. Salomon

#### a.      Discriminatory Compensation

274.   Despite her consistently high performance reviews and recognition for professional excellence, Ms. Salomon's salary during her five years of employment at Bayer has consistently fallen below the bottom end of the pay range required for her position.

275.   The pay discrimination began when Bayer offered her only a manager position despite her more than quarter-century of experience in comparable marketing positions.  Despite her superior qualifications, the Company did not offer her the Director position that was commensurate with her skills and experiences; instead, they offered her only a manager position upon hiring her in April 2006.  The hiring manager committed to promoting her to a director position and increasing her compensation quickly.

276.   Although Ms. Salomon was given a title change within her first year at the Company to the position of Associate Director of Market Research, which falls into a higher pay range, she received no salary increase.

277.   Additionally, Ms. Salomon repeatedly received performance reviews that did not accurately reflect her exemplary performance.

278.   Deputy Director Morrison told Ms. Salomon during multiple year-end review meetings that he had tried to secure higher ratings for her performance but that he was forced to recalibrate his proposed ratings to Ms. Salomon's disadvantage.  These recalibrated ratings resulted in reduced compensation for Ms. Salomon with respect to her yearly merit increases and bonus awards.

279.   During a reorganization in January 2010, Ms. Salomon was promoted to Deputy Director of Market Intelligence in January 2010.  Following the reorganization, Ms. Salomon received a minimal salary increase of 5%, bringing her total salary to approximately $128,000.

280.   Soon after the reorganization, Ms. Salomon discovered in conversation with male Deputy Directors that her salary compensation was approximately $30,000 lower than their average base salary.  Furthermore, although the class of Deputy Directors originally included three women and four men, one woman was soon replaced by a male employee and the other woman left the Department.  At that time, Ms. Salomon became the only female Deputy Director.  She later learned that the male employee who was hired to replace the female Deputy Director was offered a base salary $50,000 greater than her base salary.

281.   At the end of January 2010, Ms. Salomon requested a meeting with Defendant Lamb to discuss the pay disparity.  During the meeting, she told Defendant Lamb about the $30,000 difference between her compensation and the average compensation of her male colleagues. Defendant Lamb denied that any such disparity existed.

282.   After Defendant Lamb contested the pay disparity, Ms. Salomon asked him to view the pay data within his computer system.  Defendant Lamb located the pay data and confirmed the $30,000 pay disparity.  After confirming the disparity, he stated, "You know better.  The Company won't do anything about that."

283.   Ms. Salomon understood Defendant Lamb's comment to mean that the Company refused to address her pay disparity or issue a salary adjustment.

284.   Nonetheless, Ms. Salomon pressed Defendant Lamb on the issue.  Only upon her request, Defendant Lamb committed to speak with HR regarding the pay disparity and to share his findings with her within two weeks.

285.   After three weeks had passed, Ms. Salomon encountered Defendant Lamb in the Company parking lot and inquired about the status of his communications with HR.  Defendant Lamb responded that he "[did] not want to talk about it" and that Ms. Salomon should speak with her direct supervisor, Defendant Herster.

286.   On information and belief, that VP Lamb did not, in fact, escalate Ms. Salomon's concerns to HR as promised.  Ms. Salomon never heard more on this issue.

287.   In March 2010, Ms. Salomon met with Defendant Herster to discuss her concerns regarding the pay disparity and to request a salary adjustment.   Following this meeting, Defendant Herster has subjected Ms. Salomon to an escalating campaign of retaliation.

### b.        Retaliation and Hostile Work Environment

288.   From very early in her time at the Company, Ms. Salomon has endured disrespect and criticism that were not based on her work performance but were instead based on who she was and on her decisions to speak up for herself and others.

289.   For example, in early 2009, Defendant Oelrich called Ms. Salomon into his office and questioned her at length regarding her Jewish heritage and religion.  During that meeting, he asked Ms. Salomon, "Why would a Jew like you work for a German company?"  Ignoring her confusion and discomfort, he continued by needling her about how her Jewish family felt about her decision to work at Bayer.  During this conversation, which lasted approximately 30 minutes, he asked Ms. Salomon to "explain [her]self."

290.   Following this meeting, Defendant Oelrich avoided interaction with Ms. Salomon and stopped making eye contact during their professional interactions.  Upon information and belief, other male employees are not called on to "explain themselves" or otherwise justify their

employment at the Company when their performance, like Ms. Salomon's, meets or exceeds expectations.

291.   In addition, Defendant Herster retaliated against Ms. Salomon for raising concerns about a discriminatory pay disparity by subjecting her to unfair and unwarranted disciplinary measures, increasing scrutiny, and denying her career-enhancement opportunities.

292.   Following Ms. Salomon's meeting with Defendant Herster in March 2010, Defendant Herster's treatment of her underwent a sudden and pronounced change.  Directly following the meeting, in late March or early April 2010, Defendant Herster informed Ms. Salomon that she was placing her on a four-month performance plan.

293.   Performance plans represent a corrective disciplinary action at Bayer that can result in termination of employment.

294.   Prior to notifying Ms. Salomon of the four-month performance plan, Defendant Herster had never expressed any concerns regarding her performance.  In fact, in the annual performance review that she had completed just a few weeks prior, she rated her performance as "fully meeting expectations."

295.   Upon information and belief, Defendant Herster did not place any of Ms. Salomon's similarly-rated male colleagues on four-month performance plans.

296.   As part of the four-month performance plan, Defendant Herster required Ms. Salomon to create a plan of her business activity for those months.  She provided very limited direction regarding the content and format of this plan.  When Ms. Salomon provided her with a draft, Defendant Herster stated that it "wasn't what [Herster] wanted" and that "if [Salomon] doesn't get it, that's a problem."

297.   After Ms. Salomon rewrote the plan and provided a copy to Defendant Herster, she heard nothing further from her regarding the status of the corrective disciplinary action.

298.   After the meeting in March 2010 during which Ms. Salomon addressed her concerns to Defendant Herster, Herster became increasingly critical of Ms. Salomon's work and became generally more hostile in their interactions.

299.   Defendant Herster has criticized all aspects of Ms. Salomon's work without cause and created a stressful, no-win work environment.   For example, in her review of Ms. Salomon's performance for 2009, Defendant Herster encouraged her to replace frequent travel commitments with teleconferences in order to reduce expenses.   She implemented this change in early 2010.   However, later in the year, Defendant Herster criticized Ms. Salomon for conducting teleconferences with focus group participants rather than traveling to focus group sites.

300.   In addition to such criticism, Defendant Herster has subjected Ms. Salomon to increased scrutiny.   Defendant Herster has required weekly one-on-one meetings with Ms. Salomon to review her progress.   On information and belief, she does not require weekly meetings with Ms. Salomon colleagues, who have not voiced concerns about their compensation.

301.   Defendant Herster also denied Ms. Salomon important training opportunities for which she was qualified and which would create promotional opportunities for her.

302.   In August 2010, Ms. Salomon received a notice from the Company that she had been selected for the Leadership Excellence Training Program.   This program is made available to employees who have distinguished themselves as potential leaders within the Company and is required to advance beyond her current position grade.

303.   Shortly after Ms. Salomon received this notice and explored enrollment dates, she received an additional notice from the Company stating that Defendant Herster had denied her access to the program.  Neither Defendant Herster nor the notice explained the revocation.

304.   Upon information and belief, Defendant Herster has not denied Ms. Salomon's colleagues comparable career-enhancement opportunities.

305.   In November 2010, Defendant Herster notified Ms. Salomon that she had been demoted from her Deputy Director position to an Associate Director position.

## V.    CLASS ACTION ALLEGATIONS

306.   Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon represent a Class consisting of all female employees who are, have been, or will be employed by Bayer HealthCare Pharmaceuticals situated at the VS level 1.2 or higher from 2009 to the date of judgment.  Class Representatives and the Class of Bayer employees they seek to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by Bayer.

307.   These discriminatory practices have subjected female employees to continuing unlawful disparate treatment and have had a continuing, unlawful disparate impact on them and their employment opportunities.   Such gender discrimination includes (a) paying female employees less than their male counterparts; and (b) denying female employees development, promotion and advancement opportunities resulting in their relegation to lower classification and compensation levels.  The gender discrimination also involves retaliation against female employees who have complained of wage disparity and gender discrimination, including by unfairly demoting them, taking unwarranted disciplinary measures, and subjecting them to

increased scrutiny; discrimination against female employees on the basis of their pregnancy and caretaking responsibilities; and creation a hostile work environment.

308. Bayer, in effect, bars female employees from better and higher-paying positions which have traditionally been held by male employees. The systemic means of accomplishing such gender-based stratification include, but are not limited to, Bayer's development, promotion, advancement, training, and performance evaluation policies, practices and procedures.

309. Bayer's development, promotion, advancement, training, and performance evaluation policies, practices and procedures incorporate the following gender-based discriminatory practices: (a) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional biases or stereotypes; (b) refusing or failing to provide equal training opportunities to females; and (c) relying upon subjective judgments, procedures, and criteria which permit and encourage the incorporation of gender stereotypes and biases by Bayer's predominately male executive, managerial and supervisory staff in making promotion, training, performance evaluation, and compensation decisions.

310. In addition, Bayer cultivates a hostile environment in which Company officers regularly retaliate against women who have brought gender discrimination complaints to their attention.

311. Defendants' development, compensation, promotion, training, performance evaluation, and termination policies, practices and procedures have a disparate impact on the Class Representatives and the Class they seek to represent. Such procedures are not valid, job-related, or justified by business necessity. Such practices form a part of the Defendants' overall

pattern and practice of keeping women in the lower classifications that carry less desirable terms and conditions of employment.

312.   Indeed, the facts above and herein demonstrate that it is Bayer's standard operating procedure to discriminate against female employees on a mass scale.

313.   Because of Defendants' systemic pattern and practice of gender discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay, and employment benefits as well as physical and emotion pain and suffering.

314.   Bayer has failed to impose adequate discipline for managers and employees who violate the Company's fair employment policies and equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with such policies and laws.

315.   Rather than taking remedial action to correct this discrimination, Individual Defendants ratified, perpetuated, and often escalated the discriminatory policies and practices of Bayer to the detriment of the Class.

316.   The Class Representatives and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and the Class are now suffering, and will continue to suffer, irreparable injury from Bayer's ongoing, unlawful policies, practices, and procedures as set forth herein unless those policies, practices, and procedures are enjoined by this Court.

**A.     General Facts Relevant To Class Claims And Class Definition**

317.   Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon seek to maintain claims on their own behalf and on

behalf of a Class of female employees at Bayer HealthCare Pharmaceutical employed from November 21, 2009 to the present in positions situated at VS level 1.2 or higher.

318.   Upon information and belief, the members of the proposed Class number in the hundreds.

319.   The Class Representatives seek to represent all of the female employees described above.   The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

**B.**   **Efficiency Of Class Prosecution Of Common Claims**

320.   Certification of a class of female employees is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representatives and the Class.   The individual claims of the Class Representatives require resolution of the common questions concerning whether Bayer has engaged in a systemic pattern and/or practice of gender discrimination against female employees and/or whether its facially neutral policies have an adverse effect on the Class.   The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, career and working conditions and in the lives, careers and working conditions of the Class members, and to prevent continued gender discrimination in the future.

321.   Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon have standing to seek such relief because of the adverse effects that such discrimination has had on them individually and on female employees generally.   In order to gain such relief for themselves, as well as for the Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.

322.   Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed Class, and the Bayer Defendants.

### C.   Numerosity And Impracticability Of Joinder

323.   The Class which the Class Representatives seek to represent is too numerous to make joinder practicable.  On information and belief, the proposed Class consists of hundreds of current and former employees.

324.   Bayer's pattern and/or practice of gender discrimination also makes joinder impracticable by discouraging female employees from applying for or pursuing promotional, training, or transfer opportunities, thereby making it impractical and inefficient to identify many members of the Class prior to determination of the merits of Bayer's Class-wide liability.

### D.   Common Questions Of Law And Fact

325.   The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the Class they seek to represent.  The common questions of law include, *inter alia:* whether Bayer has engaged in unlawful, systemic gender discrimination in its compensation, selection, promotion, advancement, training and discipline policies, practices, and procedures, and in the general terms and conditions of work and employment; whether Bayer is liable for a continuing systemic violation of Title VII, and/or other statutes; and a determination of the

proper standards for proving a pattern or practice of discrimination by Bayer against its female employees under both a disparate treatment and disparate impact theory of liability.

326.  The common questions of fact include, *inter alia*: whether Bayer has, through its policies, practices, and procedures: (a) compensated female employees less than similarly-situated males through the use of salary and/or other perks; (b) precluded or delayed the selection and promotion of female employees into higher level jobs traditionally held by male employees; (c) retaliated against those who have complained of gender-based discrimination through techniques including but not limited to demotions, unwarranted disciplinary measures, negative performance reviews, and increased scrutiny; and (d) otherwise discriminated against pregnant women and women with child-rearing responsibilities in the terms and conditions of employment.

327.  The employment policies, practices, and procedures to which the Class Representatives and the Class members are subjected are set at Bayer's corporate level and apply universally to all class members.  These employment policies, practices and procedures are not unique or limited to any business unit; rather, they apply to all business units and, thus, affect the Class Representatives and Class members in the same ways irrespective of business unit in which they work.

328.  Throughout the liability period, a disproportionately large percentage of the managers, executives, and officers at Bayer have been male or women without children or primary caregiving responsibilities.

329.  Discrimination in selection, promotion and advancement occurs as a pattern or practice throughout management in all business units of Bayer.  Selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-

selection and interaction between male executives and subordinates rather than by merit or equality of opportunity.

330. As a result, male employees, and, in some cases, women without primary childcare responsibilities, have advanced and continue to advance more rapidly to better and higher-paying jobs than do female employees.

331. Bayer's policies, practices, and procedures have had an adverse impact on and has resulted in routine adverse disparate treatment of on female employees seeking selection for, or advancement to, better and higher-paying positions. On information and belief, the higher the level of the job classification, the lower the percentage of female employees holding it.

### E. Typicality Of Claims And Relief Sought

332. The claims of the Class Representatives are typical of the claims of the Class. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the Class.

333. Like the members of the Class, the Class Representatives are in the same protected class.

334. Discrimination in selection, promotion, advancement, performance evaluation, and training affects the compensation of the Class Representatives and all the employee class members in the same or similar ways.

335. Bayer has failed to create adequate incentives for its executives and managers to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and has failed to discipline adequately its executives, managers and other employees when they violate Company

policy or discrimination laws. These failures have affected the Class Representatives and the Class members in the same or similar ways.

336. The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the Class members in this case. Class Representatives seek the following relief for their individual claims and for those of the members of the proposed class: (a) a declaratory judgment that Bayer has engaged in systemic gender discrimination against the Class by (1) paying female employees less than their male counterparts, (2) denying female employees into better and higher-paying positions and (3) discriminating against pregnant women and women with child-rearing responsibilities; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effectuates a restructuring of Bayer's promotion, training, performance evaluation, compensation, and discipline policies, practices, and procedures – so that women at Bayer will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher-paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) back pay, front pay, and other equitable remedies necessary to make the employees whole from the Defendants' past discrimination; (e) punitive and nominal damages to prevent and deter Bayer from engaging in similar discriminatory practices in the future; (f) compensatory damages; and (g) attorneys' fees, costs and expenses.

### F.    Adequacy Of Representation

337. The Class Representatives' interests are co-extensive with those of the Class they seek to represent in this case. Class Representatives seek to remedy Bayer's discriminatory employment policies, practices, and procedures so that female employees will no longer be prevented from advancing into higher-paying and more desirable higher management positions.

338.   Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon are willing and able to represent the Class fairly and vigorously as they pursue their individual claims in this action.

339.   The Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience, and resources of Plaintiffs' counsel to litigate competently the individual and class claims at issue in this case satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.      Requirements Of Rule 23(b)(2)

340.   Bayer has acted on grounds generally applicable to the Class Representatives and the Class by adopting and following systemic policies, practices, and procedures which are discriminatory.   Gender discrimination is Bayer's standard operating procedure rather than a sporadic occurrence.

341.   Bayer has refused to act on grounds generally applicable to the Class by, *inter alia*: (a) failing to pay and promote female employees on par with similarly-situated male employees or employees without primary caregiving responsibilities; (b) refusing to adopt and apply selection, promotion, training, performance evaluation, compensation, Human Resources, corporate leadership, and discipline policies, practices, and procedures which do not have a disparate impact on, or otherwise systemically discriminate against, female employees; and (c) refusing to provide equal terms and conditions of employment for female employees, for pregnant women, and for women with child-rearing responsibilities.

342.   Bayer's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the Class as a whole.

343.   Injunctive and declaratory relief are the predominant forms of relief sought in this case.  Entitlement to declaratory and injunctive relief flows directly and automatically from proof of systemic gender discrimination by Bayer.

344.   In turn, entitlement to declaratory and injunctive relief forms the factual and legal predicate for recovery by the Class Representatives and Class Members of monetary and nonmonetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

### H.   Requirements Of Rule 23(b)(3)

345.   The common issues of fact and law affecting the claims of the Class Representatives and proposed class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims. These issues include whether Bayer has engaged in gender discrimination against female employees by denying them equal pay, promotion and advancement opportunities and whether Bayer has tolerated a culture of gender discrimination directed against such employees.

346.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

347.   The cost of proving Bayer's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

## VI.   COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT

137.   Plaintiffs Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon incorporate by reference the allegations from the previous paragraphs of this Complaint alleging class-based discrimination against female employees.

### A.   Collective Action Standards

138.   Plaintiffs bring collective claims under the Equal Pay Act ("EPA") pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of current, former, and future female employees of Bayer at the VS level 1.2 or higher during the applicable liability period, including until the date of judgment.  The EPA action includes female employees (a) who were not compensated equally to males who had substantially similar job classifications, functions, titles and/or duties, (b) who were not compensated equally to males who performed substantially similar work, and/or (c) who were denied equal compensation to similarly situated males by being hired into positions at lesser grades than male employees who performed substantially similar work.

139.   Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following:

    (a) Whether Defendant unlawfully failed and continues to fail to compensate female employees at VS level 1.2 or higher at a level commensurate with similarly situated male employees;

    (b) Whether Defendant unlawfully assigned and continues to assign female employees at VS level 1.2 or higher into positions graded at a lower pay and compensation scale to similarly qualified males;

    (c) Whether Defendant's policy and practice of failing to compensate female employees at the VS level 1.2 or higher on a par with comparable male employees as a result of (a), (b), and (c) violates applicable provisions of the EPA; and

(d) Whether Defendant's failure to compensate female employees at VS level 1.2 or higher on a par with comparable male employees as a result of (a), (b), and (c) was willful within the meaning of the EPA;

140.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

141.    Plaintiffs Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles and/or duties; and (c) are subject to Defendants' common policy and practice of gender discrimination in (i) failing to compensate female on par with men who perform substantially equal work and/or hold equivalent levels and positions; (ii) failing to provide female employees at VS level 1.2 or higher with job classifications, grades and titles commensurate with male employees who perform substantially equal work and/or have similar duties and responsibilities; (iii) hiring and assigning females into lower-level positions than males who perform substantially equal work and/or have similar or lesser experience and qualifications; and (iv) failing to provide female employees equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to males who perform substantially equal work.

## VII.   COUNTS

### COUNT I
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e, *et seq.***
**Pay Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

348.   The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

349.   This Count is brought on behalf of the Class Representatives and all members of the Class.

350.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

351.   Defendants have discriminated against the Class Representatives and all members of the Class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of Title VII.

352.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

353.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

354.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

355.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT II**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e, *et seq.***
**Promotion Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

356.   The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

357.   This Count is brought on behalf of the Class Representatives and all members of the Class.

358.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

359.   Defendants have discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of Title VII.

360.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members

of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

361.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

362.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

363.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT III**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-5(f),** *et seq.*
**Pregnancy and Family Responsibilities Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

364.   The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

365.   This Count is brought on behalf of the Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa and similar all members of the Class.

366.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

367.   Defendants have discriminated against the Class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional and discriminatory treatment with respect to work responsibilities and other terms and conditions of employment in violation of Title VII.

368.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

369.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

370.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

371.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT IV**
**VIOLATION OF FAMILY MEDICAL LEAVE ACT ("FMLA")**
**29 U.S.C. § 2601,** *et seq.*
**(On Behalf of Ms. Barghout, Ms. Christiansen, and Ms. Feringa Against Corporate**
**Defendants)**

372.   Ms. Barghout, Ms. Christiansen, and Ms. Feringa re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

373.   Bayer discriminated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa on the basis of their pregnancy, childbirth, and related conditions in violation of the Family Medical Leave Act ("FMLA").

374.   Defendants retaliated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa for taking their FMLA-protected leave by adversely and materially changing the terms and conditions of their employment by, *inter alia,* denying them career advancement opportunities, making inaccurate statements harmful to their professional careers, and otherwise creating an environment hostile to pregnancy and the taking of statutorily protected leave.

375.   Defendants acted willfully, intentionally, and with reckless disregard for Ms. Barghout, Ms. Christiansen, and Ms. Feringa's rights under the FMLA.

376.   As a direct and proximate result of defendants' actions, Ms. Barghout, Ms. Christiansen, and Ms. Feringa suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses and costs, and are entitled to all legal and equitable remedies available.

377.   By reason of Defendants' discrimination, Ms. Barghout, Ms. Christiansen, and Ms. Feringa are entitled to all legal and equitable remedies available for violations of the

FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT V
## VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"), 29 U.S.C. §206(d)
### (On Behalf of All Plaintiffs and EPA Collective Action Plaintiffs Against Corporate Defendants)

378.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

379.   This Count is brought on behalf of the Plaintiffs and all EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

380.   Defendants have discriminated against the Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act, ("EPA") by providing them with lower pay than similarly-situated male colleagues on the basis of their gender, female, even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

381.   Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated males all perform similar job duties and functions across the Defendants' various U.S. offices.  Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated males all performed jobs which required equal skill, effort, and responsibility, and are or were performed under similar working conditions.

382.   Defendants so discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denial of promotions, and other forms of discrimination in violation of the Equal Pay Act.

383.   The differential in pay between males and female employees was not due to seniority, merit, quantity or quality of production, but was due to gender.

384.   Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

385.   The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

386.   As a result of Defendant's conduct alleged in this complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

387.   By reason of Defendants' discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

388.   Attorneys' fees should be awarded under 29 U.S.C. §216(b).

### COUNT VI
**VIOLATION OF THE LAW AGAINST DISCRIMINATION**,
**N.J. STAT. § 10:5-1,** *et seq*.
**Pay Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

389.   The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

390.   This Count is brought on behalf of the Class Representatives and all members of the Class.

391.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of the Law Against Discrimination by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

392.   Defendants have discriminated against the Class Representatives and all members of the Class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of the Law Against Discrimination.

393.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

394.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

395.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

396.   Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

## COUNT VII
## VIOLATION OF THE LAW AGAINST DISCRIMINATION,
## N.J. STAT. § 10:5-1, *et seq*.
## Promotion Discrimination
## (On Behalf of All Class Members Against Corporate Defendants)

397.   The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

398.   This Count is brought on behalf of the Class Representatives and all members of the Class.

399.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of the Law Against Discrimination by subjecting them to different treatment on the basis of their gender.   The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

400.   Defendants have discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of the Law Against Discrimination.

401.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

402.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm,

including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

403.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

404.   Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT VIII**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION**,
**N.J. STAT. § 10:5-1**, *et seq*.
**Pregnancy and Family Responsibilities Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

405.   The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

406.   This Count is brought on behalf of the Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa and similar all members of the Class.

407.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

408.   Defendants have discriminated against the Class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional and

discriminatory treatment with respect to work responsibilities and other terms and conditions of employment in violation of Title VII.

409.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

410.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

411.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

412.   Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT IX**
**VIOLATION OF THE FAMILY LEAVE ACT ("FLA")**
**N.J. STAT. § 34:11B-1, *et. seq.***
**(On Behalf of Ms. Barghout, Ms. Christiansen, and Ms. Feringa Against Corporate Defendants)**

413.   Ms. Barghout, Ms. Christiansen, and Ms. Feringa re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

414.   Defendants discriminated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa on the basis of their pregnancy, childbirth, and related conditions in violation of the Family Leave Act ("FLA"). N.J. Stat. § 34:11B-1, *et seq.*

415.   Defendants retaliated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa for taking their FMLA-protected leave by adversely and materially changing the terms and conditions of their employment by, *inter alia,* denying them career advancement opportunities, making inaccurate statements harmful to their professional careers, and otherwise creating an environment hostile to pregnancy and the taking of statutorily protected leave.

416.   Defendants acted willfully, intentionally, and with reckless disregard for Ms. Barghout, Ms. Christiansen, and Ms. Feringa's rights under the FLA.

417.   As a direct and proximate result of defendants' actions, Ms. Barghout, Ms. Christiansen, and Ms. Feringa suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, pain and suffering, expenses and costs, and are entitled to all legal and equitable remedies available.

418.   By reason of Defendants' discrimination, Ms. Barghout, Ms. Christiansen, and Ms. Feringa are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

419.   Attorneys' fees should be awarded under N.J. Stat. § 34:11B-1.

**COUNT X**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION –**
**N.J. STAT. § 10:5-12(e)**
**AIDING AND ABETTING**
**(On Behalf of All Class Members Against Individual Defendants)**

420.   The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

421.   On information and belief, Individual Defendants Cukier, D'Agostino, Hester, Kolb-Hunt, Lamb, North, Oelrich, Rosen, and Williamson all actively and knowingly

participated in practices that resulted in unfair compensation and promotion, a hostile work environment, and other forms of discrimination based on gender.

422.   By aiding, abetting, inciting, compelling and/or ratifying Corporate Defendant Bayers' discriminatory practices and decisions, each Individual Defendant has aided and abetted both the Corporate Defendants' and each of the other Individual Defendant's discrimination against the Class Representatives and the Class of female employees, in violation of the Law Against Discrimination. N.J. Stat. § 10:5-12(e).

423.   Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Class Representatives' and the Class members' rights and has damaged Class Representative and the Class.

424.   The Class Representatives and the Class members are therefore entitled to all legal and equitable remedies, as well as punitive damages.

425.   Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

## COUNT XI
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e-5(f), et seq.,
### Retaliation
### (On Behalf of Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon Against Corporate Defendants)

426.   Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

427.   Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon engaged in a protected activity by filing EEOC Charges and otherwise complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for

professional advancement, favorable treatment towards male employees, and derogatory remarks—to people in management positions and in Human Resources.

428.   Defendants engaged in adverse employment actions against Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon for engaging in protected activities. Such adverse employment actions taken have been in the form of subjecting them to unfavorable terms and conditions of employment, including inter alia, denials of promotions, negative performance reviews, and hostile working environments.   The adverse employment actions have materially and adversely affected the plaintiffs overall terms and conditions of employment.

429.   A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

430.   Defendants' retaliatory acts against Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon were a direct, proximate, and pretextual result of the plaintiffs' protected activities.

431.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon, entitling these plaintiffs to punitive damages.

432.   As a result of Defendants' conduct alleged in this complaint, these plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

433.   By reason of Defendants' discrimination, these plaintiffs are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

434.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT XII
## VIOLATIONS OF THE LAW AGAINST DISCRIMINATION, N.J. STAT. § 10:5-12(d) *et seq.*, Retaliation
### (On Behalf of Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon Against Corporate Defendants)

435.   Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

436.   Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon engaged in a protected activity by filing EEOC Charges and otherwise complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male employees, and derogatory remarks—to people in management positions and in Human Resources.

437.   Defendants engaged in adverse employment actions against Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon for engaging in protected activities. Such adverse employment actions taken have been in the form of subjecting them to unfavorable terms and conditions of employment, including inter alia, denials of promotions, negative performance reviews, and hostile working environments.  The adverse employment actions have materially and adversely affected the plaintiffs overall terms and conditions of employment.

438.   A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

439.   Defendants' retaliatory acts against Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon were a direct, proximate, and pretextual result of the plaintiffs' protected activities.

440.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, and Ms. Salomon, entitling these plaintiffs to punitive damages.

441.   As a result of Defendants' conduct alleged in this complaint, these plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

442.   By reason of Defendants' discrimination, these plaintiffs are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

443.   Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

## PRAYER FOR RELIEF ON CLASS CLAIMS

WHEREFORE, the Class Representatives, on their own behalf and on behalf of the Class, pray that this Court:

A.       Certification of this case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff Class;

designation of the proposed Class Representative as representative of this Class; and designation of Plaintiff's counsel of record as Class Counsel;

B.      Declare and adjudge that the corporate Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and Class members;

C.      A permanent injunction against Bayer HealthCare and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

D.      Order Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above; and/or

E.      Order Defendants to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner; and/or

F.      Order Defendants to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in E through F above; and/or

G.      Order Defendants to adjust the wage rates and benefits for the Class Representatives and the Class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures; and/or

H.      Order Defendants to place or restore the Class Representatives and the Class members into those jobs they would now be occupying but for Defendants' discriminatory policies, practices and/or procedures; and/or

I.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law; and/or

J.      Award nominal, compensatory and punitive damages to the Class Representatives and the Class members, in excess of one hundred million dollars; and/or

K.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Class Representatives and Class members; and/or

L.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives and the Class members to be determined at trial; and/or

M.      Order Defendants to make whole the Class Representatives and Class members by providing them with appropriate lost earnings and benefits, and other affirmative relief; and/or

N.      Award any other appropriate equitable relief to the Class Representatives and Class members; and/or

O.      Award any additional and further relief as this Court may deem just and proper.

## VIII.  <u>JURY DEMAND</u>

The Class Representatives demand a trial by jury on all issues triable of right by jury.


Dated:   Fort Lee, New Jersey
         March 21, 2011

                                 SANFORD, WITTELS & HEISLER, LLP

                     By:     s/ Steven L. Wittels
                             Steven L. Wittels (SLW-8110)
                             **SANFORD WITTELS & HEISLER, LLP**
                             440 West Street
                             Fort Lee, New Jersey 07024
                             Telephone: (201) 585-5288
                             Facsimile: (201) 585-5233

                             Katherine M. Kimpel, D.C. Bar No. 493028
                             **SANFORD WITTELS & HEISLER, LLP**
                             1666 Connecticut Avenue, N.W., Suite 310
                             Washington, D.C. 20009
                             Telephone: (202) 742-7777
                             Facsimile:  (202) 742-7776

                             Grant Morris, D.C. Bar No. 926253
                             **LAW OFFICES OF GRANT E. MORRIS**
                             1666 Connecticut Ave. NW, Suite 310
                             Washington, D.C. 20009
                             Telephone: (202) 742-7783
                             Facsimile: (202) 742-7776

                             *Counsel for Plaintiffs*