NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| VICTORIA BARGHOUT, JENNIFER CHRISTIANSEN, BABARA FERINGA, JENNIFER MUSUMECI, LAURA REILLY, KAREN SALOMON, NATALIE CELSKE, and VERA SANTANGELO, | : : : : : : : : | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | : : | **OPINION** |
| v. | : : : | Civil Action No. 11-cv-1576 (DMC) (JAD) |
| BAYER HEALTHCARE PHARMACEUTICALS, et al., | : : : : | |
| Defendants. | : : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Defendants Bayer Healthcare Pharmaceuticals, Bayer Healthcare Consumer Care, Bayer Corporation (collectively, "Bayer"), Herm Cukier, Denise D'Agostino, Susan Herster, Sean Kolb-Hunt, Duncan Lamb, Leslie North, Stefan Oelrich, Robert Rosen, Todd Williamson, Frank Knapp, Lawrence Platkin and Cleve Scott (hereinafter, "Defendants") motion to strike class allegations and to dismiss partially the second amended complaint filed August 3, 2011 (ECF No. 25).  Pursuant to FED. R. CIV. P. 78, no oral argument was heard.  For the reasons contained herein, Defendants' application is **denied**.

I.      **B**ACKGROUND[1]

Plaintiffs are current and former female employees of Bayer.  Plaintiffs allege that they have

been subjected a systematic pattern and practice of gender discrimination and disparate impact gender

discrimination by Defendant (Pl.'s Second Am. Compl. ¶ 412).  Such gender discrimination is said to

include: (a) paying female employees less than their male counterparts; (b) denying female employees

development, promotion and advancement opportunities resulting in their relegation to lower

classification and compensation levels; and (c) otherwise subjecting them to disparate treatment with

respect to the terms and conditions of their employment through exposure to pregnancy

discrimination, sexual harassment, and a hostile work environment with no viable avenues for

recourse (¶ 413).

A.      **Victoria Barghout**

Ms. Barghout continued to work for Bayer as of July 8, 2011 when the second amended

complaint was filed, holding the title of Director of the Oncology Division for Health Economics and

Outcomes Research ("HEOR") (¶ 65).  At some point before January 2009, Ms. Barghout applied for

a newly created position one level higher than her Director position (¶ 77).  The position was Vice

President for HEOR.  Id.  Normally, Plaintiff says, Bayer gives internal candidates priority over

external candidates applying for positions (¶ 80).  Here, however, the position was awarded to

Defendant Todd Williamson, an outside candidate (¶ 81).

---

[1]All citations in this section refer to paragraphs of Plaintiff's Second Amended Complaint
(July 8, 2011, ECF No. 21.)

In January 2009, Ms. Barghout informed her then boss, Mr. Williamson, that she was pregnant (¶ 84).  Between January and June 2009, Ms. Barghout achieved significant professional success with a project named the Leukine Initiative (¶ 85).  She received excellence awards, praise for transferring the initiative to another company by sale, significant press coverage of publications and conferences related to the products involved and was also asked to lead the Women's Healthcare Portfolio (¶ 85-7).

Plaintiff alleges that despite these successes, Mr. Williamson became "increasingly hostile to [her] over the course of the year" (¶ 88).  The "undue levels of criticism and hostility," Plaintiff contends, caused her a "great deal of stress and anxiety" (¶ 89).  In March 2009, she miscarried and took one week of sick time.  Id.  On August 24, 2009, Mr. Williamson issued a warning letter to Ms. Barghout citing lack of "teamwork and cooperation" and "noncompliance" for failure to obtain legal, medical and regulatory approval for certain documents (¶ 90).  On the noncompliance issue, Ms. Barghout presented evidence that a male colleague had followed the same procedure as her, an act which prompted no reprimand (¶ 92).

On August 25, 2009, Ms. Barghout notified Mr. Williamson that she was pregnant (¶ 95).  After a meeting with Defendants Williamson and Sean Kolb-Hunt regarding her behavioral problems in October 2009, Ms. Barghout was later demoted from Director to Deputy Director in January 2010 (¶ 97 and 103).  In February 2010, Mr. Williamson characterized Ms. Barghout's performance as "poor" on the business and behavioral side in her annual performance review (¶ 108).  Ms. Barghout was scheduled to begin her maternity leave at the end of March 2010 and was diagnosed with breast

cancer shortly before delivering her child (¶ 117 and 121).  On September 30, 2010, she began long

term disability (¶ 122).  Just before commencing her maternity leave, Ms. Barghout applied for a

position "in the force field," recommended by Mr. Williamson (¶ 117-8).  Soon after finishing her last

round of interviews, Ms. Barghout was notified that the position had been offered to and accepted by

a male employee, an external applicant (¶ 120).

   **B.    Jennifer Christiansen**

   Ms. Christiansen was terminated during maternity leave from Bayer in December 2010 (¶

127).  At that time, she held the title of Associate Director of Consumer Marketing in the Women's

Healthcare Division.  Id.  Ms. Christiansen commenced her career at Bayer as a contract employee (¶

132).  In February 2010, she was hired full time.  Id.  She received an employee of the month award

in June 2010 (¶ 128).

   In January 2010, Ms. Christiansen informed her Manager Beth Bell that she was pregnant

with her first child (¶ 135).  Ms. Bell mentioned that she hesitated to share the news with other

supervisors as they had "expressed their preference for employees without childcare responsibilities."

Id.  Ms. Christiansen alleges that male supervisors "subjected she and her female colleagues to

harsher criticism than that directed at male counterparts" (¶ 134).

   After leading a monthly meeting for the Women's Healthcare Division staff, Plaintiff alleges

that Defendant Stefan Oelrich commented inappropriately on her pregnancy saying, as stated in the

complaint, that "she did not need to use the podium because her belly was so large" (¶ 138).  Ms.

Christiansen explains that she was "humiliated," "uncomfortable" and "deeply upset" by Mr.

4

Oelrich's clearly disapproving manner.  Id.  Ms. Christiansen did not report this comment and alleges that her failure to report was a result of her fear that the human resources department would not respond and also that her reporting would incite retaliatory conduct (¶ 139).

Ms. Christiansen took maternity leave as short term disability from July 2010 to October 2010, then took unpaid leave starting in October 2010.  Id.  When Ms. Christiansen brought her infant into work in October 2010, Mr. Oelrich commented, "There are babies everywhere. I need to stop hiring women of reproductive age," which Plaintiff construed as demonstrating his preference for employees without children or male employees (¶ 141).

Ms. Bell and Ms. Christiansen spoke about JobShare opportunities in June 2010 (¶ 144).  Ms. Bell later informed Ms. Christiansen that Mr. Oelrich was "no longer doing or approving JobShare" (¶ 144).  Plaintiff argues that Mr. Oelrich's denial of the JobShare opportunity was discriminatory (¶ 145).  In November 2010 while Ms. Christiansen was on unpaid leave, Defendant Leslie North contacted her to notify her that the Company would be undergoing a reorganization.  Ms. Christiansen characterizes the conversation as condescending in that Ms. North noted the job was "serious" and "nine-to-five" implying that she believed Ms. Christiansen would be an unreliable or invaluable employee (¶ 147).  Plaintiff further cites Ms. North's known preference for employees without primary childcare responsibilities and her mention "on multiple occasions" that "children should be raised by nannies"  (¶ 148).

Ms. Christiansen, still seeking a JobShare position, emailed Defendant Herm Cukier about an opportunity (¶ 150).  After receiving an email response from Mr. Cukier, she then contacted human

resources (¶ 151).  On December 1, 2010, Ms. Christiansen received a call from Ms. North, who stated that the brand to which Ms. Christiansen had been reassigned was being eliminated (¶ 153). Ms. Christiansen alleges the statement was pretextual and that the decision was discriminatory based on her gender, pregnancy and family responsibilities (¶ 155).  Plaintiff alleges she was the only employee terminated on this basis (¶ 154).

### C.     Barbara Feringa

Ms. Feringa is a current employed by Bayer (¶ 156).  She began her employment with Bayer in May 2007 as Assistant Director of Marketing in Women's Healthcare at Bayer's Wayne, New Jersey location (¶ 162.)  In August 2008, she took the position of Associate Director (¶ 163).  In December 2008, she was promoted to Deputy Director (¶ 164).  She received "multiple awards" during her employment and consistently achieved "strong performance" reviews for every year of her employment (¶ 157).

After a first offer of $119,000 for her base salary, Ms. Feringa negotiated an annual base salary of approximately $125,600 for her first position as Assistant Director (¶ 169 and 171).  Ms. Feringa states she took a pay cut by leaving another healthcare company where she was making $135,000 annually (¶ 168).  Ms. Feringa alleges that in the late fall of 2008, she was due a greater merit increase than she received (¶ 175).  Further, she contends her "responsibilities far exceeded those of her peers" on the same job level (¶ 176).  In December 2010, Defendant Cukier recommended an equity adjustment raising her salary to $165,000 (¶ 178).  Plaintiff received a call from a human resources representative explaining that the request had to be denied (¶ 179).  Ms.

Feringa contends that she continues to be underpaid (¶ 180).

Ms. Feringa contends she was denied "career-enhancing opportunities" (¶ 181).  Further, she alleges she was denied "promotional opportunities" by predominantly male senior management (¶ 185).  A Director position she had reason to believe she had serious potential to obtain based on comments from upper management was given instead to a male who, she states, has inferior qualifications, educational background, strategic marketing experience and medical device expertise (¶ 188).  After some negotiation, Ms. Feringa was offered an annual base salary of $145,000 for the Deputy Director position (¶ 193).

Ms. Feringa alleges the work environment at Bayer represents a hostile work environment (¶ 194).  Allegations include "harsh criticism" against her and other female colleagues by supervisors, and disparaging comments about female employees' commitment and ability (¶ 195).  Ms. Feringa had a desire to become pregnant but states she was resistant because of the work environment at Bayer (¶ 196).  Specifically, Ms. Feringa noted that Defendant North warned employees not to "use childcare as an excuse" (¶ 198).

Ms. Feringa began serving as Interim Director in late January 2010 (¶ 204).  Defendant Oelrich asked if Plaintiff planned on returning to Bayer following her leave (¶ 202).  Ms. Feringa notes that further comments led her to "understand that Defendant Oelrich was hostile to her pregnancy and impending leave" (¶ 204). She took maternity leave from June to September 2010 (¶ 206).  Defendant Oelrich, in a meeting in October or November 2010, alluded to his belief that Plaintiff would have "been promoted to a Director position within a different brand if she had not

been 'away over the summer'" (¶ 211).   During leave Ms. Feringa learned that rather than a

Permanent Director position, a Vice President position was created (¶ 205).  That position was given

to a male external applicant.  Id.  In October 2010, Ms. Feringa learned that another male had

received a Director position (¶ 207).  She had not been invited to bid for that position.  Id.

Ms. Feringa filed a charge with the Equal Employment Opportunity Commission ("EEOC")

on January 27, 2011 (¶ 212).  She was notified that 'current or former management is threatening that

she will become 'damaged goods' if she continues to pursue her claims" (¶ 213).

### D.    Jennifer Musumeci

Ms. Musumeci resigned from the Deputy Director of Market Intelligence position in March

2010 (¶ 214).  Ms. Musumeci joined Bayer in September 2007 as Associate Director of Market

Research (¶ 218).  In December 2009, during a company reorganization, she became a Deputy

Director (¶ 219).  Plaintiff received the "On-the-Spot" Award for going above and beyond in 2008 (¶

215).  In 2009, she received President and CEO Mark Trudeau's nomination for the Special

Recognition Award and was selected for the Executrack Talent Management Program and Diversity

and Inclusion counsel in 2009.  Id.

Plaintiff alleges Defendants denied pay equal to that of her male counterparts and, once

alerted, refused to address pay disparities (¶ 220).  She spoke with Deputy Director Jack Morrison

about her concerns throughout September 2007 to December 2009.  Id.  Specifically, Ms.

Musumeci's base salary was approximately $120,000, while male employees in comparable deputy

director positions received base salaries of approximately $150,000 (¶ 223).  Plaintiff spoke with

8

Defendant Oelrich about her concerns in February 2010 (¶ 225).

Plaintiff alleges the environment at work was hostile because male supervisors subjected she and female colleagues of hers to harsh criticism on a professional and personal basis including comments about a lack of commitment and ability (¶ 226).

Plaintiff cites various comments from Vice President of Marketing for Women's Healthcare Paul Bedard, Director of Consumer Marketing in Women's Healthcare Samuel Trujillo and Executive Management Trainee Ron Wang criticizing her for taking maternity leave or her alleged incompetence (¶ 227-30). Plaintiff alleges that her responsibilities were undermined by male colleagues (¶ 228). In 2008, Ms. Musumeci contacted Human Resources Representative Patty Gallagher, but believes Ms. Gallagher took no immediate steps to address her concerns (¶ 231). In March 2010, Ms. Musumeci met with Defendant Denise D'Agostino after choosing to resign from her position (¶ 233). Defendant D'Agostino noted that Bayer was "immature in its policy and ability to address employee development" and she acknowledged a "lack of growth opportunities for women" (¶ 235).

### E.      Laura Reilly

In July 2005, Ms. Reilly was hired as Director of Marketing for Nexavar (¶ 241). In 2006 she received a team recognition award (¶ 237). Hostilities arose between Plaintiff and Defendant Robert Rosen. In 2006, at a conference in Phoenix, Arizona, Mr. Rosen announced that he would "never [hire] another woman over 40 again [because] [t]hey're all crazy!" (¶ 244). When Ms. Reilly responded that the comment meant he would not hire her, Mr. Rosen confirmed that this was indeed a

correct conclusion resulting from his comment (¶ 245).  Ms. Reilly reported this comment to human resources which was followed by an "insincere apology" from Mr. Rosen (¶ 248).  A few months after noticing the complaint, she and Mr. Rosen met one-on-one at which point Mr. Rosen allegedly "berated" her for thirty minutes about her inferior work product and ethic (¶ 251).

In 2007, Ms. Reilly assumed the position of Director of New Product Planning and business development during a company reorganization.  (¶ 242).  In 2008, Ms. Reilly sought a Vice President of Marketing position, and was led to believe that she would be elevated by Vice President Shannon Campbell, who indicated her qualification for the role (¶ 262).  Plaintiff alleges her application was undermined by Mr. Phillips (¶ 264).

In 2009, Ms. Reilly received a President Circle award (¶ 237).  In January 2010, Ms. Reilly began working with Defendant Rosen in the context of membership in a global leadership team for new products (¶ 265).  Defendant Rosen selected two external applicants to oversee the global launch despite Ms. Reilly's ideal qualifications (¶ 266).  Shubh Goel was an applicant chosen to oversee the launch.  Id.  In July 2010, Defendant Rosen and Ms. Goel prepared a conduct memorandum regarding Ms. Reilly's performance citing her "not being a team player" and "not falling in line" (¶ 270).  Defendant Rosen impressed upon Ms. Reilly that he planned to take it to the President of Bayer in order to secure her termination (¶ 273).  Ms. Reilly wrote a rebuttal memorandum at the recommendation of Ms. Campbell.  Id.  Ms. Reilly alleges that senior management and human resources routinely ignored and contributed to the hostile work environment she experienced (¶ 276).  In January 2011, Ms. Reilly filed a claim with the EEOC (¶ 277).  As of July 8, 2011, Plaintiff

10

continued to be employed by Bayer (¶ 236).

### F.    Karen Solomon

Ms. Solomon is currently employed by Bayer as Associate Director of Market Intelligence in Business Intelligence Development and Innovation (¶ 279).  In April 2006, she was employed at Bayer's predecessor, Berlex, as Senior Manager (¶ 283).  In 2008, Ms. Salomon received an award for outstanding performance on a brand marketing job (¶ 280).

Plaintiff alleges Bayer discriminated against her, subjected her to increased scrutiny and a hostile work environment (¶ 281).  For instance, in 2009, Defendant Oelrich asked, "Why would a Jew like you work for a German company?" during a meeting in his office, initiated by him, where he questioned her regarding her faith and religion (¶ 301).

Moreover, Plaintiff alleges Defendants denied her pay comparable to that of male counterparts and denied her career enhancement opportunities (¶ 281 and 292).  In January 2010, Ms. Solomon was promoted to Deputy Director of Market Research due to reorganization (¶ 284).  Plaintiff alleges her salary was approximately $30,000 lower than the average base salary (¶ 292).  A male employee was hired to replace another female Deputy Director.  Id.  The base salary offered to him was $50,000 greater than Ms. Salomon's.  Id.  She met with Defendant Duncan Lamb regarding the pay disparity at the end of January 2010 (¶ 293).  Mr. Lamb responded to Ms. Solomon's concerns by saying "You know better than that.  The Company won't do anything about that" (¶ 294).

In March 2010, Ms. Salomon met with Defendant Susan Herster regarding the salary adjustment (¶ 299).  Plaintiff alleges Defendants took unfair and unwarranted disciplinary action

against her (¶ 281).  In April 2010, Defendant Herster placed Ms. Solomon on a four-month

performance plan (¶ 306).  Plaintiff alleges Defendant Herster was retaliating against her for raising

concerns about the discriminatory pay disparity (¶ 303).

In August 2010, Salomon was selected for the Leadership Excellence Training Program (¶

314).  Plaintiff alleges Defendant Herster denied Salomon's access to the program (¶ 315).

November 2010, Plaintiff was demoted to Associate Director of Market Research (¶ 317).

### G.    Natalie Celske

Ms. Celske is currently employed by Bayer as a Senior Sales Consultant for Defendant Bayer

HealthCare Pharmaceuticals (¶ 318).  In 2003, Ms. Celske joined Bayer as a Senior Sales Consultant

(¶ 323).  In 2009, Ms. Celske completed all requirements for a promotion to Executive Sales

Consultant (¶ 326).  She had raked in the top 25th percentile for two years and had earned the Winning

Sales Consultant Award two years in a row.  Id.  She engaged in mentorship activities and served as a

District trainer demonstrating leadership and fulfilling requirements for the position.  Id.  In

December 2009, she was removed from the District Trainer role by Regional Sales Manager Glen

Butler (¶ 328).  The position was then filled by James Webb, a male peer of Plaintiff's (¶ 329).  Mr.

Webb's sales results and overall performance were significantly lower than Ms. Celske's at the time

(¶ 330).  Plaintiff states Mr. Butler refused to consider her promotion to Executive Sales Consultant

and notes that every male employee of equal tenure has been promoted to that position (¶ 354).

Ms. Celske alleges that she was discriminatorily denied promotional opportunities.  For

example, Mr. Butler commented to Ms. Celske that the District Trainer position fell "more into

James' career path, not [hers]" (¶ 331).  Further, Plaintiff states that Mr. Butler refused to allow her to participate in interviews of potential new hires (¶ 333).  She alleges that Mr. Butler would retort to her legitimate business questions with, "What are you talking about?" or "Are you dumb?" (¶ 338). Additionally Mr. Butler called Plaintiff "disrespectful" and "undeserving" of a Senior title in an email sent to a group of employees (¶ 343). Ms. Celske contends this hostile treatment stood in stark contrast to Mr. Butler's treatment of male counterparts (¶ 339).

Ms. Celske states that her pay is at the bottom end of the pay range for her position while several male employees enjoy the upper end of the same spectrum (¶ 358).  More specifically, she received a base salary of $98,000 while her male counterparts receive base salaries of $120,000 (¶ 358).  Plaintiff alleges Bayer's compensation system is highly subjective and lacks transparency (¶ 356).

**H.    Vera Santangelo**

In April 2006, Ms. Santangelo commenced her employment at Bayer as a Financial Specialist (¶ 364).  She is currently employed by Bayer HealthCare Consumer Care as a Financial Specialist, Global Analgesics Controller in the Global Planning and Administration Division (¶ 359).  Despite receipt of four "On-the-Spot" Awards in 2010 and one to two percent merit raises throughout her employment, Ms. Santangelo alleges that she has been denied pay equal to that of her male counterparts (¶ 360, 366 and 369).

In January 2010, Ms. Santangelo alleges Defendant Cleve Scott, Director and Senior Counsel for Bayer HealthCare Consumer Care, began to sexually harass her (¶ 377).  At least once per week,

Defendant Scott would approach Ms. Santangelo and make comments about her body and attire (¶ 378).  At one point Plaintiff states that Defendant Scott placed his hand on Plaintiff's backside and said, "Vera, you can eat whatever you want as long as you don't lose that girlish figure of yours."  Id. Another instance causing Plaintiff stress and anxiety occurred when, staring at her chest, Defendant Scott said, "Thank you very much for wearing that shirt today."  Id.  She visited the nurse, due to the stress of the situation, but never reported it to a manager (¶ 381-2).

In October 2010, Santangelo called Bayer's integrity hotline to make an anonymous report (¶ 383).  She was told to call again two weeks later (¶ 384).  At that point, she was told Bayer "would address it in accordance with its procedures."  Id.  After a third or fourth call, Ms. Santangelo requested to have her report shared anonymously with Ombudsman Melissa Cameron (¶ 386).  Ms. Cameron reported Defendant Scott was in "sensitivity training" (¶ 387).  In November 2010, Santangelo went to human resources regarding the continuing harassment (¶ 388).  Human resources representative Egor Zhelezniak informed Plaintiff that if she wanted the harassment to stop, the department would have to reveal her identity (¶ 388).  Even after Plaintiff agreed, the harassment did not stop.  Id.  A month later, she reported the concern to Research and Development Manager Michael Brachfeld and Defendant Frank Knapp (¶ 376).  Ms. Santangelo claims three other women, specifically Ms. Valentine, were also harassed (¶ 395-7).

Plaintiff contends that Defendants engaged in retaliatory conduct following her reports of sexual harassment (¶ 402).  In January 2011, her request to move cubicles was denied (¶ 405). During the same time, Defendant Lawrence Platkin reported that investigation did not substantiate the

harassment claim (¶ 392).  During a review meeting in January 2011, Mr. Brachfeld called Ms. Santangelo "too emotional" and put this belief in writing on her performance review for 2010 (¶ 406). He further stated that he wanted to assign a rating of "partially meets expectations" which would essentially halt her progress towards obtaining a promotion and result in denial of a salary increase (¶ 406-7).

On May 28, 2011, Ms. Santangelo reported the harassment by email to President of Bayer HealthCare Consumer Care Gary Balkema and Assistant General Counsel of Bayer HealthCare William Hawxhurst (¶ 398).  Neither replied to acknowledge her concerns.  Id.  Plaintiff alleges that following her report of sexual harassment, Mr. Brachfeld constructively demoted Ms. Santangelo by replacing her high-level duties with work appropriate for lower grade levels and assigning her duties to other employees (¶ 403).  Subsequently, she took medical leave for extreme emotional trauma (¶ 410).

## I.      Causes of Action Stated and Damages sought

Plaintiffs allege pay and promotion discrimination as well as pregnancy and family responsibilities discrimination under Title VII and the New Jersey Law Against Discrimination ("NJLAD"), violation of the Fair Labor Standards Act in terms of Equal Pay, aiding and abetting under the NJLAD, violation of federal and state Family Medical Leave acts as to Plaintiffs Barghout, Christiansen and Feringa, retaliation under Title VII as to Plaintiffs Christiansen, Feringa, Musumeci, Reilly, Salomon and Santangelo, and Sexual Harassment under Title VII and the NJLAD as to Santangelo.

Plaintiffs seek a permanent injunction, a declaratory judgment reforming Defendants' discriminatory policies and programs, compensatory and punitive damages, a retroactive adjustment of low wages, restoration of jobs, and back and front pay and lost benefits.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

In deciding a motion to dismiss, the District Court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to [the Plaintiff]." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). The Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, when their truth is assumed, those factual allegations "must be enough to raise a right to relief above a speculative level." Twombly, 550 U.S. at 555. Plaintiff's obligation "requires more than labels and conclusions." Id. at 545. To survive a motion to dismiss, the complaint must state a plausible claim. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

In reviewing a motion to dismiss, it is well-established that a court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." M & M Stone Co. v. Pa., 388 Fed.Appx. 156, 162 (3d Cir. 2010).

16

B.      Motion to Strike Class Allegations

The prerequisites that must be proved when seeking certification as a class action include showings of numerosity, commonality, typicality and representativeness.  FED. R. CIV. P. 23(a) (2009).  Numerosity means that the class is so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1).  Commonality involves questions of law or fact common to the class.  FED. R. CIV. P. 23(a)(2).  The claims or defenses of the representative parties must be typical of the class and must fairly and adequately protect the interests therewith.  FED. R. CIV. P. 23(a)(3)-(4).  Plaintiff must further prove that the class action falls into one of three types under Rule 23(b).  These types involve proof that: (1) prosecuting separate actions would create a risk of unfair or unjust relief; (2) behavior of the Defendant applies generally to the class; or (3) questions of law or fact common to class members predominate over those affecting individuals.  FED. R. CIV. P. 23(b) (2009).

Class certification is proper only "if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are met.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008).  The trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23.  Id. at 310.

**III.   DISCUSSION**

A.      Motion to Dismiss

Defendants seek partial dismissal of the second amended complaint.  More specifically, Defendants seek dismissal of claims based on their arguments that Plaintiffs failed to explain the

17

"supposed commonality" of "highly individualized and fact specific claims." (Pl.'s Mot. Dismiss 2, Aug. 3, 2011, ECF No. 25). Further, Defendants take issue with Plaintiff's plea for allegedly individualized monetary relief despite an intention to seek certification under 23(b)(3). Id. Indeed Defendants ably present strong legal analysis regarding Plaintiffs' potential deficiencies in so far as class certification is sought. However, Defendants' look forward to a future motion to certify, currently not before this Court. These arguments are not appropriate at this stage of litigation. This timing issue is fatal to the instant motion by Defendants.

This Court, in Andrews v. Home Depot, U.S.A., Inc., held that dismissal of class allegations was premature where the matter came before the court on a motion to strike class action allegations based on the face of the complaint rather than on a motion by Plaintiffs to certify the class. No 3-cv-5200, 2005 U.S. Dit. LEXIS 44304, at *8 (D.N.J. Jun. 20, 2005) (DMC). This Court finds its reasoning in Andrews as appropriate here as it was almost seven years ago. Defendants station their arguments to dismiss in the instant matter as those that would typically be offered in responsive objection to Plaintiffs' motion to certify a class under Rule 23.

Given the weight of authority describing the "prudence" with which the Court should approach motions to strike class allegations, it is clear that this Court should exercise significant apprehension in considering dismissing Plaintiff's class allegations at this stage. The proposition of dismissing the class theory of liability as an initial matter, on so little evidence, is overwhelming.

Upon motion for certification of a class, this Court must engage in an exhaustive Rule 23 analysis. Despite Defendants' undertaking of the Rule 23 analysis at this junction, this matter shall be

18

undertaken as would any other issue up for review before this Court.  It is generally, practically and simply inappropriate for rule analysis to take place <u>before</u> presentation of the issue by motion.  The dangers of discounting that rule are two-fold and include a failure to weigh all of the evidence available due to the premature procedural posture and encroachment upon a nonmoving party's sufficient opportunity to object without good reason.

In any event, the question remains as to whether Plaintiffs' claims survive the motion to dismiss standards as handed down to this Court in <u>Twombly</u> and <u>Iqbal</u>.  This Court hereby finds that they do.  Plaintiffs sufficiently plead their disparate impact claims by showing that a facially neutral practice results in a discriminatory effect upon a group protected by Title VII.  <u>See generally</u>, <u>NAACP v. No. Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464 (3d Cir.2011).  Although the factual backgrounds of some Plaintiffs meet this threshold with greater ease than others, Plaintiffs' complaint as a whole sufficiently shows that female employees felt adverse effects at work especially in terms of opportunities for promotion and the privilege of maternity leave, despite the existence of facially neutral policies.

Plaintiffs further sufficiently plead their claims under the Equal Pay Act ("EPA").  At a later stage of litigation, the Third Circuit has held that a plaintiff must demonstrate "that employees of the opposite sex were paid differently for performing 'equal work' – work of substantially equal skill, effort and responsibility, under similar working conditions" in order to prevail on her EPA claim.  <u>Rhoades v. Young Women's Christian Ass'n</u>, 423 Fed.Appx. 193 (3d Cir. 2011) (citing <u>Stanziale v. Jargowsky</u>, 200 F.3d 101, 107 (3d Cir. 2000)).  Moreover, courts in this Circuit have found that the

19

specificity requirement does not require the plaintiff to allege the identity and circumstances of those individuals who received more favorable treatment because requiring such would place too great a burden on plaintiffs who have yet to have the opportunity for discovery.  See e.g., West v. First Pennsylvania Bank, No. 89-4730, 1991 WL 17807, at *4 (E.D.Pa. July 25, 1990) (TNO).  Plaintiffs have identified promotions granted and disparities in compensation as compared to similarly situated males that are sufficient to survive Defendants' motion to dismiss at this stage.

       B.      Motion to Strike Class Allegations

      Even if this Court decides to deny Defendants' motion to dismiss, Defendants argue, Plaintiffs' class claims should alternatively be stricken for want of proof of the Rule 23 requirements. Plaintiffs have been candid in terms of describing their strategy and envisioned approach in this case and disclosing, seemingly without hesitation, that they plan to seek class certification eventually.  As a concrete example of Plaintiffs' candor, they aptly respond to Defendants' argument that certification is clearly implausible because of the plea for individualized relief.  Defendants aver that the seminal case of Wal-Mart Stores, Inc. v. Dukes precludes certification entirely because Plaintiffs do not state a class-wide claim for relief.  131 S.Ct. 2541, 2551 (2011) ("[a]common contention . . . must be of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). However, Plaintiffs show, at the very least, an understanding of what certification under 23(b)(2), 23(b)(3) or 23(c)(4) would require and how the Dukes holding is not as broad as Defendants suggest. Further, Plaintiffs distinguish Dukes based on the procedural posture of that case.  The Supreme

20

Court, in Dukes, reviewed District Court and Court of Appeals approval of a decision certifying a class.  Although the Dukes Court reasoning is binding and relevant to analysis of whether an expansive class of employee-Plaintiffs should be certified, its applicability is tenuous as this stage of litigation.

Defendants contend that Rule 23(d)(4) empowers the Court to strike Plaintiff's class claims.  As part of the thrust of the rule, Defendants state, the provision guides that the Court determine "as soon as practicable after the commencement of an action brought as a class action . . . whether it is to be so maintained."  Def.'s Mot. Dismiss and Strike 6 (citing FED. R. CIV. P. 23(c)(1)(A); and 7B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1795 (2d ed. 1986.))  In fact, Rule 23 was recently amended in 2003 eliminating the "as soon as practicable" language in favor of the words "at an early practicable time." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 318-9 (3d Cir.2008).  Legislative history tells us that the Advisory Committee commented upon this change as reflecting the time that "may be needed to gather information necessary to make the certification decision."  FED. R. CIV. P. 23 advisory committee's note.  Such "information," the Committee explained further, included discovery and that "required to identify the nature of the issues that actually will be presented at trial."  Id.  Indeed it cannot yet be found, given the procedural posture of this case, whether Plaintiffs could satisfy the threshold requirements of 23(a)(2), (b)(2) or (b)(3).  Thus, Defendant's application must be denied.

## IV.   CONCLUSION

Based on the foregoing, and for the reasons stated herein, Defendants' motion to strike the

21

class allegations and to dismiss partially the second amended complaint is **denied.**  An Order stating

this disposition follows this Opinion.

                                                _____ s/ Dennis M. Cavanaugh_____
                                                Dennis M. Cavanaugh, U.S.D.J.

Orig.:          Clerk
cc:             All Counsel of Record
                Joseph A. Dickson, U.S.M.J.