Katherine M. Kimpel*
Lauren E. Seffel*
Katherine E. Lamm*
David W. Sanford, D.C. Bar No. 457933
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
Telephone: (202) 742-7777
Facsimile:  (202) 742-7776

Steven L. Wittels (SLW-8110)
Jeremy Heisler (JH-0145)
**SANFORD WITTELS & HEISLER, LLP**
440 West Street
Fort Lee, NJ  07024
Telephone: (201) 585-5288
Facsimile: (201) 585-5233

Grant Morris*
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
Telephone: (202) 742-7783
Facsimile: (202) 742-7776

*Counsel for Plaintiffs*

*admitted pro hac vice*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **VICTORIA BARGHOUT, JENNIFER CHRISTIANSEN, BARBARA FERINGA, JENNIFER MUSUMECI, LAURA REILLY, KAREN SALOMON, NATALIE CELSKE, VERA SANTANGELO, GRETCHEN LIENHOP, MARYJEAN SAWYER and MICHELLE SIMPSON, individually and on behalf of a class of similarly-situated female employees,** | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| **Plaintiffs,** | |
| -- against -- | **No. 2:11-cv-1576 (DMC/JAD)** |
| **BAYER HEALTHCARE PHARMACEUTICALS, BAYER HEALTHCARE CONSUMER CARE, BAYER HEALTHCARE ANIMAL HEALTH, BAYER HEALTHCARE LLC, BAYER CORPORATION, HERM CUKIER, DENISE D'AGOSTINO, SUSAN HERSTER, SEAN KOLB-HUNT, DUNCAN LAMB, LESLIE NORTH, STEFAN OELRICH, ROBERT ROSEN, TODD WILLIAMSON, FRANK KNAPP, LAWRENCE PLATKIN and CLEVE SCOTT.** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

1.      Plaintiffs Victoria Barghout ("Ms. Barghout"), Jennifer Christiansen ("Ms. Christiansen"), Barbara Feringa ("Ms. Feringa") Jennifer Musumeci ("Ms. Musumeci"), Laura Reilly ("Ms. Reilly") Karen Salomon ("Ms. Salomon"), Natalie Celske ("Ms. Celske"), Vera Santangelo ("Ms. Santangelo"), Gretchen Lienhop ("Ms. Lienhop"), MaryJean Sawyer ("Ms. Sawyer"), and Michelle Simpson ("Ms. Simpson") (collectively "Plaintiffs" or "Class Representatives"), through their attorneys Sanford Wittels & Heisler, LLP, bring this action in

their individual capacities and on behalf of a class of women defined below to redress gender discrimination in employment.

**I.**     <u>**INTRODUCTION**</u>

2.     This action arises out of Defendants Bayer Corporation, Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals, Bayer HealthCare Consumer Care, and Bayer HealthCare Animal Health's (collectively, "the Company" or "Bayer") systematic, company-wide discriminatory treatment of its female employees on the basis of (1) their gender, (2) their taking federally and state-protected leave, and (3) their status as pregnant women or primary-caregiving mothers.

3.     On information and belief, men greatly outnumber women in management positions. Bayer HealthCare Pharmaceuticals' Executive Committee, which represents the highest level of management attainable within the Company, exemplifies this disparity: only three of approximately eleven permanent committee members are women.

4.     In fact, Bayer itself has acknowledged the underrepresentation of women, saying "it's true that the proportion of women in executive positions at Bayer is too small."

5.     The dearth in female leadership at the Company is both a contributing factor to and a cause of the ongoing and pervasive discrimination against female employees at Bayer.

6.     High ranking company officials within the predominantly-male management team foster an environment hostile to the success and advancement of female employees.

7.     In its own publications, the Company has commented on the paucity of female leadership. For example, in its "Executive News Summary," which was published to employees in October 2010, the Executive Committee distributed an article that suggested the superiority of

men for management roles.  Labeling women "the fairer sex," the article described women as prone to "mood swings," "indecision," and "backstabbing."

8.      The article stated that a majority of men and women polled prefer to work for a male manager because men are "easier to deal with" and "much less likely to have a hidden agenda, suffer mood swings or get involved in office politics."

9.      The article concluded that "women with power are 'loose canons' who often feel threatened by colleagues. "Bayer has created a workplace in which Vice Presidents can announce with impunity that they are "never hiring another woman over 40 again.  They're all crazy!" or can dictate that the only kind of working mothers who can succeed are ones who hire full-time nannies or otherwise abdicate their child-rearing responsibilities.  In fact, a senior manager has announced that he "needed to stop hiring women of reproductive age."

10.     This sentiment is echoed by individuals at all levels within Bayer's management. Members of Human Resources have explicitly stated that the Company considers having young children a liability when considering advancement opportunities.  In fact, a Vice President has specifically indicated that because a female employee availed herself of maternity leave, she was not promoted to a Director-level position.

11.     The few women who have advanced beyond the Director level and into the highest echelon of management have achieved this rank only without primary childcare responsibilities. The female Vice President of Global Health Economics and Outcomes Research is unmarried with no children, the female Senior Director in Women's Healthcare has no children, and the female Vice Presidents in Oncology and Women's Healthcare have others who serve as primary care-givers for their children.

12.     For example, Vice President of Women's Healthcare Leslie North frequently expressed her hostility to childcare issues, threatening employees that she is not amenable to childcare concerns being raised "as an excuse."

13.     In addition, Bayer management feels empowered to belittle or otherwise disparage its female employees in the most extreme ways.  For example, in 2009, a Vice President cornered a female employee and questioned her at length about her Jewish heritage, making comments such as "Why would a Jew like you work for a German company [like Bayer]," and demanding that the employee "explain herself."

14.     Even the most high-performing of women are ultimately frustrated in this environment, garnering some recognition but not enough to shatter the glass ceilings or maternal walls that discriminatorily constrain their opportunities.

15.     For example, when one high-performing sales representative who had repeatedly won awards for her performance on the national level raised questions about why her opportunities for advancement were being discriminatorily diminished, she was told those opportunities needed to be provided to a lower-performing male colleague to support his "career path."  When she asked what about her own career path, the male manager scoffed back "what about your career path?"  On the whole, the development of female employees is not treated as a valid or appropriate priority.

16.     Company policy also requires that managers adjust performance evaluations to conform to a forced ranking, such that high-achieving female employees receive artificially diminished ratings, stalling their advancement and diminishing their earning potential.   One Director told a Plaintiff that he was forced to downgrade her ranking on multiple occasions, resulting in a loss of career advancement opportunities and salary increases.

17.     Even when faced with evidence that women are underpaid, Bayer's compensation policies allow women to continue to be paid less than their male counterparts without justification.  In fact, attempts by several Plaintiffs to equalize their compensation were met with resistance by Bayer management and Human Resources.  Bayer told one Plaintiff who requested that she be compensated fairly that her salary could not be equalized because it was already "high" for her salary grade, even though the Company was simultaneously increasing the salary grades of her male counterparts who performed the same or similar job functions.

18.      High-ranking company officials within the predominantly-male management team exercise the excessive subjectivity afforded to them in order to impede the advancement of female employees.  For example, they utilize a highly subjective "bidding" process for internal employees who wish to be considered for upper management promotional opportunities.  This "bidding" process equates to a "tap on the shoulder" by which the overwhelmingly male upper-management pool taps other male employees for advancement opportunities.  To this end, high-ranking male employees groom their junior male colleagues for leadership positions by granting them disproportionate access to resources and exposure to decision-makers.

19.     When female employees have complained to upper-level management about discrimination, they have been told, "You know better. The Company won't do anything about that."  Corroborating this lack of concern, the Company's Human Resources Department ("HR") has responded to complaints by characterizing gender discrimination as "a grey area" that should be handled by the employee, not the Company.

20.     In attempting to seek resolution through HR, female employees have met a common refrain: "This is just the way it is, deal with it."

21.    Indeed, this disregard and indifference for concerns or complaints about discrimination and sexual harassment pervades every corner of the Company.  One Plaintiff has unsuccessfully sought help by lodging concerns about ongoing sexual harassment with the reporting hotline, Bayer Corporation's Ombudsman, Human Resources, and senior members of Bayer management including the Vice President and Assistant General Counsel and both the former and current Presidents of Bayer HealthCare Consumer Care.  These efforts spanned more than a year.  Instead of appropriately investigating her concerns or disciplining the harasser, Bayer responded by subjecting the victim to retaliation.

22.    While Bayer simply ignores the concerns raised by some women, it actively retaliates against others who voice concerns and attempt to protect their rights.  Immediately after joining this lawsuit and without explanation or justification, another Plaintiff was singled out and subjected to a 20% increase in her sales quota and a threefold increase in geographic sales region, forcing her to travel up to 300 miles a day. In over ten months of seeking an explanation from HR directly and through repeated requests by her Counsel, she has received nothing but empty defenses of the Company's retaliatory changes to the terms of her employment.

23.    Bayer discriminates against its female employees through, *inter alia*: (a) discriminatory policies, practices and/or procedures in selection, assignment, development, promotion and advancement; (b) disparate pay; (c) differential treatment; (d) gender hostility; (e) pregnancy discrimination; and (f) retaliation in the workplace, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 (Fair Pay Act), Title 42 U.S.C. 2000e, *et. seq.* ("Title VII"); the Equal Pay

Act, 29 U.S.C. § 206(d) ("EPA"); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; and the New Jersey Law Against Discrimination, N.J. Stat. § 10:5-1, *et. seq.*

24.     Bayer has known or should have known that its business practices—including but not limited to its insufficiently designed, articulated, and implemented assignment, promotion, discipline, demotion, evaluation, and compensation policies, practices, and procedures —have an illegal disparate impact on female employees, employees with family responsibilities, and pregnant employees.  Despite this knowledge, Bayer has failed to take measures to rectify such illegal disparate impact.

25.     The systemic gender discrimination described in this Amended Complaint has been, and is, continuing in nature.

26.     Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; backpay; front pay; compensatory, nominal and punitive damages; and attorney's fees, costs and expenses to redress Bayer's pervasive and discriminatory employment practices, policies and/or procedures.

27.     Had the remedies sought by the Class Representatives been in place – or had Bayer responded appropriately to address complaints of discrimination and harassment – the Plaintiffs who were forced out of the Company would still occupy their previous positions.

## II.     <u>JURISDICTION AND VENUE</u>

28.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action is based on Title VII, the EPA and FMLA, which are federal statutes. This Court has supplemental jurisdiction over Plaintiffs' New Jersey state law claims under 28 U.S.C. § 1367.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendants Bayer HealthCare Pharmaceuticals, Bayer HealthCare Consumer Care, and Bayer Corporation are headquartered in and transact a substantial portion of their business in New Jersey.

30.     A substantial part of the events or omissions giving rise to the claims set forth herein, including the discriminatory denial of pay and promotions, occurred in the State of New Jersey.

31.     Plaintiffs have standing to bring this suit as Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, and Ms. Lienhop have duly filed their administrative charges before the Equal Employment Opportunity Commission and have perfected or are in the process of perfecting their Rights to Sue.  These administrative charges gave notice of the class-wide nature of the allegations, including those alleged by other Named Plaintiffs.

## III.     <u>THE PARTIES</u>

32.     At all times relevant to this action, **PLAINTIFF VICTORIA BARGHOUT** has worked in Wayne, New Jersey.  Ms. Barghout was employed at Bayer from April 2008 until she was constructively discharged on October 3, 2011.

33.     At all times relevant to this action, **PLAINTIFF JENNIFER CHRISTIANSEN** has worked in Wayne, New Jersey.  Ms. Christiansen was employed by Bayer from September 2009 until she was terminated on December 2010.

34.     At all times relevant to this action, **PLAINTIFF BARBARA FERINGA** has worked in Wayne, New Jersey.  Ms. Feringa has been employed by Bayer since May 2007.

35.     At all times relevant to this action, **PLAINTIFF JENNIFER MUSUMECI** has worked in Wayne, New Jersey.  She was employed at Bayer from September 2007 to March 2010.

36.     At all times relevant to this action, **PLAINTIFF LAURA REILLY** has worked in Wayne, New Jersey. Ms. Reilly has been employed by Bayer since July 2005.

37.     At all times relevant to this action, **PLAINTIFF KAREN SALOMON** has worked in Wayne, New Jersey.  Ms. Salomon has been employed at Bayer since April 2006.

38.     At all times relevant to this action, **PLAINTIFF NATALIE CELSKE** has worked in field sales positions.  Ms. Celske has been employed at Bayer and its predecessor company since 1998.

39.     At all times relevant to this action, **PLAINTIFF VERA SANTANGELO** has worked in Morristown, New Jersey.  Ms. Santangelo has been employed at Bayer since April 2006.  In August 2011, she began Long Term Disability leave.

40.     At all times relevant to this action, **PLAINTIFF GRETCHEN LIENHOP** has worked in Shawnee, Kansas.  Ms. Lienhop has been employed at Bayer since April 4, 1994.

41.     At all times relevant to this action, **PLAINTIFF MARYJEAN SAWYER** has worked in Morristown, New Jersey.  Ms. Sawyer was employed at Bayer and its predecessor company from 1982 to 1988, and from 1992 to the present.

42.     At all times relevant to this action, **PLAINTIFF MICHELLE SIMPSON** has worked in Lexington, Kentucky.  Ms. Sawyer was employed at Bayer from May 2004 until February 2012.

43.     At all times relevant to this action, **DEFENDANT BAYER HEALTHCARE PHARMACEUTICALS** is and has been a company incorporated under the laws of Delaware and headquartered in Wayne, New Jersey.

44.     At all times relevant to this action, **DEFENDANT BAYER HEALTHCARE CONSUMER CARE** is and has been a company incorporated under the laws of Indiana and headquartered in Morristown, New Jersey.

45.     At all times relevant to this action, **DEFENDANT BAYER HEALTHCARE ANIMAL HEALTH** is and has been a company incorporated under the laws of Delaware and headquartered in Shawnee, Kansas.

46.     At all times relevant to this action, **DEFENDANT BAYER HEALTHCARE LLC** is and has been a company incorporated under the laws of Delaware and headquartered in Tarrytown, New York that conducts substantial business in New Jersey.

47.     At all times relevant to this action, **DEFENDANT BAYER CORPORATION** is and has been a multi-national company incorporated under the laws of Indiana and headquartered in Pittsburgh, Pennsylvania that conducts substantial business in New Jersey.

48.     **DEFENDANT HERM CUKIER** ("Defendant Cukier") is Vice President of Brand Management for Long-Acting Contraception in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

49.     Upon information and belief, Defendant Cukier actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

50.     **DEFENDANT DENISE D'AGOSTINO** ("Defendant D'Agostino") is Director of Human Resources at Bayer HealthCare Pharmaceuticals.

10

51.     Upon information and belief, Defendant D'Agostino actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

52.     **DEFENDANT SUSAN HERSTER** ("Defendant Herster") is Senior Director of Market Research in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

53.     Upon information and belief, Defendant Herster actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

54.     **DEFENDANT SEAN KOLB-HUNT** ("Defendant Hunt") is Vice President of Human Resources at Bayer HealthCare Pharmaceuticals.

55.     Upon information and belief, Defendant Kolb-Hunt actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

56.     **DEFENDANT DUNCAN LAMB** ("Defendant Lamb") is Vice President of Business Analytics in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

57.     Upon information and belief, Defendant Lamb actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

58.     **DEFENDANT LESLIE NORTH** ("Defendant North") is Vice President of Brand Management for Short-Term Contraception in Women's Healthcare at Bayer HealthCare Pharmaceuticals.

59.     Upon information and belief, Defendant North actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

60.     **DEFENDANT STEFAN OELRICH** ("Defendant Oelrich") is Vice President and General Manager of Women's Healthcare at Bayer HealthCare Pharmaceuticals.

61.     Upon information and belief, Defendant Oelrich actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

62.     **DEFENDANT ROBERT ROSEN** ("Defendant Rosen") was Vice President of Global Oncology at Bayer HealthCare Pharmaceuticals.

63.     Upon information and belief, Defendant Rosen actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

64.     **DEFENDANT TODD WILLIAMSON** ("Defendant Williamson") is Vice President for Health Economics and Outcomes Research at Bayer HealthCare Pharmaceuticals.

65.     Upon information and belief, Defendant Williamson actively and knowingly took actions that aided and/or abetted discriminatory actions against members of the Class on account of their gender and family responsibilities.

66.     **DEFENDANT FRANK KNAPP** ("Defendant Knapp") is Vice President of Global Business Planning and Administration at Bayer HealthCare Consumer Care.

67.     Upon information and belief, Defendant Knapp actively and knowingly took actions that aided and/or abetted sexual harassment and/or discriminatory actions against members of the Class on account of their gender and family responsibilities.

68.    **DEFENDANT LAWRENCE PLATKIN** ("Defendant Platkin") is Vice President and Compliance Officer at Bayer HealthCare.

69.    Upon information and belief, Defendant Platkin actively and knowingly took actions that aided and/or abetted sexual harassment and/or discriminatory actions against members of the Class on account of their gender and family responsibilities.

70.    **DEFENDANT CLEVE SCOTT** ("Defendant Scott") is Director and Senior Counsel for Bayer HealthCare.

71.    Upon information and belief, Defendant Scott actively and knowingly took actions that aided and/or abetted sexual harassment and/or discriminatory actions against members of the Class on account of their gender and family responsibilities.

## IV.    FACTUAL ALLEGATIONS

### A.    MS. BARGHOUT'S FACTUAL ALLEGATIONS

72.    Ms. Barghout is a former employee of Bayer.  At the time of her separation, she held the title of Director of the Oncology Division for Health Economics and Outcomes Research.

73.    Ms. Barghout consistently achieved superior performance results.  She received multiple Excellence Awards and was nominated for the prestigious Success Together Achieves Results ("STAR") and Special Recognition Award ("SRA") Awards.

74.    In addition, she was asked to lead initiatives for the Executive Committee of the Company, which reports directly to the President of Bayer HealthCare Pharmaceuticals—a responsibility granted to only a handful of the Company's most valued employees.

75.    Despite her obvious skills and qualifications, Ms. Barghout was discriminated against on account of her gender, her pregnancy, and her family responsibilities.  She has been

13

denied promotional opportunities, subjected to unfair and unwarranted disciplinary measures, discriminatorily demoted, given unfair performance evaluations, and subjected to discriminatory actions that have stalled her career and harmed her professional reputation.  She was also subjected to escalating retaliation after the filing of this lawsuit.  After her repeated requests and complaints were met with indifference by her managers, she was left with no choice but to resign on October 3, 2011.

### 1. Ms. Barghout's Educational And Work Background Prior To Her Employment At Bayer

76.     Ms. Barghout obtained a Bachelor of Science Degree from Loyola University Maryland.

77.     Ms. Barghout obtained a Masters of Science Degree in Public Health from the University of North Carolina School of Public Health.

78.     After obtaining her Masters degree, Ms. Barghout worked for twelve years in the pharmaceutical industry as a health economist.  During this period, her work was published in dozens of peer reviewed publications and received attention from numerous media outlets.

### 2. Ms. Barghout's Employment With Bayer

#### a. Oncology Division for Health Economics and Outcomes Research – Deputy Director: April 2008 to June of 2008, Wayne, New Jersey

79.     Ms. Barghout began her employment with Bayer in April 2008 as a Deputy Director of the Oncology Division for Health Economics and Outcomes Research ("HEOR") at Bayer's Wayne, New Jersey location.  During her three months in that position, Ms. Barghout reported to Director for HEOR Joanne Chang ("Director Chang").

          **b.**      **Oncology Division for Health Economics and Outcomes Research – Interim Director and Director: June 2008 to January 2010, Wayne, New Jersey**

80.      In June 2008, Director Chang left the company. At that time, Ms. Barghout acted as Interim Director for HEOR.

81.      During her time as Interim Director, Ms. Barghout was nominated for a STAR Award for her instrumental role in moving the company forward.

82.      Due to her superior performance as Interim Director, Ms. Barghout permanently assumed the Director position in December 2008, where she continued until her constructive discharge from the Company in October 2011.

          **3.**      **Bayer's Retaliatory and Discriminatory Acts Against Ms. Barghout**

          **a.**      **Discriminatory Denial of Promotion**

83.      After Ms. Barghout became Director, Vice President of Medical Affairs Paul MacCarthy created a new position one level higher than the Director position, called Vice President for HEOR.

84.      Based on her success and experience within HEOR, Ms. Barghout applied for the Vice President position.

85.      The Company considered two candidates for the Vice President position: Ms. Barghout and Defendant Williamson.  Unlike Ms. Barghout, who had worked for the Company for several months, Defendant Williamson was an outside candidate who had never worked for Bayer.

86.      Normally, the Company gives internal candidates priority over external candidates.  As Ms. Barghout's qualifications were at least equal to those of Defendant

Williamson, her internal tenure at the Company should have resulted in her selection for the position.

87.     In January 2009, Ms. Barghout learned that Bayer awarded the Vice President position to Defendant Williamson and that he would serve as her supervisor.

88.     At the time, Ms. Barghout had primary caretaking responsibility for her young daughter and had expressed interest to her supervisors in having more children.

89.     Upon information and belief, the Vice Presidents responsible for the hiring decision, including Vice President of Global HEOR Kathleen Gondek, Vice President of Oncology and General Medicine Pam Cyrus, and Vice President of Medical Affairs Paul MacCarthy, did not support her candidacy for the position on the basis of her gender and her family responsibilities.  Further, Bayer's promotion practices, policies, and procedures lacked sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on or treatment of female professionals.

**b.     Discriminatory Disciplinary Measures**

90.     Following the discriminatory denial of promotion of January 2009, Ms. Barghout began to work as Director for HEOR under Defendant Williamson.  At this time, she informed him that she was pregnant.

91.     In the following months, Ms. Barghout received several awards from the Company for her achievement with the Leukine Initiative.  She received Excellence Awards in February 2009 and March 2009.  Additionally, in recognition of her strong performance, she was asked in February 2009 to lead the Women's Healthcare Portfolio, the largest and most lucrative portfolio at Bayer.

92.     When Leukine was sold to another company later in 2009, Ms. Barghout was charged with its transfer.  She received an award in May or June 2009 for her successful completion of the transfer as well as her superior performance throughout her time working on the Leukine Initiative.

93.     From January 2009 to June 2009, Ms. Barghout secured a substantial amount of press coverage regarding significant industry publications and conferences related to Bayer products.  She was recognized by the Company as the first employee within HEOR at Bayer to achieve this level of success in promoting its products.

94.     Despite this success, Defendant Williamson became increasingly hostile to Ms. Barghout over the course of the year.  Ms. Barghout, confused by this hostility in light of her superior performance, nonetheless attempted to meet and exceed every expectation set for her and to otherwise maintain a professional and positive attitude at work.

95.     However, due to Defendant Williamson's undue levels of criticism and hostility, Ms. Barghout began experiencing a great deal of stress and anxiety.  In March 2009, she experienced a miscarriage and took one week of sick time.

96.     On August 24, 2009, without warning, Defendant Williamson issued a warning letter to Ms. Barghout.  He gave two bases for this warning letter: (1) lack of "teamwork and cooperation" with global colleagues, and (2) "noncompliance" with Company processes. Specifically, the warning stated that she failed to obtain legal, medical, and regulatory approval for particular documents.

97.     Ms. Barghout responded to the first allegation by citing emails from colleagues and recent awards evidencing her high reviews for teamwork.  She also reminded Defendant Williamson that she had been selected by the Company to lead several teams, including the

Leukine Initiative and two Executive Committee initiatives for the President of Company, precisely because of her strong collaborative skills.

98.    Ms. Barghout responded to the second allegation by pointing out that the documents in question did not require legal, medical, and regulatory approval. She also pointed out that a male colleague, Ronald Preblick, followed the same procedure as her for similar documents but that he did not receive any warning letter.

99.    Following the delivery of this warning letter, Ms. Barghout contacted Defendant Kolb-Hunt to express her concerns regarding the unwarranted allegations in the letter. Although the two had never met, Defendant Kolb-Hunt launched into a lecture regarding how Ms. Barghout had "behavioral problems" and failed to respect authority.  Defendant Kolb-Hunt stated, "I know women like you!"  Upon information and belief, Defendant Kolb-Hunt's criticisms were based on a perception that Ms. Barghout did not adequately conform to gendered ideas about femininity and how a woman ought to behave in the workplace.

100.    Defendant Kolb-Hunt refused to explain the requirements of the warning letter or address Ms. Barghout's concerns regarding its appropriateness.

101.    On August 25, 2009, Ms. Barghout notified Defendant Williamson that she was pregnant again.

102.    During the same time period, Ms. Barghout learned that Defendant Williamson and male employee John O'Connell were contacting her vendors to question them regarding her performance and contracts.  Upon information and belief, such contact is neither required nor typical in the performance evaluation process, and the purpose of such contact was to try to build a record against Ms. Barghout for the purpose of terminating her employment.

103.    In October 2009, during a meeting with Defendant Williamson, Defendant Kolb-Hunt, and HR Representative Sandra James ("Ms. James"), Ms. Barghout learned that the warning letter would be removed from her file.   Upon information and belief, this was in recognition that its inclusion was unfounded and improper.

104.    Nonetheless, at the same meeting, Defendant Kolb-Hunt and Ms. James persisted in discussing ways Ms. Barghout should "improve her relationships" with global colleagues.

105.    During this conversation, Defendant Kolb-Hunt became condescending and confrontational, baselessly accusing Ms. Barghout of failing to respect authority figures and of "behavioral problems."

106.    Although Defendant Kolb-Hunt committed to working with Ms. Barghout to "overcome" these alleged problems, and despite Ms. Barghout's numerous attempts to follow up with her, Ms. Barghout did not receive any direction from anyone at HR regarding these alleged problems.   Rather, representatives at HR responded to her questions by stating that they were "too busy" to provide such direction.

107.    In addition, representatives at HR rebuffed Ms. Barghout's attempts to propose proactive solutions.   For example, her proposal for an executive coach to assist her in working through the alleged "behavioral problems" was denied.   In fact, Ms. Barghout did not receive any direction or assistance from HR until a pretextual email was sent five months later, shortly before the beginning of her maternity leave in March 2010.

108.    Shortly after the October 2009 meeting in which the "behavioral problems" were alleged, the Company once again recognized Ms. Barghout's strong performance by further enlarging her work responsibilities.   Specifically, a vice president tasked Ms. Barghout as the

lead HEOR employee to review two due diligence projects that Bayer was interested in purchasing.

### c.      Discriminatory Demotion

109.    Despite her record of award-winning success, in January 2010, Defendant Williamson demoted Ms. Barghout from the Director position to the Deputy Director position. Defendant Williamson stated that the demotion resulted not from performance issues but from "restructuring" within the Company. Specifically, he stated—falsely—that her position was eliminated because she "lacked direct reports."

110.    Immediately following that meeting, Ms. Barghout provided to Defendant Williamson a list of numerous Directors within the Company lacking direct reports, none of whom were affected by the purported restructuring.  At that time, Defendant Williamson gave a different reason for Ms. Barghout's demotion, stating vaguely that it was an "equity issue."

111.    Ms. Barghout also spoke with Vice President of Managed Markets Alex Santini ("VP Santini"), who led restructuring initiatives at the Company.  VP Santini stated that there had been no restructuring within HEOR and that Bayer was, in fact, preparing to increase the number of employees within HEOR.

112.    Around this time, Defendant Williamson made threatening statements to Ms. Barghout regarding the status of her employment.  Specifically, he stated that she had "no future within the Company" and that she would "not be succeeding."

113.    This discriminatory demotion adversely affected Ms. Barghout's compensation and benefits, including her annual salary, annual bonus target, long-term bonus target, vacation days, and her stock options.

#### d.      Discriminatory Evaluation

114.    In February 2010, Defendant Williamson conducted Ms. Barghout's annual performance review for her performance in 2009.  He characterized her performance as "poor" on both scales of the evaluation: business side and behavioral side.  Specifically, he assigned the rating "partial meets" to both scales.

115.    During the *same time period covered by the annual performance review*, Ms. Barghout maintained two of the largest and most lucrative portfolios at the Company (Oncology and Women's Health), led two major initiatives for the Executive Committee, received numerous awards, and secured several publications.  Ms. Barghout subsequently learned that all other employees within HEOR received "meets" ratings or higher on their annual performance reviews for their performance in 2009.

116.    On information and belief, none of these employees were pregnant.

117.    Bayer's performance evaluation and compensation structures lack sufficient quality controls, standards, implementation metrics, transparency, and opportunities for redress that would have otherwise ensured that there was no disparate impact on or discriminatory treatment of female employees.  For example, neither evaluations nor compensation are consistently linked to objective measures of performance. Because performance evaluations bear on compensation, Ms. Barghout's discriminatory performance evaluation rating affected her standing at the Company as well as her compensation.  Specifically, she experienced a substantial decrease in her bonus for that year and received a minimal merit salary increase.

118.    On the same day that Defendant Williamson delivered this discriminatory performance review, Ms. Barghout suffered from cramping and premature contractions as a result of the stress that she was experiencing from Defendant Williamson's harassment and

discrimination.  At that time, she saw her OB-GYN, who prescribed one week of bed rest to address this stress.

119.    The following day, Ms. Barghout was nominated for the SRA Award for outstanding teamwork and superior results with managed markets.

120.    Following the delivery of the discriminatory performance evaluation, Ms. Barghout met with VP Santini to discuss her concerns regarding the unfair rating.  VP Santini advised her to dispute the unfair rating by collecting letters with positive feedback from her colleagues and stakeholders.  During the month of February 2010, she collected dozens of letters from employees at all levels of the Company, including the top-ranking executives in the Oncology division.  These materials conclusively demonstrated that Ms. Barghout should receive an "exceeds" rating.

121.    Upon receiving these materials, Defendant Williamson changed her rating from "partial meets" to "meets," but refused to further increase the rating to reflect her superior performance.  As a result, her compensation and bonus were reset to a "meets" level, which was still substantially lower than what it would have and should have earned for an "exceeds" rating.

122.    During this period of time, Ms. Barghout approached Defendant D'Agostino regarding her concerns that Defendant Williamson was not rating her performance fairly.  During their meeting, Defendant D'Agostino spoke with Ms. Barghout regarding her options.  Specifically, rather than sharing Ms. Barghout's concerns or offering recourse, Defendant D'Agostino stated, "This is just the way it is, deal with it."  Bayer's performance evaluation system lacked sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.

### e.      Pretextual "Promotional" Opportunity

123.    Ms. Barghout was scheduled to begin her maternity leave under Short Term Disability at the end of March 2010.  In late March, Defendant Williamson informed her that a Director position in the field force was opening.  He stated that this position would provide an opportunity to reverse her demotion and return to the Director level.

124.    Ms. Barghout submitted an application for the open position and completed a round of interviews on her final day of office work prior to maternity leave.

125.    During Ms. Barghout's interview, Vice President of Medical Affairs Pam Cyrus ("VP Cyrus") stated, "I'm really surprised that you're applying for this position."  At the time, Ms. Barghout did not understand the comment.

126.    However, directly following her interview, Ms. Barghout received notice from Defendant Williamson that the open position had been offered to and accepted by a male employee named Brian Seal ("Mr. Seal") who was hired from a different company.  VP Cyrus' comment, coupled with the timing of this announcement, suggested that Mr. Seal received an offer for the position before Ms. Barghout even completed the interview process.  Upon information and belief, Defendant Williamson suggested the position to Ms. Barghout with no intent for her actually to be considered for the position.

### f.      Disability Leave and Professional Disparagement

127.    After Ms. Barghout began her leave and directly before she delivered her child, she was diagnosed with breast cancer.  Her OB-GYN and Oncologist explained that her diagnosis was "breast cancer associated with pregnancy," and that stress can play a major role in the development of this kind of cancer.

128.    Ms. Barghout began Long Term Disability on September 30, 2010.  During her

leave, she underwent a double mastectomy as a part of the treatment for her breast cancer and underwent over a year of chemotherapy.

129.    While on leave, Ms. Barghout learned from a colleague that male employees at the Company made inaccurate statements harmful to her professional reputation during her leave.  For example, a male employee asked other employees within the Company what was *really* wrong with Ms. Barghout, implying that she was making excuses to extend her leave.

130.    Ms. Barghout also learned that several employees associated with her position who might vouch for her excellent and dedicated work history, including her administrative assistant and her consultant, were terminated.

131.    Defendant Williamson selected Mr. Seal to assume some of Ms. Barghout's work responsibilities during her leave.  On information and belief, Mr. Seal made comments to Ms. Barghout's colleagues and other pharmaceutical professionals undermining her work.  These unfounded statements caused significant harm to her professional reputation.

132.    Ms. Barghout remained on disability leave until September 1, 2011.

### g.    Retaliation and Constructive Discharge

133.    After Ms. Barghout returned to full-time employment at Bayer on September 1, 2011, she was subjected to increasing retaliation by her superiors, colleagues, and subordinates because of her participation in this lawsuit.  Specifically, Bayer reduced her responsibilities and attempted to isolate her from her colleagues.

134.    On August 25, 2011, Ms. Barghout emailed Ms. James to remind her that she was scheduled to resume work on September 1, 2011.  On August 29, 2011, Ms. James informed Ms. Barghout that VP Williamson was making the necessary arrangements for her return.

135.    The first week after she returned to Bayer, VP Williamson informed Ms.

24

Barghout that she would no longer be responsible for overseeing the overall oncology portfolio which included three products but instead would work on only one, Nexavar.  The remaining two products remained assigned to Mr. Seal, even though Mr. Seal's job description as Field Director did not include oversight of these oncology products.

136.    After Ms. Barghout learned that she would oversee only Nexavar, she expressed her concern to VP Williamson and her desire to resume her full previous responsibilities, including oversight for the remaining two oncology products, Alpharadin and Regorafenib.  VP Williamson replied that he had been instructed to give her only Nexavar.

137.    Even for the one product for which she was allowed to resume responsibility, Ms. Barghout was not allowed to fully assume that role and fulfill her duties. In the days that followed, Ms. Barghout reached out to Mr. Seal on several occasions to inquire about the steps needed for her to transition fully into the Nexavar role.  He consistently ignored her inquiries. As a result of this treatment, she was unable to perform her job duties.

138.    Further, upon her return, Mr. Seal continued to perform as interim Head of Oncology.  Ms. Barghout was clearly more qualified than Mr. Seal for the position, as she had performed at or above expectations while she held the role and he had struggled while holding it in an interim capacity.

139.    Specifically, Ms. Barghout had learned that Mr. Seal's performance as "Head of Oncology" was so disappointing during her leave that he had been removed from one of the key products in January 2011.   However, despite the fact that Mr. Seal had demonstrated poor performance in the role of Head of Oncology, Bayer did not allow Ms. Barghout to reassume responsibility for the product or of her position generally.

140.    In addition, during her absence in 2010, Bayer had prematurely circulated internal

materials that listed her at a demoted title of Deputy Director.  The title change, discussed above, was discriminatory.  Nonetheless, she had been promised it would not take effect until January 2011.  In addition, during her leave, Bayer cut her annual base salary by $14,000 and began to compensate her at this reduced rate.

141.   After her return, Bayer also deprived Ms. Barghout of professional support and disparaged her professional reputation.  Specifically, despite Ms. James' statement that VP Williamson was preparing for her return, she soon learned that no one else besides a select few of her Nexavar teammates had been informed that she would be returning.  Further, Bayer removed her from her previous office and placed her into an ill-equipped office located far from her immediate colleagues and administrative assistant.  Ms. Barghout raised concerns about this to VP Williamson on several occasions, but was not moved back to her former office until nearly two weeks after her return.  Bayer's actions resulted in confusion amongst her superiors and colleagues, who did not know where she was, when she was in the office, or if she was still engaged in any substantive work for the franchise.  For example, days after Ms. Barghout's return, VP Campbell expressed complete surprise when she saw that Ms. Barghout had returned to work.

142.   In addition, Bayer failed to provide Ms. Barghout with the resources necessary for her to complete her duties and refused to integrate her back into the workplace.  Bayer failed to order the proper computer or provide her with printer access.  Bayer also did not connect the computer she was given to the network, making it difficult for her to perform her duties.

143.   She expressed concerns to VP Williamson that she could not fully perform her job duties without full access to Bayer's network or the necessary resources.  Two weeks passed before VP Williamson's Executive Assistant, Celia Lathrop, responded to Ms. Barghout,

26

informing her that she would not receive her computer until sometime in October.

144.   Further, upon her return, Ms. Barghout was informed by her administrative assistant that Manager of Operations, Jennifer Cameron ("Ms. Cameron"), had made disparaging statements to other employees following the filing of the lawsuit.  Specifically, Ms. Cameron had told other members of the office that Ms. Barghout was "wicked" and instructed the administrative assistants to monitor Ms. Barghout and report her actions to Ms. Cameron.  Ms. Cameron and VP Williamson also retaliated against Ms. Barghout's administrative assistant for demonstrating unwillingness to participate in the retaliatory actions directed at Ms. Barghout.

145.   Bayer's retaliation against Ms. Barghout made it impossible for her to fully resume her role, and her repeated attempts to reassume the responsibilities of her position were consistently ignored.  As a result of the retaliatory treatment of her and the isolation and stress that it caused, Ms. Barghout suffered from severe anxiety, nausea, weight loss, and insomnia, which continued until the time she left the Company.  While at Bayer, the stress was so severe that she sought professional therapy.

146.   Bayer's failure to respond to her complaints made it clear that they were not going to take action to address her concerns or provide her with the necessary resources or otherwise allow her career to progress unimpeded by retaliation.  Reduced to a minor role for which she was only minimally involved, isolated from her team and the necessary resources, and otherwise singled out for suspicion and derision, Ms. Barghout was branded with the stamp of her protected activity and sidelined as a legitimate career professional.

147.   Familiar with the devastating potential physical consequences of work-related stress on one's health, and no longer able to tolerate the retaliatory environment to which she was being subjected, Ms. Barghout had no choice but to resign from the Company effective

October 3, 2011.

**B.    JENNIFER CHRISTIANSEN'S FACTUAL ALLEGATIONS**

148.    Ms. Christiansen is a former employee of Bayer.  She was unlawfully terminated during her maternity leave in December 2010.  Prior to that time, she held the title of Associate Director of Consumer Marketing in the Women's Healthcare Division.

149.    While at Bayer, Ms. Christiansen consistently achieved strong performance results, receiving the Employee of the Month Award in June 2010, which included a cash bonus and an opportunity to lead the Women's Healthcare Division monthly meeting.

150.     Despite her strong performance, she was subjected to a hostile work environment and wrongfully terminated on account of her pregnancy.

**1.    Ms. Christiansen's Educational And Work Background Prior To Her Employment At Bayer**

151.     Ms. Christiansen received a Bachelor of Arts Degree from Loyola University Maryland.

152.    Prior to joining Bayer, she worked in brand marketing at a pharmaceutical company for three years and in advertising for ten years.

**2.    Ms. Christiansen's Employment with Bayer**

**a.    Consumer Marketing, Women's Healthcare Division – Associate Director: September 2009 to December 2010, Wayne, New Jersey**

153.    Ms. Christiansen began her employment with Bayer in September 2009 as a contract employee serving as Associate Director of Consumer Marketing in the Women's Healthcare Division.  In February 2010, she was hired as a full-time employee into that position.

154.   Ms. Christiansen reported to Director of Consumer Marketing in Women's Healthcare Samuel Trujillo ("Director Trujillo") and subsequently to Deputy Director of Brand Marketing in Women's Healthcare Beth Bell ("Deputy Director Bell").

3.   **Bayer's Retaliatory and Discriminatory Acts Against Ms. Christiansen**

a.   **Hostile Work Environment**

155.   Throughout her employment, Ms. Christiansen's male supervisors subjected her and her female colleagues to harsher criticism than that directed at male counterparts.  Her male managers made disparaging comments about the commitment and ability of female employees of reproductive age, reflecting a corporate culture – shared among executives and upper management – that consistently devalued the abilities of female employees.

156.   In January 2010, Ms. Christiansen informed Deputy Director Bell that she was pregnant with her first child. Although Manager Bell was supportive of her, Ms. Christiansen hesitated to share her pregnancy with other supervisors as they had expressed their preference for employees without childcare responsibilities.

157.   As she feared, after Ms. Christiansen announced her pregnancy and her maternity leave, she experienced hostile treatment directed from high-ranking officers within the Company.

158.   In July 2010, Ms. Christiansen led the monthly Women's Healthcare Division staff meeting as recognition for the Employee of the Month Award presented to her in June 2010.  During that meeting, which took place approximately one week prior to the start of her maternity leave, Defendant Oelrich inappropriately commented on her pregnancy.

159.   Specifically, when Ms. Christiansen rose from her chair and approached the podium with her laptop computer, Defendant Oelrich commented to the full staff that she did not

29

need to use the podium because her belly was so large.  Ms. Christiansen felt humiliated and uncomfortable that Defendant Oelrich brought attention to her physical appearance. Furthermore, she was deeply upset that Defendant Oelrich made the comment in such a way that made it clear he disapproved of her pregnancy and that he tried to undermine her contributions to the meeting by bringing attention to that fact.

160.    Although Ms. Christiansen wanted to report Defendant Oelrich's comment to HR, she declined to make a report because she feared retaliation and because she believed that HR was ineffective.   When Ms. Christiansen had contacted HR with questions regarding her maternity leave, HR Representative Marilyn Hundley ("Ms. Hundley") did not address her questions, instead directing her to a website with general maternity leave information that did not respond to the specific inquiries raised by Ms. Christiansen.  Based on this interaction, as well as a sense among her peers that complaints directed at high-ranking officers often result in retaliation, Ms. Christiansen did not report Defendant Oelrich's comment.

161.    Ms. Christiansen took maternity leave as Short Term Disability from July 2010 to October 2010.  Because she was not eligible for maternity leave under the Family Medical Leave Act, she extended her maternity leave by taking unpaid leave starting in October 2010.

162.    In October 2010, she went to the Company's offices in Wayne, NJ to introduce her infant son to several of her colleagues.  She visited with another female employee who had recently returned from maternity leave, Ms. Feringa.  During their visit, Defendant Oelrich passed them in the hallway and commented, "There are babies everywhere. I need to stop hiring women of reproductive age."

163.    A reasonable employee would understand Defendant Oelrich's comments as a clear expression of his preference for male employees or for female employees without children.

### b.      Discriminatory Denial of JobShare Opportunities

164.    Leading up to her maternity leave, Ms. Christiansen spoke with Deputy Director Bell regarding JobShare opportunities.  In June 2010, she notified Deputy Director Bell that she would be interested in exploring JobShare opportunities when she returned from leave.

165.    Initially, Deputy Director Bell was supportive of Ms. Christiansen's interest; however, she later told Ms. Christiansen that Defendant Oelrich had responded to Ms. Christiansen's request for JobShare by stating that he was "no longer doing or approving JobShare."  He provided no further explanation for his denial of this JobShare opportunity, but made clear that whatever the written policy, the practice would be that she could not pursue a JobShare.

166.    Defendant Oelrich's flat denial of Ms. Christiansen's request for JobShare despite her excellent record and general qualifications for a JobShare was further discrimination based on her family responsibilities.  His decision to deny the JobShare was consistent with his comment regarding preferring employees who are not women of reproductive age or women with child-rearing responsibilities, and was designed to make it more difficult for Ms. Christiansen or other women like her to remain at the Company.

### c.      Retaliation and Wrongful Termination

167.    In November 2010, during her unpaid leave, Ms. Christiansen was contacted by Defendant North.  During their telephone call, Defendant North informed her that the Company was undergoing a "reorganization" during her maternity leave.  She stated that Ms. Christiansen would report to Deputy Director Heidi Schnell upon return from leave.

168.    During this telephone call, Defendant North made it clear that she believed Ms. Christiansen would not be committed to her job after returning from maternity leave.

Specifically, she stated emphatically that the new position was *not* a JobShare position but instead was a "serious job." She also told Ms. Christiansen that working for her would not be a "nine-to-five job." She spoke to Ms. Christiansen in a condescending tone during this conversation, and generally implied that she believed Ms. Christiansen would be an unreliable or unproductive employee.

169.   Defendant North has a reputation within the Company for preferring employees without primary childcare responsibilities. She has stated on multiple occasions her belief that children should be raised by nannies and that having a nanny is the solution to work being first. She has also selected less-qualified employees in her hiring decisions rather than more-qualified employees with primary childcare responsibilities.

170.   Shortly after this conversation, Ms. Christiansen learned about a JobShare opportunity on another brand within the Women's Healthcare Division. Specifically, she learned that an equivalent position at another brand in the Women's Healthcare Division would become available at the time that she planned to return to work.

171.   In November 2010, Ms. Christiansen emailed Defendant Cukier regarding this opportunity. Defendant Cukier responded with an email stating that he had "no plans to make any staffing changes." Defendant Cukier copied Defendant Oelrich, Defendant North, and Ms. Hundley on this correspondence.

172.   Because Defendant Cukier's email provided no explanation for the denial of another JobShare opportunity, Ms. Christiansen contacted HR at the end of November 2010. In response to her questions about the decision to deny her JobShare request, the HR Representative stated that the decision "was up to Stefan Oelrich and not to HR."

173.    Ms. Christiansen received no further explanation for the denial, and HR did not offer any assistance or investigate the matter further.

174.    On December 1, 2010, during her unpaid leave, Ms. Christiansen received a call from Defendant North and Ms. Hundley.  During this call, Defendant North stated that the brand to which Ms. Christiansen had recently been reassigned was not doing well.  Defendant North announced that the Company was eliminating consumer marketing for that brand and therefore Ms. Christiansen's position.

175.    However, this excuse was nothing more than pretext.  Upon information and belief, Ms. Christiansen was the only employee who was terminated as part of the "elimination" of consumer marketing for this brand.

176.    Ms. Christiansen's termination clearly constitutes unlawful discrimination based on her gender, pregnancy, and family responsibilities as well as retaliation for her protected activities of being pregnant, availing herself of maternity leave, and requesting JobShare.

## C.    BARBARA FERINGA'S FACTUAL ALLEGATIONS

177.    Ms. Feringa is a current employee of Bayer.  She holds the title of Deputy Director of Marketing for Mirena in the Women's Healthcare Division.

178.    Throughout her tenure at Bayer, Ms. Feringa has consistently achieved strong performance results, receiving "meets expectations" or "exceeds expectations" on performance reviews for every year of her employment.  She has received multiple awards, including the SRA in 2009.  This award recognized her extraordinary contributions in 2008, including her leadership in serving as interim Director of Marketing for Mirena.

179.    Despite her strong performance, her career has stalled due to pervasive discrimination on the basis of her gender, family responsibilities, and pregnancy.

180.    Company management has, among other things, subjected her to discrimination and retaliation by paying her less than similarly-situated male employees, denying her career-enhancing opportunities and promotional opportunities in favor of less-qualified male employees, and subjecting her to increased scrutiny.

### 1.    Ms. Feringa's Educational And Work Background Prior To Her Employment At Bayer

181.    Ms. Feringa graduated with highest distinction from University of North Carolina at Chapel Hill.  She obtained a Masters Degree in Public Health and a Masters Degree in International Affairs from Columbia University.

182.    Prior to joining the Company, Ms. Feringa worked as a public health contractor for the United States Government for seven years.  Additionally, she held a marketing position at a healthcare company for five years.

### 2.    Ms. Feringa's Employment with Bayer

#### a.    Mirena Division, Women's Healthcare – Assistant Director: May 2007 to August 2008, Wayne, New Jersey

183.    Ms. Feringa began her employment with Bayer in May 2007 as Assistant Director of Marketing for Mirena in Women's Healthcare at Bayer's Wayne, New Jersey location.

#### b.    Mirena Division, Women's Healthcare – Associate Director: August 2008 to December 2008, Wayne, New Jersey

184.    In August 2008, Ms. Feringa was mapped into the position of Associate Director of Marketing for Mirena in Women's Healthcare at Bayer's Wayne, New Jersey location.

c. **Mirena Division, Women's Healthcare – Deputy Director: December 2008 to Present, Wayne, New Jersey**

185. In December 2008, Ms. Feringa received the position of Deputy Director of Marketing for Mirena in Women's Healthcare at Bayer's Wayne, New Jersey location. Ms. Feringa continues to hold this title.

3. **Bayer's Discriminatory and Retaliatory Acts Against Ms. Feringa**

a. **Discriminatory Compensation**

186. During her employment at Bayer, Ms. Feringa's supervisors denied her pay equal to that of her male counterparts and refused to timely address pay disparities.

187. Bayer's base compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress and challenge to ensure that female employees are compensated commensurate with their abilities, qualifications, and responsibilities. As a result of these flaws in the system and/or because Bayer has taken advantage of its highly subjective compensation practices, female employees are paid less than similarly-situated male employees.

188. In May 2007, Ms. Feringa was hired by Bayer for the position of Assistant Director of Marketing for Mirena in the Women's Healthcare Division. The hiring manager was Director of Marketing for Mirena in the Women's Healthcare Division Catherine Holtz ("Director Holtz"), and the recruiter was Jennifer Hinkle ("Ms. Hinkle").

189. Prior to joining Bayer, Ms. Feringa held the position of Marketing Director, Worldwide, Gynecology at another healthcare company. In that position, she earned an annual base salary of approximately $135,000.

190. The original employment offer extended by Director Holtz and Ms. Hinkle included an annual base salary of approximately $119,000. Ms. Feringa was hesitant to accept

35

this offer as both the title and compensation were inferior to her title and compensation with her previous employer.

191.    When Ms. Feringa expressed this hesitation to Ms. Hinkle and worked to negotiate a higher annual base salary, she was told that the position would soon undergo a reclassification during which she would be promoted to an Associate Director position and receive a salary increase.  Director Holtz and Ms. Hinkle acknowledged that the position and compensation were "lower than what [Ms. Feringa] deserved" and promised to reclassify her at the earliest opportunity.  In addition, Director Holtz stated that she wanted to hire Ms. Feringa because Ms. Feringa would be qualified to assume the Director title when Director Holtz moved to a higher position within the Company.

192.    Based on these representations from Director Holtz and Ms. Hinkle, Ms. Feringa accepted an offer at an annual base salary of approximately $125,600.

193.    Contrary to the representations from Director Holtz and Ms. Hinkle regarding an immediate reclassification, Ms. Feringa was not reclassified to an Associate Director position until approximately August 2008, or about 15 months after her date of hire.

194.    Additionally, although Director Holtz told Ms. Feringa on numerous occasions that she had attempted to secure a salary increase for her from Vice President of Marketing for Women's Healthcare Paul Bedard ("VP Bedard"), Ms. Feringa later learned from him that Director Holtz had never approached him regarding Ms. Feringa's compensation concerns.

195.    Ms. Feringa achieved outstanding performance results during her first year at the Company.  Yet Bayer requires managers to assign performance ratings according to a forced distribution such that performance ratings do not correspond to objective measures of performance.  During Ms. Feringa's annual review meeting in February or March 2008, Director

Holtz stated that she wanted to rate Ms. Feringa's performance as exceeding expectations but was "required" to assign a "meets expectations" rating.

196.     Soon thereafter, Ms. Feringa learned that she would receive a minimal merit increase.   Ms. Feringa was told that she was hired at the "high end" of the salary range for her job level (VS 1.2) and that the Company's compensation guidelines "required" this minimal merit increase to keep her salary within range for her job level.   However, Ms. Feringa later learned that the cap of the salary range for her job level was approximately $5,000 greater than what Director Holtz had told her it was and that her merit increase could and should have been greater.

197.     Based on Ms. Feringa's experience during her first several months at Bayer, she learned that her responsibilities far exceeded those of her peers in the VS 1.2 job level.   In fact, the majority of her colleagues assumed that Ms. Feringa was an Associate Director, which is a level above Assistant Director and classified at a VS 1.3 job level.   Ms. Feringa's counterpart in the Yaz marketing team held the title Associate Director and the job level VS 1.3 with accompanying higher earning potential.

198.     In 2010, the Women's Healthcare Division was assigned a new HR Representative, Ms. Hundley.   During a meeting with Ms. Hundley in February 2010, Ms. Feringa repeated her concerns that her salary remained below the range or at the bottom end of the range for her position and job level.

199.     Nearly a year after this conversation, in December 2010, Defendant Cukier called Ms. Feringa into his office.   He told Ms. Feringa that HR had completed a salary analysis and confirmed that her salary was lower than similarly-situated employees.   He explained that Ms. Feringa would receive an equity adjustment, bringing her salary to approximately $165,000.

200.     Following this meeting, Ms. Feringa received a call from Ms. Hundley regarding the equity adjustment.  Ms. Hundley told Ms. Feringa that she had pushed for the Company to grant a retroactive salary adjustment as Ms. Feringa's salary had been below range for a long period of time.  Ms. Hundley explained that her request was denied and that she could not provide a retroactive adjustment.

201.     This conversation as well as the equity adjustment confirmed Ms. Feringa's concerns regarding disparate pay throughout her employment at the Company.  In addition, upon information and belief, Ms. Feringa continues to be underpaid.

### b.     Discriminatory Denial of Career-Enhancing Opportunities

202.     Ms. Feringa worked under the supervision of Director Holtz until she vacated the Director position in June 2008.  For the year during which Ms. Feringa worked under Director Holtz, she was denied numerous career-enhancing opportunities.

203.     During this timeframe, Ms. Feringa repeatedly asked Director Holtz for opportunities to display her skills and to gain visibility with the senior management team.

204.     Although Director Holtz had committed to preparing her for the Director position, Director Holtz repeatedly denied Ms. Feringa opportunities to advance her career.

205.     Furthermore, although Director Holtz claimed that she would speak with VP Bedard regarding Ms. Feringa's qualifications and potential for advancement, Ms. Feringa later learned from VP Bedard that Director Holtz never did so.

### c.     Discriminatory Denial of Promotional Opportunities

206.     Bayer promotes and develops employees within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably, or fairly develop and promote employees who demonstrate excellent results.  During Ms. Feringa's employment at

Bayer, the predominantly male senior management has denied her promotional opportunities for which she was qualified in favor of male employees.

207.    Bayer's advancement and promotion policies, practices, and procedures are not based on true comparative performance.  For example, managers utilize a highly subjective "bidding" process in which male employees who wish to be considered for development and promotion are given opportunities for advancement and career development, through channels that are not available to female employees.

208.    When Director Holtz vacated her position in June 2008, Ms. Feringa expected to be considered for the Director position based on representations made by Director Holtz during and subsequent to the time of her hire.

209.    When Ms. Feringa spoke with VP Bedard regarding the Director position, he informed her that she would not be invited to bid for the position.  When Ms. Feringa questioned his decision and referenced her superior performance in serving as interim director for several months, VP Bedard replied that the director position was "too high profile" for Ms. Feringa.  At that time, Ms. Feringa had served as interim director for several months.

210.    The Director position was given to Russell Barrans ("Director Barrans").  Ms. Feringa was passed over for the position despite having qualifications superior to him in educational background, strategic marketing experience, and medical device expertise.  In fact, Director Barrans commented at a later date that Ms. Feringa "could have taken the job" based on her qualifications.

211.    During this timeframe, in August 2008, Ms. Feringa was mapped to the position of Associate Director, which fell within a job level of VS 1.3.  Ms. Feringa received a minimal salary increase, bringing her annual base salary to approximately $133,000.  If Ms. Feringa had

instead received the Director position for which she was qualified, she would have received a significant base salary increase.

212.    Shortly after Ms. Feringa was mapped to the Associate Director position, the Company announced a major reorganization scheduled for December 2008.

213.    During the reorganization, Ms. Feringa's Associate Director position was eliminated and she was permitted to bid for the Deputy Director of Professional Marketing position (job level of VS 2.0).  Although Ms. Feringa received the Deputy Director position, she was offered a minimal salary increase to an annual base salary of approximately $139,000 for this higher job level.

214.    Based on this minimal salary increase and her ongoing compensation concerns, Ms. Feringa rejected the original offer and attempted to negotiate a higher salary.  Director Barrans confirmed her concerns, stating that this salary was below the median for the salary range for a VS 2.0 position.

215.    As a result of her efforts and the efforts of Director Barrans to negotiate a higher salary, Ms. Feringa was subsequently offered an annual base salary of approximately $145,000 for the Deputy Director position.

       **d.**     **Discriminatory Actions Related to Pregnancy and Maternity Leave**

216.    The work environment at Bayer represents a hostile work environment in which women, no matter how well they perform, can never feel comfortable or secure in their jobs.

217.    Throughout her employment, Ms. Feringa's supervisors have subjected her and her female colleagues to harsh criticism and have made disparaging comments about the commitment and ability of female employees, pregnant employees, and employees with childcare responsibilities.

218.     From 2007 through 2009, Ms. Feringa tried to become pregnant and underwent fertility treatments.  She was reluctant to share this information with the senior management, including Director Holtz, because of a corporate culture that discourages women from becoming pregnant.

219.     All of the women in Director positions in the Women's Healthcare Division had full-time childcare providers or did not have children.  Accordingly, Ms. Feringa felt that she would not be able to advance her career if she became pregnant and assumed primary childcare responsibilities.

220.     Several male and female managers have made negative comments regarding pregnancy and motherhood.  For example, Defendant Leslie North frequently warns employees not to "use childcare as an excuse."

221.     Similar statements have been directed by representatives of HR.  Specifically, contracted HR Representative Patty Gallagher ("Ms. Gallagher") made a presentation regarding career development in February or March 2009.   During the presentation, Ms. Gallagher presented a slide stating that "ability to travel to meet the needs of the position" represented a major consideration in certain selection decisions.  She further stated that the Company would take into consideration whether employees seeking advancement opportunities had young children when assessing this ability.

222.     In October 2009, Ms. Feringa underwent in vitro fertilization treatment and became pregnant.

223.     In December 2009, she met with Defendant Oelrich to tell him that she was pregnant.  Ms. Feringa explained that her pregnancy was "high risk" due to her age and explained that complications could require her to take extended leave during her pregnancy.

224.    During this timeframe, Ms. Feringa also discussed her career goals with Defendant Oelrich.  As Ms. Feringa was speaking with Defendant Oelrich, he interrupted to ask whether she even planned on returning to Bayer following her maternity leave.   He acknowledged that he "probably should not be asking that question," but nonetheless quizzed her, implying that her pregnancy and her motherhood would compromise her commitment to the job.

225.    Later, Defendant Oelrich made comments about Ms. Feringa, stating that she needed to "do whatever was needed" regardless of her pregnancy.  Such comments led Ms. Feringa to understand that Defendant Oelrich was hostile to her pregnancy and her impending leave.

226.    To the contrary, Ms. Feringa assumed more responsibilities and took on more work during the period she was pregnant and before going on leave.  To that end, effective in late January 2010, Ms. Feringa began serving as Interim Director.

227.    The Company decided that rather than hire a permanent Director, it would create a Vice President position.  Although Ms. Feringa expressed interest in this position and was qualified for the role as she handled the responsibilities as interim director, she was not invited to bid for the position.  Instead, the position was given to a man from a different pharmaceutical company, Defendant Cukier.

228.    Ms. Feringa took maternity leave from June 2010 until September 2010.  When she returned from maternity leave, she began reporting to Defendant Cukier.

229.    In October 2010, Ms. Feringa received an announcement stating that a male employee named Jan Georg Moeller had received a Director position within strategic planning. Ms. Feringa was never made aware of this position, nor was she invited to bid for the position.

230.   Despite her continued superior performance, Defendant Cukier has undermined Ms. Feringa's commitment and abilities following her return from maternity leave.  For example, Defendant Cukier called Ms. Feringa after she returned from leave to discuss an upcoming reorganization that would expand her responsibilities.

231.   When Ms. Feringa thanked Defendant Cukier for demonstrating confidence in her abilities by adding new responsibilities, Defendant Cukier responded that Ms. Feringa's reputation within the Company was generally positive, but he was concerned that Ms. Feringa was "still in mommy mode."  Based on the context of the comment and the manner in which it was delivered, Ms. Feringa understood that Defendant Cukier was surprised that her reputation remained positive because he believed that her childcare responsibilities had reduced her competencies.

232.   Furthermore, immediately following Ms. Feringa's return from leave, Defendant Cukier excluded her from several important meetings related to major strategic decisions for the brand.

233.   In October or November 2010, Ms. Feringa spoke with Defendant Oelrich regarding her concerns about how she saw her treatment having changed subsequent to her taking leave.  In an attempt to reassure Ms. Feringa that she was valued within the Company, Defendant Oelrich stated that Ms. Feringa was so highly regarded that she would have been promoted to a Director position within a different brand if she had not been "away over the summer"—referring to her protected activity of availing herself of maternity leave.

e.        **Retaliation**

234.    As a result of this ongoing and escalating discrimination and retaliation, Ms. Feringa filed a Charge with the Equal Employment Opportunity Commission on January 27, 2011.

235.    Subsequent to this filing, Ms. Feringa was notified that Bayer's management has disparagingly discussed her Charge with current and former employees.  Ms. Feringa was further notified that either current or former management is threatening that she will become "damaged goods" if she continues to pursue her claims.

D.        **JENNIFER MUSUMECI'S FACTUAL ALLEGATIONS**

236.    Ms. Musumeci is a former employee of Bayer.   As a result of escalating discrimination and retaliation, Ms. Musumeci had no choice but to resign from her position in March 2010.  Prior to that time, she held the title of Deputy Director of Market Intelligence.

237.    During her tenure at Bayer, Ms. Musumeci consistently excelled and received numerous accolades.  In 2008, she became President's Circle Winner and received the "On-the-Spot Award for Going Above and Beyond."  In 2009, she received President and CEO of Bayer HealthCare Pharmaceuticals Mark Trudeau's ("President Trudeau") nomination for the SRA Award and was selected for the Executrack Talent Management Program and the Diversity and Inclusion Counsel.

238.    Despite her outstanding performance, she was subjected to continuous discrimination on account of her gender.  Specifically, Bayer denied her pay equal to her male counterparts and subjected her to increased scrutiny and a hostile work environment.

1.   **Ms. Musumeci's Educational And Work Background Prior To Her Employment At Bayer**

239.   Ms. Musumeci completed a Masters Degree in Human Development and worked within the healthcare industry for seven years prior to joining Bayer.

2.   **Ms. Musumeci's Employment With Bayer**

a.   **Market Research in Women's Healthcare – Associate Director: September 2007 to December 2009, Wayne, New Jersey**

240.   Ms. Musumeci joined Bayer in September 2007 as an Associate Director of Market Research in the Women's Healthcare Division in Wayne, New Jersey.  In that position, she reported to Deputy Director of Market Research in Women's Healthcare Jack Morrison ("Deputy Director Morrison").

b.   **Market Intelligence – Deputy Director: December 2009 to March 2010, Wayne, New Jersey**

241.   In December 2009, the Company underwent a reorganization.  During that reorganization, Ms. Musumeci's title changed from Associate Director of Market Research in Women's Healthcare to Deputy Director of Market Intelligence.

3.   **Bayer's Discriminatory Acts Against Ms. Musumeci**

a.   **Discriminatory Compensation**

242.   During her employment at Bayer, Ms. Musumeci's supervisors denied her pay equal to that of her male counterparts and refused to address pay disparities.  Throughout her tenure as an Associate Director from September 2007 to December 2009, Ms. Musumeci spoke with Deputy Director Morrison on numerous occasions regarding her concern that her base salary was lower than the base salary of her counterparts.

243.   Bayer's compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress or challenge that

would otherwise have ensured that there was no disparate impact on or disparate treatment of female employees.  As a result of these flaws in the system and/or because Bayer management systematically took advantage of these flaws in the system, female employees are paid less than similarly-situated male employees – even after demonstrating evidence of disparities in pay. Although Deputy Director Morrison acknowledged that her base salary was lower than that of her male counterparts, he refused to correct the disparity in a timely fashion through an immediate salary adjustment.  Instead, Deputy Director Morrison claimed that he would attempt to bring her salary in line through sizeable merit increases.

244.    Ms. Musumeci never received any substantial increases to her base salary.

245.    After the Company's reorganization in December 2009, Ms. Musumeci learned that her base salary was significantly lower than the base salaries of Oguz Bakkal, Jack Morrison, Joseph Accumano, and Joseph Genuardi, male employees in comparable deputy director positions. Specifically, she learned that these male employees received base salaries of approximately $150,000.00.  At that time, her base salary was approximately $120,000.00.

246.    In December 2009, she approached Defendant Lamb regarding this pay disparity. During their discussion, Defendant Lamb made it clear that regardless of when or how Ms. Musumeci raised concerns about her pay, nothing would be done to address the gender disparity. In the course of the conversation, Defendant Lamb offered pretextual excuses for the unaddressed pay disparity, including that adjustments had to be made in 5% increments, and that adjustments could not be made for at least six months.

247.    Following this conversation, in February 2010, Ms. Musumeci approached Defendant Oelrich regarding disparate pay and Defendant Lamb's comments.  Defendant Oelrich also made it clear that he would not do anything to correct the situation.  Instead, he claimed that

only Defendant Lamb could correct her salary and that Defendant Lamb had the discretion to request from HR a salary adjustment greater than 5%. Defendant Oelrich would not acknowledge the gender disparity and did not offer to help.

### b.    Hostile Work Environment and Constructive Discharge

248.    Throughout her employment, Ms. Musumeci's male supervisors subjected her and her female colleagues to harsh criticism on the basis of their professional and personal activities, including but not limited to making disparaging comments about the commitment and ability of female employees.

249.    In late 2008, VP Bedard stated that he would not invest in the career development of a female employee because any female employee would inevitably lose interest in and commitment to her career advancement after taking maternity leave and having children. These comments left Ms. Musumeci with the distinct impression that he would prioritize the advancement of male employees in his selection decisions.

250.    Ms. Musumeci's male managers constantly and unfairly criticized her in condescending and unprofessional ways. For example, Director Trujillo frequently stated that she was incompetent, that she did not know what she was doing, and that she was not committed to her work in response to minor or nonexistent infractions.

251.    In fact, Director Trujillo's comments were baseless. During her tenure at the Company, Ms. Musumeci consistently achieved superior performance results and received numerous awards for her outstanding performance.

252.    In addition, Executive Management Trainee Ron Wang ("Mr. Wang") constantly undermined Ms. Musumeci's work by inserting himself into her job responsibilities and pressuring her to take his advice. Whenever Ms. Musumeci declined Mr. Wang's advice, he

responded that she was violating the Company's values and standards of behavior by "questioning his authority."

253.    In 2008, Ms. Musumeci contacted HR regarding this treatment by Mr. Wang, Director Trujillo, and other male managers and coworkers.  She described the hostile work environment to Ms. Gallagher and stated that if this treatment of her continued or escalated, it would soon become intolerable.  Ms. Gallagher replied that "harassment is a grey area" and that it was the nature of the Women's Healthcare business unit.  Further, she suggested that Ms. Musumeci should handle the problems by herself.  On information and belief, Ms. Gallagher did not take any immediate steps to address the hostile work environment, and the hostility continued until Ms. Musumeci's resignation.

254.    Indeed, even after she had spoken with HR, Bayer continued to subject Ms. Musumeci to discriminatory treatment.  For example, Mr. Wang, VP Bedard, and Director Trujillo would dismiss her ideas and ignore her contributions at group meetings.  They also openly and unfairly criticized her work during these meetings, which they did not do to her male counterparts.  In addition, Mr. Wang and Director Trujillo made disparaging comments about her to her colleagues even though during this period she continued to be an excellent performer in order to isolate and diminish her further.  Upon information and belief, this hostile environment and treatment was intended to limit and downplay her contributions to the business, to punish her for her legitimate complaints to HR and to otherwise drive her from the Company.

255.    From 2009 to 2010, Ms. Musumeci served on the Diversity and Inclusion Council.  Her work with the Council focused on the lack of diversity within the work force and the lack of female representation within leadership positions.  Although she had hoped to address the Company's hostile treatment of female employees through her work on the Council, she was

instructed that the Council was not designed to affect policy change or involve itself in HR processes or decisions regardless of the problems that it identified.  In fact, the Council was specifically instructed to overlook gender disparities and was prevented from offering programming on gender issues.

256.    As a result of the discrimination she faced, Ms. Musumeci experienced severe stress and anxiety that led to insomnia, migraines, digestive problems, and loss of appetite.  She had difficulty maintaining her personal relationships and also suffered from increased asthma attacks and respiratory illnesses, the timing and duration of which coincided with periods of heightened stress.  These symptoms continued up until the date of her resignation.

257.    In March 2010, after years of being subjected to pay discrimination and a hostile work environment created by her male managers, it had become clear that upper management and HR had not and were not going address her complaint, and that Company-wide committees such as the Diversity and Inclusion Council were not equipped or empowered to address discrimination.  In light of the lack of growth opportunities, the hostile work environment created by her male managers, and the continued mishandling of complaints by HR and upper management, Ms. Musumeci had no choice but to resign from her position at Bayer.

258.    Prior to leaving the Company, Ms. Musumeci completed an exit interview with Defendant D'Agostino.  During the interview, Ms. Musumeci shared with Defendant D'Agostino her frustrations regarding the lack of growth opportunities and the hostile work environment.

259.    In response, Defendant D'Agostino echoed the same dismissive language that Ms. Gallagher had used.  Defendant D'Agostino stated that she knew that a lack of growth opportunities for women was a problem and that the Company was "immature in its policy and

ability to address employee development." She also stated that she recognized that the Women's Healthcare Division was a "politically-charged unit."

### E.   LAURA REILLY'S FACTUAL ALLEGATIONS

260.   Ms. Reilly is a current employee of Bayer. She holds the title of Director of Oncology Marketing in the Oncology Division.

261.   Throughout her tenure at Bayer, Ms. Reilly has consistently achieved strong performance results, receiving "meets expectations" or "exceeds expectations" for every year of her employment. She has received multiple awards, including a team recognition award in 2006 for work with Nexavar and the prestigious President's Circle Award in 2009.

262.   Despite her strong performance, her career has stalled due to pervasive gender discrimination. Company management has, among other things, subjected her to a hostile work environment and retaliated against her for drawing the company's attention to the hostile work environment by subjecting her to unwarranted disciplinary measures, increasing scrutiny, denying her promotion, and reducing her work responsibilities.

#### 1.   Ms. Reilly's Educational Background

263.   Ms. Reilly received a Bachelor of Science Degree in Nursing from Molloy College. She obtained a Master of Business Administration Degree in marketing and management from New York University.

264.   Prior to joining the Company, Ms. Reilly was licensed as a Registered Nurse in oncology clinical nursing. She also served as a Managing Director within the pharmaceutical advertising industry for three years and, prior to Bayer, was promoted almost every year since joining the industry.

     **2.**     **Ms. Reilly's Employment with Bayer**

         **a.**     **Marketing for Nexavar – Director: July 2005 to January 2007, West Haven, Connecticut**

265.    Ms. Reilly began her employment with Bayer in July 2005 as Director of Marketing for Nexavar in West Haven, CT.

         **b.**     **New Product Planning and Business Development for Oncology – Director: January 2007 – July 2011, Wayne, New Jersey**

266.    In January 2007, the Company underwent a restructuring and Ms. Reilly assumed the position of Director of New Product Planning and Business Development in Oncology.

         **c.**     **Oncology Marketing – Director: July 2011 – Present, Wayne, New Jersey**

267.    Around 2011, her title was changed to Director of Oncology Marketing.

     **3.**     **Bayer's Retaliatory and Discriminatory Acts Against Ms. Reilly**

         **a.**     **Hostile Work Environment**

268.    Throughout her employment, Ms. Reilly's male supervisors have subjected her and her female colleagues to harsh criticism on the basis of their professional and personal activities. Her male managers have made disparaging comments about the commitment and ability of female employees.

269.    During an investigator meeting at a conference in Phoenix, Arizona in 2006, a male executive made inappropriate and sexist comments to a group of employees and consulting physicians. Specifically, Defendant Rosen announced the hiring of a male employee for the head of the oncology medical science group. He stated, "I'm never hiring another woman over 40 again. They're all crazy!"

270.    Hiding her offense to the remark, Ms. Reilly attempted to defuse the situation by replying to Defendant Rosen, "Come on, Rob!   That means that you'd never hire me!" Defendant Rosen responded to Ms. Reilly's statement by confirming that she was correct and that he would never have hired her.

271.    Immediately following this incident, Ms. Reilly reported Defendant Rosen's inappropriate and discriminatory comments to HR. She also expressed concerns that Defendant Rosen had offended and alienated important consulting physicians.

272.    Bayer's complaint procedures lack meaningful quality controls, standards, implementation metrics, transparency, oversight, and means of redress that would otherwise ensure that complaints are appropriately addressed.   As a result of these flaws in the system and/or because HR and upper managers at Bayer take advantage of these flaws in the system, HR and upper managers mishandle complaints, allow them to go entirely unaddressed, or otherwise fail to properly respond to evidence of discrimination in the workplace.   Following this report to HR, Ms. Reilly never heard anything from anyone at HR regarding the status of her complaint.

273.    There is no meaningful separation between complaint reporting channels and the managers who create discriminatory or hostile working conditions for women and caregivers, such that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether.   Soon after she made her complaint, it became apparent that HR violated Company policy by sharing Ms. Reilly's confidential communication with Defendant Rosen.   Soon after her contact with HR, Ms. Reilly was approached by Defendant Rosen, who stated that HR had told him about her complaint and subsequently gave her an insincere apology for offending her with his comment.

b.      **Retaliation**

274.    After Defendant Rosen confronted Ms. Reilly, he began subjecting Ms. Reilly to a campaign of retaliation that continues to the present.

275.    This retaliatory treatment has included subjecting her to unwarranted disciplinary measures, increased scrutiny, denial of promotion, reduction of work responsibilities, and an increasingly hostile work environment.

276.    For example, a few months after Ms. Reilly's complaint to HR regarding Defendant Rosen's statements, Defendant Rosen called a one-on-one meeting with her in her office.   During that meeting, Defendant Rosen berated her for approximately thirty minutes. During his rant, he stated that she "sucked" and that she was "terrible."   He further stated, "You haven't done a damn thing" and "I don't know why we're paying you."

277.    Defendant Rosen's comments regarding Ms. Reilly's work product and work ethic were baseless.   Since joining the Company in July 2005, she had made outstanding progress in marketing her brand.   She prepared for two launch meetings and moved forward as soon as approval from the Food and Drug Administration was granted.   During the first year, she did not taken a single vacation day and worked several nights and weekends.

278.    However, Defendant Rosen recruited other managers and employees for assistance in building a case against Ms. Reilly and creating an uncomfortable work environment for her in an effort to push her out of the Company.

279.    For example, after Bayer underwent restructuring in January 2007, Ms. Reilly began reporting to General Manager Craig Phillips ("Manager Phillips").   Soon after, she learned that he was trying to "phase out" a female employee in his division named Carol Pohlod ("Ms. Pohlod").   On information and belief, in order to accomplish this goal, he paired Ms. Pohlod and

53

her together because he expected that they would not work well together and that he could use their disharmony as cause to terminate both of them.

280.    Contrary to these expectations, Ms. Pohlod and Ms. Reilly worked together effectively and achieved strong performance results during this period of time, from 2007 to 2008.

281.    Thereafter, Manager Phillips subjected Ms. Pohlod and Ms. Reilly to an increasingly hostile work environment.  He made vague and unreasonable requests, he dismissed all of their work product as poor, and he withheld their performance evaluations for 2007.  These actions affected their standing within the Company and negatively affected their compensation and advancement opportunities.

282.    On information and belief, Manager Phillips did not subject male employees to this treatment.  Rather, he specifically targeted Ms. Pohlod and Ms. Reilly on the basis of their gender.

283.    In 2007, Ms. Reilly's division was involved in a launch meeting for the second launch of Nexavar.   Leading up to that meeting, Manager Phillips reduced her work responsibilities.  For example, Defendant Phillips barred her from attending the launch meeting.

284.    When Ms. Reilly asked him why she could not attend a launch meeting, Manager Phillips stated that he was "cutting travel costs."  However, Manager Phillips allowed numerous other employees to attend the meeting, including lateral employees and employees who reported to Ms. Reilly such as her administrative assistant.

285.    Upon information and belief, Manager Phillips' financial concerns were nothing but strained pretexts for excluding her from this meeting on the basis of her gender and in retaliation for her reports to HR.

286.    Manager Phillips left the Company in mid-2008, at which time Shannon Campbell ("VP Campbell") assumed his position.    At that time, VP Campbell's previous position of Vice President of Marketing came open.

287.    In prior discussions with VP Campbell regarding Ms. Reilly's career advancement, Ms. Reilly was led to believe that she would be elevated to a VP position when VP Campbell received a promotion.   VP Campbell indicated that Ms. Reilly was qualified for the role of Vice President of Marketing.

288.    However, when Ms. Reilly approached VP Campbell regarding the open position, VP Campbell instructed Ms. Reilly not to apply and stated that she could not support Ms. Reilly's candidacy "because of VP Phillips."

289.    Upon information and belief, Ms. Reilly was ultimately denied the Vice President position because Manager and VP Phillips—motivated by a discriminatory intent—actively undermined her.

290.    In January 2010, Ms. Reilly began working with Defendant Rosen again in the context of membership of a global leadership team for new products.

291.    Defendant Rosen announced that he would select two employees to oversee the global launch.   Although Ms. Reilly was ideally qualified for this position, Defendant Rosen selected one male employee from Germany and one female employee from New Jersey, Shubh Goel ("Ms. Goel").

292.    Ms.  Goel lacked Ms. Reilly's qualifications and experience for this position.  For example, Ms. Reilly had completed 10 major launches, whereas Ms. Goel had not completed any launches.

293.   Upon information and belief, Ms. Goel has never made a complaint to HR regarding Defendant Rosen.

294.   Upon information and belief, Defendant Rosen overlooked Ms. Reilly's candidacy for the position due to her complaint to HR regarding him in 2006.

295.   Since January 2010, Defendant Rosen and Ms. Goel have worked together to undermine Ms. Reilly's contributions to the global launch team.   Whenever Ms. Reilly asked questions of Ms. Goel or tried to provide helpful feedback, Ms. Goel would report to Defendant Rosen that Ms. Reilly is "not being a team player" and "not falling in line."

296.   In July 2010, Defendant Rosen and Ms. Goel prepared a conduct memorandum regarding Ms. Reilly's alleged "behavior" and "performance" deficiencies.

297.   A conduct memorandum represents a disciplinary action, and its placement within an employee's personnel file can affect her standing with the Company, her compensation, and her advancement opportunities.

298.   Ms. Reilly learned of this conduct memorandum when Defendant Rosen forwarded it to VP Campbell and told her that he planned to take it to the President of the Company in order to secure her termination.   VP Campbell advised Ms. Reilly to write a rebuttal to each point in the conduct memorandum in order to save her job.

299.   Each point contained in the conduct memorandum was untrue.   In fact, there was only one point for which Ms. Reilly did not have conclusive documentary evidence to rebut the accusations.

300.   Ms. Reilly provided her rebuttal document to VP Campbell, who shared it with Defendant Rosen during a dinner meeting in August 2010.   VP Campbell told Ms. Reilly that Defendant Rosen realized during the meeting that he lacked cause to "take this forward" and

terminate her employment.

301.    As a result of Defendant Rosen's concerted efforts to terminate her employment without cause, Ms. Reilly has come to fear the security of her job and her standing with the Company.   Although Ms. Reilly was supported by VP Campbell in this instance, senior management and HR routinely ignore or contribute to the hostile work environment.

302.    As a result of this ongoing and escalating discrimination and retaliation, Ms. Reilly filed a Charge with the Equal Employment Opportunity Commission on January 10, 2011.

303.    Subsequent to this filing, Ms. Reilly was notified that Bayer's management has disparagingly discussed her Charge with current and former employees.   Ms. Reilly was further notified that Defendant Rosen has made disparaging comments regarding her claims and her motivations for bringing this action.   Specifically, in reference to Ms. Reilly, Defendant Rosen stated to another employee that he was "pissed" and demanded to know "who she thinks she is."

### F.    MS. SALOMON'S FACTUAL ALLEGATIONS

304.    Ms. Salomon is a current employee of Bayer.   She holds the title of Associate Director of Market Intelligence in Business Intelligence Development and Innovation.

305.    Throughout her employment with Bayer, Ms. Salomon has consistently achieved strong performance results ranging from "meets expectations" to "exceeds expectations" on performance reviews for every year of her employment.   She received an award in 2008 for outstanding performance on a brand marketing job.

306.    Despite her exemplary performance, her career has stalled on account of Bayer's discriminatory employment practices.   Over the course of her employment, the Company has denied her pay comparable to that of her male counterparts, taken unfair and unwarranted

disciplinary measures against her, subjected her to increase scrutiny and the hostile work environment, and denied her career enhancement opportunities.

### 1.    Ms. Salomon's Educational And Work Background Prior To Her Employment At Bayer

307.    Ms. Salomon received her Bachelor of Science Degree from Dickinson College. Prior to joining the Company, she worked in primary and secondary market research for 26 years.

### 2.    Ms. Salomon's Employment With Bayer

#### a.    Market Research – Manager/Associate Director: April 2006 to January 2010, Wayne, New Jersey

308.    Ms. Salomon began her employment with a Bayer predecessor company, Berlex, in April 2006 as Senior Manager.

#### b.    Market Intelligence – Deputy Director: January 2010 to October 2010, Wayne, New Jersey

309.    During a reorganization in January 2010, Ms. Salomon was promoted to Deputy Director of Market Research.

#### c.    Market Intelligence – Associate Director: October 2010 to Present, Wayne, New Jersey

310.    In October 2010, Ms. Salomon was demoted to the position of Associate Director of Market Research.

311.    In February 2011, she took medical leave to seek treatment for breast cancer.  She returned from Short Term Disability leave in August 22, 2011 and continues to hold the position of Associate Director.

### 3.  Bayer's Retaliatory and Discriminatory Acts Against Ms. Salomon

#### a.  Discriminatory Compensation

312.  Despite her consistently high performance reviews and recognition for professional excellence, Ms. Salomon's salary during her five years of employment at Bayer has consistently fallen below the bottom end of the pay range required for her position.

313.  The pay discrimination began when Bayer offered her only a manager position despite her more than quarter-century of experience in comparable marketing positions.  Despite her superior qualifications, the Company did not offer her the Director position that was commensurate with her skills and experiences; instead, they offered her only a manager position upon hiring her in April 2006.  The hiring manager committed to promoting her to a director position and increasing her compensation quickly.

314.  Although Ms. Salomon was given a title change within her first year at the Company to the position of Associate Director of Market Research, which falls into a higher pay range, she received no salary increase.

315.  Additionally, Ms. Salomon repeatedly received performance reviews that did not accurately reflect her exemplary performance.

316.  Bayer requires upper managers to determine performance evaluations according to a forced ranking system, in which managers must adjust evaluations to correspond to a predetermined distribution, regardless of the employee's objective level of performance or contributions to the Company.  Deputy Director Morrison told Ms. Salomon during multiple year-end review meetings that he had tried to secure higher ratings for her performance but that he was forced to recalibrate his proposed ratings to Ms. Salomon's disadvantage.

317.    These recalibrated ratings resulted in reduced compensation for Ms. Salomon with respect to her yearly merit increases and bonus awards.

318.    During a reorganization in January 2010, Ms. Salomon was promoted to Deputy Director of Market Intelligence in January 2010.  Following the reorganization, Ms. Salomon received a minimal salary increase of 5%, bringing her total salary to approximately $128,000.

319.    Soon after the reorganization, Ms. Salomon discovered in conversation with male Deputy Directors that her salary compensation was approximately $30,000 lower than their average base salary.  Furthermore, although the class of Deputy Directors originally included three women and four men, one woman was soon replaced by a male employee and the other woman left the Department.  At that time, Ms. Salomon became the only female Deputy Director.  She later learned that the male employee who was hired to replace the female Deputy Director was offered a base salary $50,000 greater than her base salary.

320.    At the end of January 2010, Ms. Salomon requested a meeting with Defendant Lamb to discuss the pay disparity.  During the meeting, she told Defendant Lamb about the $30,000 difference between her compensation and the average compensation of her male colleagues. Defendant Lamb denied that any such disparity existed.

321.    After Defendant Lamb contested the pay disparity, Ms. Salomon asked him to view the pay data within his computer system.  Defendant Lamb located the pay data and confirmed the $30,000 pay disparity.  After confirming the disparity, he stated, "You know better.  The Company won't do anything about that."

322.    Ms. Salomon understood Defendant Lamb's comment to mean that the Company refused to address her pay disparity or issue a salary adjustment.

323.    Nonetheless, Ms. Salomon pressed Defendant Lamb on the issue.  Only upon her request, Defendant Lamb committed to speak with HR regarding the pay disparity and to share his findings with her within two weeks.

324.    After three weeks had passed, Ms. Salomon encountered Defendant Lamb in the Company parking lot and inquired about the status of his communications with HR.  Defendant Lamb responded that he "[did] not want to talk about it" and that Ms. Salomon should speak with her direct supervisor, Defendant Herster.

325.    On information and belief, VP Lamb did not, in fact, escalate Ms. Salomon's concerns to HR as promised.  Ms. Salomon never heard more on this issue.

326.    In March 2010, Ms. Salomon met with Defendant Herster to discuss her concerns regarding the pay disparity and to request a salary adjustment.   Following this meeting, Defendant Herster has subjected Ms. Salomon to an escalating campaign of retaliation.

### b.    Retaliation and Hostile Work Environment

327.    From very early in her time at the Company, Ms. Salomon has endured disrespect and criticism that were not based on her work performance but were instead based on who she was and on her decisions to speak up for herself and others.

328.    For example, in early 2009, Defendant Oelrich called Ms. Salomon into his office and questioned her at length regarding her Jewish heritage and religion.  During that meeting, he asked Ms. Salomon, "Why would a Jew like you work for a German company?"  Ignoring her confusion and discomfort, he continued by needling her about how her Jewish family felt about her decision to work at Bayer.  During this conversation, which lasted approximately 30 minutes, he asked Ms. Salomon to "explain [her]self."

329.    Following this meeting, Defendant Oelrich avoided interaction with Ms. Salomon and stopped making eye contact during their professional interactions.  Upon information and belief, other male employees are not called on to "explain themselves" or otherwise justify their employment at the Company when their performance, like Ms. Salomon's, meets or exceeds expectations.

330.    In addition, Defendant Herster retaliated against Ms. Salomon for raising concerns about a discriminatory pay disparity by subjecting her to unfair and unwarranted disciplinary measures, increasing scrutiny, and denying her career-enhancement opportunities.

331.    Following Ms. Salomon's meeting with Defendant Herster in March 2010, Defendant Herster's treatment of her underwent a sudden and pronounced change.  Directly following the meeting, in late March or early April 2010, Defendant Herster informed Ms. Salomon that she was placing her on a four-month performance plan.

332.    Performance plans represent a corrective disciplinary action at Bayer that can result in termination of employment.

333.    Prior to notifying Ms. Salomon of the four-month performance plan, Defendant Herster had never expressed any concerns regarding her performance.  In fact, in the annual performance review that she had completed just a few weeks prior, she rated Ms. Salomon's performance as "fully meeting expectations."

334.    Upon information and belief, Defendant Herster did not place any of Ms. Salomon's similarly-rated male colleagues on four-month performance plans.

335.    As part of the four-month performance plan, Defendant Herster required Ms. Salomon to create a plan of her business activity for those months.  She provided very limited direction regarding the content and format of this plan.  When Ms. Salomon provided her with a

draft, Defendant Herster stated that it "wasn't what [Defendant Herster] wanted" and that "if [Ms. Salomon] doesn't get it, that's a problem."

336.    After Ms. Salomon rewrote the plan and provided a copy to Defendant Herster, she heard nothing further from her regarding the status of the corrective disciplinary action.

337.    After the meeting in March 2010 during which Ms. Salomon addressed her concerns to Defendant Herster, Herster became increasingly critical of Ms. Salomon's work and became generally more hostile in their interactions.

338.    Defendant Herster has criticized all aspects of Ms. Salomon's work without cause and created a stressful, no-win work environment.  For example, in her review of Ms. Salomon's performance for 2009, Defendant Herster encouraged her to replace frequent travel commitments with teleconferences in order to reduce expenses.  She implemented this change in early 2010. However, later in the year, Defendant Herster criticized Ms. Salomon for conducting teleconferences with focus group participants rather than traveling to focus group sites.

339.    In addition to such criticism, Defendant Herster has subjected Ms. Salomon to increased scrutiny.  Defendant Herster has required weekly one-on-one meetings with Ms. Salomon to review her progress.  On information and belief, she does not require weekly meetings with Ms. Salomon colleagues, who have not voiced concerns about their compensation.

340.    Defendant Herster also denied Ms. Salomon important training opportunities for which she was qualified and which would create promotional opportunities for her.

341.    In August 2010, Ms. Salomon received a notice from the Company that she had been selected for the Leadership Excellence Training Program.  This program is made available to employees who have distinguished themselves as potential leaders within the Company and is required to advance beyond her current position grade.

342.     Shortly after Ms. Salomon received this notice and explored enrollment dates, she received an additional notice from the Company stating that Defendant Herster had denied her access to the program.  Neither Defendant Herster nor the notice explained the revocation.

343.     Upon information and belief, Defendant Herster has not denied Ms. Salomon's colleagues comparable career-enhancement opportunities.

344.     In November 2010, Defendant Herster notified Ms. Salomon that she had been demoted from her Deputy Director position to an Associate Director position.

345.     Ms. Salomon was diagnosed with breast cancer in October 2010 and took medical leave from February to August 2011, when she returned to full-time employment at Bayer.

346.     Despite being on notice of Ms. Salomon's claims of discrimination and retaliation by virtue of her EEOC complaint and this lawsuit, the Company has continued to subject Ms. Salomon to escalating retaliation and unwarranted scrutiny rather than conduct an investigation into her concerns.

347.     For example, during a one-on-one meeting that took place just a few weeks after Ms. Salomon's return, Defendant Herster refused to acknowledge the concerns raised by Ms. Salomon about the inaccurate portrayal of her performance.  Instead, she made unfounded accusations about Ms. Salomon's performance, citing Ms. Salomon's supposed failure to hold enough team meetings, her supposed failure to invite Defendant Herster to the meetings that took place, her supposed failure to communicate with teammates, as well as her supposed failure to submit scorecards on time.  When Ms. Salomon attempted to rebut these unfounded accusations or otherwise discuss Defendant Herster's concerns regarding these alleged performance problems, Defendant Herster dismissed her and stated that she would be extending Ms. Salomon's performance improvement plan.

348.    In addition, Defendant Herster has publicly degraded Ms. Salomon's skills, character, and qualifications in the presence of others.  For instance, following a team meeting on September 30, 2011, Defendant Herster spoke at length with Senior Director Steven White ("Senior Director White") about her negative feelings towards Ms. Salomon and her accomplishments.   Upon information and belief, Defendant Herster's actions against Ms. Salomon continue to constitute an attempt to isolate her from her peers, subordinates and superiors.  Notably, Senior Director White, with whom Ms. Salomon worked successfully for many years, began avoiding her after his conversation with Defendant Herster.

349.    Since Ms. Salomon returned to Bayer, her colleagues and superiors also have avoided including her in projects or giving her new assignments.  In addition, one of her largest responsibilities, which had been given to another employee while Ms. Salomon during her absence, was not returned to her even though she had worked on it substantially prior to her leave.  She also was excluded from meetings, often learning of them only after they had taken place or begun.  In spite of the exclusion she was facing, she remained committed to her role and completed a large, self-initiated project for her product Beyaz in the remaining months of 2011.

350.    However, on February 28, 2012, Ms. Salomon received a discriminatory and retaliatory performance review from Defendant Herster.  In the review, Defendant Herster stated that she was giving Ms. Salomon a "partially meets" rating.  To justify the lowered rating, she accused Ms. Salomon of devoting excessive time to Beyaz and stated that she should have focused on other projects.   This criticism was unfounded: Defendant Herster and Ms. Salomon's other superiors and colleagues did not assign her to any other projects or assignments, and with respect to the few assignments she did receive, she delivered strong work product within

appropriate timeframes.   Furthermore, Beyaz was   Ms. Salomon's only product during that period.

351.    In fact, during the review, Ms. Salomon expressed concerns that she was not receiving any projects and asked Defendant Herster if there was anything to which she could be assigned.  In response, Defendant Herster provided her with busywork, directing her to update an old market analysis that was no longer relevant to the business.

352.    Defendant Herster further claimed that Ms. Salomon had not completed assignments within their respective deadlines.  However, when Ms. Salomon asked for examples, Defendant Herster was unable to cite to any example during the period.

353.    Upon information and belief, the discriminatory and retaliatory performance rating is likely to be used to justify a salary increase less than that to which Ms. Salomon would otherwise be entitled.  Further, it may lead to further disciplinary action that could have short-term and long-term consequences to her career at Bayer.

354.    Rather than conduct an investigation into the discrimination or otherwise take her concerns seriously, Bayer continues to subject Ms. Salomon to increasing retaliation and discrimination.  Upon information and belief, Bayer has taken these actions against her in an attempt to harm her reputation, hinder any future success she would rightly achieve, and push her out of the Company.

G.    NATALIE CELSKE'S FACTUAL ALLEGATIONS

355.    Ms. Celske is a current employee of Bayer.  She holds the title of Senior Sales Consultant for Bayer HealthCare Pharmaceuticals.

356.    Throughout her employment with Bayer, Ms. Celske has consistently achieved exceptional performance results, including ratings from "meets expectations" to "outstanding" on performance reviews for every year of her employment.  She received the Sales Consultant of the Year Award in 2008 and 2009.  In 2009, she was ranked third in the nation and first in her district for sales results.  She consistently is one of the top, if not the top, Sales Consultants in her geography.

357.    Despite her exemplary performance, her career has stalled on account of Bayer's discriminatory employment practices.  Over the course of her employment, the Company has denied her pay comparable to that of her male counterparts, denied her promotional opportunities, and subjected her to a hostile work environment.

### 1.    Ms. Celske's Background Prior To Her Employment at Bayer

358.    Prior to joining the Company, Ms. Celske had worked in the pharmaceutical sales industry for five years.  She demonstrated excellent performance while employed in these positions.

### 2.    Ms. Celske's Employment with Bayer

#### a.    Women's Healthcare – Pharmaceutical Sales Consultant: 1998 to 2003, Seattle, Washington

359.    Ms. Celske began her employment at Bayer's predecessor company, Berlex, as a Pharmaceutical Sales Consultant in Seattle, Washington.

**b.** **Women's Healthcare – Senior Sales Consultant: 2003 to Present, Boise, ID**

360.   In 2003, Ms. Celske became a Senior Sales Consultant in Boise, Idaho.  She continues to hold this position today.

**3.** **Bayer's Discriminatory Acts Against Ms. Celske**

**a.** **Discriminatory Denial of Promotional Opportunities**

361.   Throughout Ms. Celske's employment, she has expressed interest in being considered for career advancement opportunities.

362.   Specifically, she has consistently communicated for the past several years her desire to be promoted to a position of Executive Sales Consultant.  During this time, her tenure and performance results made her the most qualified candidate in her geography for this promotion.

363.   At the end of 2009, Ms. Celske had completed all of the requirements for promotion to Executive Sales Consultant.  These requirements include ranking in the top 25th percentile for two years, winning Sales Consultant of the Year two years in a row, engaging in mentorship activities, and demonstrating leadership.  To fulfill the mentorship and leadership requirements, Ms. Celske was serving as District Trainer.  Moreover, as the most tenured Sales Consultant on her team, she participated in hiring and promotion decisions.

364.   In addition to fulfilling these requirements, a Senior Sales Consultant must have the support of upper management in order to receive a promotion to the Executive level.  Accordingly, her eligibility for a promotion to Executive Sales Consultant depended on the willingness of her manager, Regional Sales Manager Glen Butler ("Manager Butler"), and his superior, Field Sales Development Manager Todd Ward ("Manager Ward"), to enroll her in a promotion plan.

365.    Manager Butler became Regional Sales Manager for the Portland, Reno, and Boise geography in December 2009.  Directly after he assumed that position, and before he had an adequate opportunity to evaluate her performance, Manager Butler removed Ms. Celske from the District Trainer role.

366.    Manager Butler subsequently chose Ms. Celske's male peer, James Webb ("Mr. Webb"), for the role.

367.    Mr. Webb's sales results and overall performance were significantly lower than Ms. Celske's at that time.  Further, Ms. Celske continues to outperform Mr. Webb each year.

368.    Soon after Manager Butler announced this decision, Ms. Celske approached him to request an explanation for her removal from the District Trainer role.  Manager Butler replied that the position fell "more into James' [Mr. Webb's] career path, not yours."  When Ms. Celske inquired about her career path, Manager Butler stated, "What *about* your career path?"

369.    Based on the tone of the comment and the context in which it was delivered, Ms. Celske understood Manager Butler's comment to mean that he had neither concern for nor interest in her career development.  She also understood that Manager Butler would prioritize the career advancement of a male employee over a female employee, even when the female employee consistently outperformed the male employee.

370.    In addition to stripping her of her District Trainer role, Manager Butler refused to allow Ms. Celske to participate in interviews of potential new hires.

371.    Prior to his arrival, Ms. Celske had participated actively in interviews a part of her promotion track.

372.    However, after Manager Butler arrived, he promptly stripped Ms. Celske of her interviewing opportunities – including those interviews for the Boise team – and reallocated them to Mr. Webb, even though Mr. Webb is based out of Portland, Oregon.

373.    Since becoming her supervisor, Manager Butler has refused to consider Ms. Celske for any career advancement opportunities.  He has repeatedly ignored her attempts to communicate with him regarding this matter.  When she approaches him to discuss her career, he tells her that she is being "difficult" and says, "Don't worry about it.  You'll get it someday."

374.    Furthermore, he has intentionally embarrassed Ms. Celske and undermined her capabilities in front of her colleagues during team meetings.

375.    For example, when she asks him legitimate questions regarding the business, he lashes out at her with replies such as, "What are you talking about?" and "Are you dumb?"  This hostile treatment limits her ability to perform important job responsibilities and undermines her capabilities.

376.    Manager Butler's treatment of her contrasts sharply with his treatment of her male counterparts.

377.    For example, Manager Butler gives positive attention and recognition to her male peer, Kevin Jansen ("Mr. Jansen"), during meetings, even though Mr. Jansen brings less experience and inferior performance results to their group discussions.

378.    In October 2010, Manager Butler asked Mr. Jansen to send an email to the entire regional team.  This email conveyed that Field Sales Director Scott Washburn ("Director Washburn") wanted each team member to send a digital headshot to him within one to two days.

379.    Because Ms. Celske was traveling for work and did not have access to digital photographs, she replied to his email before his proposed deadline and informed him that she was traveling but suggested he could use photographs already on file.

380.    Manager Butler replied to her email, copying Director Washburn and other members of upper management.  In his email, he called her "disrespectful" and told her that she was "undeserving" of her Senior title.

381.    Ms. Celske was extremely shocked and upset by Manager Butler's response and the threat to her level that it contained.  She responded to his email and told him that she believed he had overreacted.  Further, she stated that his treatment of her was hostile.

382.    Following transmission of her email, Manager Butler called her and demanded that she fly to Oregon to meet with him the following week.  She rearranged her work schedule and made the 13-hour trip to meet with him.

383.    When she arrived, Manager Butler called her into a one-on-one meeting and told her that she was to "forget the incident of the previous day," referring to his email.

384.    Based on the tone of his instruction and the context in which it was delivered, she understood Manager Butler to mean that she should overlook his outburst and refrain from reporting his behavior to HR if she valued her career.

385.    In November 2010, Manager Butler announced that he would be temporarily relocating to Bayer's Corporate Headquarters for three months.  He further announced that he had appointed Mr. Webb to fill the manager role for the Boise team during his absence.

386.    Upon information and belief, Manager Butler never considered Ms. Celske for this role, despite the fact that she was more qualified than Mr. Webb for this responsibility.

387.   Indeed, she was and continues to be the most qualified person on her team based on both tenure and performance.

388.   Indeed, Mr. Webb required her assistance to perform the duties of interim manager.  For example, in November 2010, he privately asked her to help him prepare for a team conference call regarding best practices that was to take place the following day.  Ms. Celske agreed to offer him her expertise and guided him through some of her techniques.  However, during the conference call the next day, Mr. Webb did not allow her to participate in the discussion, claimed ownership of her techniques, and generally failed to recognize the assistance she had provided the previous day.  He did not treat the male members of the team in this way.

389.   In late 2010, Ms. Celske spoke with Manager Butler regarding her promotion to the Executive level.   Specifically, she asked him to reinstate her promotion plan for the Executive Sales Consultant position.  Manager Butler responded, "Why?  Do you think you're qualified?"  Based on the manner in which this and other comments were made, she understood this to be Manager Butler's flat refusal to help her explore and pursue advancement opportunities.

390.   Manager Butler has stalled her career advancement by denying her his support for a promotion that she should have received no later than the fall of 2010.  If Bayer had not discriminatorily denied her a promotion to the Executive level, she would have received increased base compensation and bonus compensation and additional opportunities for development and advancement.

391.   Over the course of the past thirteen years, Ms. Celske has seen male employees receive promotions more quickly than their female counterparts.  Indeed, except for one individual, every male representative of equal tenure to Ms. Celske has already received a

promotion to Executive Sales Consultant or higher.  However, many women with equal tenure and outstanding performance, including Ms. Celske, remain in Senior Sales Consultant positions. Indeed, there is only one female Executive Sales Consultant in her geography.

### b.    Discriminatory Compensation

392.    During her employment at Bayer, her supervisors have denied her pay equal to that of her male counterparts and refused to address pay disparities.

393.    Bayer's compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight and opportunities for redress or challenge that would otherwise have ensured that there was no disparate impact on or disparate treatment of female employees.  As a result of these flaws in the system and/or because Bayer management systematically took advantage of flaws in the system, female employees continue to be paid less than similarly-situated male employees even after demonstrating evidence of disparities in pay.

394.    Throughout Ms. Celske's twelve years of employment at Bayer, her salary has consistently fallen below the bottom end of the pay range required for her position.

395.    Upon information and belief, male employees demonstrating performance equivalent to hers are earning a higher base salary than her.  Specifically, she believes that several of her male counterparts receive base salaries at the upper end of the salary range for her position, which is $120,000.  By contrast, she received a base salary of $98,000.  Furthermore, because her bonus potential and merit increases are tied to her base salary, the gap between her compensation and her male counterparts' compensation continues to grow.

### c.  Retaliation

396.    After she joined the lawsuit on May 31, 2011, Ms. Celske was subjected to increasing retaliation.  Specifically, Bayer singled her out from among her peers and altered the

terms of her employment without warning or justification.  These unexpected and retaliatory changes have prevented her from achieving the sales ranking and incentive payouts to which she would otherwise have been entitled had the terms of her employment remained the same as those of her peers.

397.    Specifically, one or two months after she joined the lawsuit, Bayer moved Ms. Celske under the management of Regional Sales Manager Tim Clark ("Manager Clark"), and increased her territory threefold to cover four states.  Such a realignment of her territory required her to spend four nights a week on the road.  These conditions made it nearly impossible for her to maintain a personal life.

398.    Upon information and belief, Bayer was aware that the travel required for the position was unsustainable.  Nevertheless, Ms. Celske never received any explanation from the Company for the territory realignment.  Upon information and belief, this was part of an attempt on the part of Bayer to force her to resign in retaliation for her filing a lawsuit against the Company.

399.    No other similarly-situated employee was subject to the same changes to their responsibilities.  Even though Ms. Celske has consistently outperformed the vast majority of my colleagues, during the realignment Bayer offered the more favorable Mirena sales positions (which require little to no travel) to less tenured and less accomplished sales consultants.  Each Mirena sales consultant covered only a fraction of the geography for which she was responsible.  Indeed, the Mirena position for Idaho – where Ms. Celske is based – was granted to a less experienced employee who has been with Bayer for less than two years and, notably, has not joined a public lawsuit.

400.    By increasing her territory, Bayer has made it more difficult for Ms. Celske to

meet requirements imposed on her by upper management.  Specifically, her managers informed her that she had to meet with each doctor twice per month – a task nearly impossible for someone covering four states and already traveling between 200 to 300 miles per day.  The constant travel and the pressure to meet these requirements caused Ms. Celske a great deal of stress and anxiety.

401.    On multiple occasions Ms. Celske expressed concerns about her territory increase.  However, whenever she inquired as to the purpose of this change to her territory, Manager Clark would ignore her or refuse to respond to her questions.  It was not until almost six months later and after her attorneys had intervened on her behalf that Manager Clark acknowledged that she had an unusually large geography.  However, when she asked him for a potential solution to the matter, he stated that there was not much that he could do.

402.    Despite this unexpected enlargement of her territory, she continued to meet and exceed expectations based on the quota defined for her in her newly expanded territory during the regional meeting.  As of July 2011, she was on track to meet the criteria for a Sales Leadership Award and was positioned to be ranked among the top sales consultants in the nation.

403.    On September 16, 2011 and just prior to the beginning of the fourth quarter, Director Washburn and Manager Clark informed Ms. Celske in private that they had decided to increase her sales quota by 20 percent.  This was a substantial increase above the quota originally assigned to her during the team meeting.  When she asked for the reason for this sudden increase, Director Washburn simply stated that Bayer had decided to increase her quota because she was outperforming her previous goal.

404.    She was the only Senior Sales Consultant in the Western region – if not the entire Company – whose quota was increased mid-year.  As a result, her market share grew to twice

that of any of her teammates, and she had the fourth highest quota in the entire country, though she had a territory with only two-thirds of the market potential compared to the majority of Bayer's territories.   Notably, two of her counterparts had their quotas for the same product significantly decreased in November 2011.

405.    Prior to the increase in quota, Ms. Celske was on track to be ranked in the top 10 out of 166 sales consultants in her sales force based on objective performance numbers. However, although she was still an exceptional performer, her August 2011 bonus report showed that she was ranked around the 50th percentile due to the quota increase.  By ranking in the middle of the country, her performance was considered "solid."  However, it did not reflect her exceptional results because of the discriminatory and retaliatory quota increase.

406.    This increase in quota had significant short term and long term consequences on Ms. Celske's career.  In the short term, she has become ineligible for the merit increase to which she would otherwise be entitled for her outstanding performance this year.  In addition, she lost approximately $30,000 in incentive compensation for the 2011 year alone and is now less competitive for awards, including the President's Circle Award, for which she became fully ineligible.  In contrast, her two counterparts, neither of whom is a named plaintiff in publicly-filed litigation against the Company, watched their national rankings immediately jump as a direct result of their quota reduction – one from 95 to 32 for that specific product line, which raised his overall ranking from 25 to 18 overall; and the other from 58 to 17 for the product, and 21 to 4 overall.

407.    In the long term, the quota increase effectively stalled Ms. Celske career by making her ineligible for a promotion.  Further, it placed a blemish on her performance history that is likely to affect whether or not she is considered for awards, promotions, and raises in the

future.

408.    In addition, almost immediately after she joined the lawsuit, management curtailed communications with her, refusing to provide her with feedback or update her on new information relevant to her job duties that they provide to her colleagues.

409.    Further, in May 2011, Ms. Celske sent a rebuttal to her 2010 performance evaluation to Bayer's online Human Resources service, HR Direct.  HR Direct instructed her to contact her HR Representative with her concerns.  In June 2011, Ms. Celske reached out to HR Representatives Marilyn Hundley and Pat Wangermann, Director Washburn, Manager Ward, and Field Development Manager John O'Donnell.  To date, she has not received a response or an acknowledgement of her email appealing her 2010 performance evaluation from HR or management.

410.    Moreover, Ms. Celske managers also attempted to isolate her from her peers. Beginning in June, she noticed that many of her colleagues had stopped responding to her business-related texts, emails, and calls.  When she reached out to management to try to address this treatment, they offered no solution and dismissed her concerns.

411.    In December 2011, Manager Clark explicitly instructed her not to communicate with the rest of the sales team, though she had previously acted as a frequent resource for colleagues on the basis of her experience and tenure.  When she inquired as to why she was prohibited from speaking with her teammates, he stated that he would "feel better" if she did not. Indeed, Manager Clark later admitted during her January 2012 performance review that he had purposefully isolated her from her colleagues because he did not think it was "appropriate" for her to be interacting with them.  Upon information and belief, Ms. Celske's peers received similar instruction from management not to reach out to her.

412.    In the few moments of communication that she has had with her colleagues, several of them have commented that they are aware of the treatment to which she has been subjected.  For example, around December 2011, a colleague of hers commented that everyone could tell that Director Washburn was singling her out to make an example of her.

413.    This treatment came instantly after Ms. Celske's involvement in the litigation and is unlike anything she has experienced in her 14 years of employment.  Upon information and belief, these actions have been taken in an attempt to isolate her, damage her professional reputation, and to intimidate others who might otherwise support or join the litigation.  In addition, they have created a hostile work environment for her and caused her a great deal of stress and anxiety.

414.    By the end of 2011, the isolation had become so severe that Ms. Celske informed Manager Clark that she no longer felt like an employee at Bayer.  It was not until January 2012 and after her attorneys had intervened on her behalf that she again began to receive some communication from her teammates.  By then, she had already endured months of professional isolation.

415.    Throughout this period, Ms. Celske continued to excel in her performance despite her territory realignment and the changes to her quota.  By the end of the year, she had met and exceeded all of her sales objectives and was the most eligible Sales Consultant on her team for a Sales Leadership Award.

416.    However, at the beginning of 2012, Bayer denied Ms. Celske the Sales Leadership Award and instead awarded it to two of her colleagues, each of whom was ineligible for the Award based on Bayer's own criteria but who, upon information and belief, have not lodged complaints of discrimination against the Company.

417.     Specifically, the first of Ms. Celske's counterparts received the award despite having failed to meet Bayer's requirement that award recipients achieve 60 percent utilization of their professional education budget.  Ms. Celske's counterpart had achieved less than 17 percent; Ms. Celske had achieved 128 percent.  Further, the second recipient received the award despite ranking in the bottom 25 percent for the second half of the year – failing to meet the eligibility requirements that the winner rank at least in the top 50 percent nationally in both the first and second halves of the year.  Again, Bayer denied Ms. Celske the award, even though she met these criteria and ranked a full 51 spots above the recipient.  Upon information and belief, Bayer's decision to deny Ms. Celske the Sales Leadership award in favor of her ineligible counterparts was retaliatory in nature.

418.     A Sales Leadership Award was valued at approximately $5000, would have increased Ms. Celske's visibility in Bayer, and would have been a positive factor in consideration for a promotion to Executive Sales Consultant, a role with a higher level and salary grade.

419.     As early as August 2011, Ms. Celske sought explanations from Bayer for the treatment she experienced following the filing of her lawsuit.

420.     After receiving no explanation for the changes, Ms. Celske's Counsel sought answers from Bayer management and HR on her behalf.  Through Counsel, Ms. Celske repeatedly requested an explanation for the changes to her territory and quota, and for the absence of communication and feedback from her managers.  Bayer repeatedly refused to substantively address her concerns, instead deflecting her inquiries twice with a conclusory claim that that the territory assignment was made in a nondiscriminatory manner and that Ms. Celske could take it up with Human Resources directly if she wanted further resolution.  Such a

response was clearly nothing more than a delay tactic, as HR had been and continued to be unresponsive.

421.    In addition to communicating through her attorneys, she also has raised concerns internally about Bayer's treatment of her and proactively provided suggestions of how the Company might address these issues.   However, her attempts to voice her concerns with management have largely been ignored or deflected.

422.    For example, on January 18, 2012, Ms. Celske learned from one of her customers that her counterpart who had been granted the more favorable Mirena sales position in Idaho, had left the position almost three weeks prior.   Ms. Celske was never notified by anyone that this position was available, even though she had expressed interest multiple times in being considered for the Mirena position, which would require less travel and involve the selling of a premier product.

423.    The following day on January 19, she informed Manager Clark and Director Washburn that she had become aware of the opening and reiterated her interest in the position. She further expressed concerns that she had not been notified by management of the departure of her Mirena counterpart, and instead had learned of the news from a customer three weeks after the fact.   Further, Ms. Celske believed that this position would resolve the difficulties she had faced over the past several months as a result of the excessive travel to which she had been subjected.   However, neither Manager Clark nor Director Washburn addressed her interest in the role.   They simply stated that they "had not been aware" that a Mirena position had become available in Idaho, and Director Washburn retorted that now was not an appropriate time to be discussing her interest in the position.

424.    Several weeks later, Ms. Celske received a response from Manager Clark to her inquiries about the Mirena position.  He informed her that she would have to wait for the position to be posted to apply online for the job.

425.    These instructions were in stark contrast to the treatment of Ms. Celske's male peer, Mr. Webb.  Mr. Webb is less qualified than Ms. Celske based on both tenure and sales performance.  However, on January 13, 2012, Mr. Webb was automatically granted a Mirena position after his colleague left the role.  The position was never posted, and Mr. Webb had not been required to apply.  When Ms. Celske asked Manager Clark and Associate Director of HR Anthony Kuhl ("Director Kuhl") about this discrepancy, they did not respond.

426.    In addition, Ms. Celske met with Director Kuhl on two occasions in late January 2012, after Bayer informed her attorneys that she would have to speak with Bayer's Human Resources for further information and resolution of her complaints.  However, when they met, she learned that Director Kuhl was unwilling or unable to respond to her extensively-documented concerns.  He stated that he had no knowledge of the allegations of discrimination outlined in her EEOC Charge, or any of the concerns she had previously communicated through her attorneys, or of any investigation into those concerns.

427.    Ms. Celske was extremely upset and surprised by his lack of knowledge of her claims, as she already had communicated them extensively with Bayer and because Director Kuhl had previously indicated that he needed additional time to review her background information before meeting with her.  When she asked Director Kuhl how it was possible that he did not know anything about her situation, he simply repeated that he had no knowledge of anything prior to meeting with her.

428.    In response to his assertion that he was unaware of the issues she and her Counsel

had previously raised, Ms. Celske was obliged to repeat her concerns, which she did in brief summary fashion.  Director Kuhl was unable to provide any information in response.  For example, when she asked him if he could provide any explanation for how realignment decisions were made with respect to territory assignments, he stated that he did not know.

429.    Further, when she expressed concerns to Director Kuhl about the fact that she had not been informed about the Mirena vacancy in her territory, his response was to defend Bayer or otherwise dismiss her concerns.  For example, he stated that perhaps Bayer wanted to hire someone who lived in Boise.  She replied that she understood Bayer's policies to require only that the Sales Consultant reside within the relevant territory, which she already did.  In addition, she informed him that she was willing to relocate for the position if residence indeed was a problem for whatever reason.

430.    Ms. Celske also described her concerns about the sudden adjustment in her quota and her frustration about the impact this would have on her career.  Again, Director Kuhl's first and only response was to defend the Company, summarily stating that Bayer simply "ma[d]e adjustments sometimes."  When she inquired as to why no one else had received a quota increase, he asked how she was aware of this.  She explained that the numbers for her region's Sales Consultants are visible on the monthly bonus reports, to which he did not reply.

431.    Additionally, she informed him of the isolation she had endured over the past several months by her peers and superiors.  She further informed him that she had been explicitly instructed by Manager Clark without justification not to contact her teammates.  Director Kuhl replied that Bayer may have had a legitimate reason to ask her not to contact her teammates.  When Ms. Celske asked him what this legitimate reason might be, he had no response.  In addition, she expressed concerns about how her colleagues, her superiors, and HR had ignored

her attempts to contact them.  Director Kuhl again had no response.

432.   She further described the stress and anxiety resulting from the discrimination and retaliation she was experiencing.  She informed Director Kuhl that she felt intimidated and bullied, to which he stated that what Ms. Celske had experienced did not qualify as being bullied. Moreover, even though he had not conducted any investigation whatsoever, he stated that in general he did not feel that she had necessarily experienced retaliation.  However, when she asked him for an explanation for the sudden changes in the terms of my employment, he was unable to provide an answer.

433.   At the end of the conversation, she expressed her reservations about speaking with HR and stated that she did not feel that they had taken her concerns seriously.  Director Kuhl had no response.

434.   At Ms. Celske's request, she and Director Kuhl met again on January 25, 2012. During this meeting, he mentioned that he could not continue to investigate her case if Bayer's Legal department was involved.  He further stated that unless she had new information for him to consider he did not have anything left to discuss with her at this time.

435.   Ms. Celske was upset by Director Kuhl's lack of preparation for the meetings and his insistence on defending the Company before investigating.  Even more upsetting was the fact that Bayer's HR knew nothing of her complaints despite Bayer's assurance through its attorneys that her concerns had already been "fully investigated" and found to be unmerited.  Based on Director Kuhl's representations, if he were to begin an investigation in January 2012, it would be the first HR investigation into complaints first brought to the Company's attention nearly a year ago.

436.    On February 27, 2012, Ms. Celske was finally placed in the Mirena position that she should have received months prior based on her sales performance and tenure.  Upon information and belief, Bayer had not originally intended to give her the position, but did so only after she and her attorneys persisted in raising concerns about unlawful retaliation.  Indeed, on February 28, 2012, one of Ms. Celske's customers informed her that as early as January 2012 Bayer had already begun introducing another sales consultant to them as the intended replacement.

437.    Further, in connection with this move, Bayer gave Ms. Celske the highest quota in the entire Western area.  Her new sales quota is the fourth largest in the nation and is surpassed only by three quotas related to metropolitan areas with exponentially larger markets.  Her disproportionately high quota will continue to have a negative impact on her compensation, career advancement, and professional reputation.

438.    Bayer has further retaliated against Ms. Celske by giving her a lowered performance rating for 2011.  Specifically, on March 6, 2012, she inquired about her performance rating as she had not yet received it, which was unusual.  Even though she had exceeded virtually all of her 2011 objectives in spite of the retaliatory changes to her employment, Bayer decided to give her a "meets expectations" rating for 2011.

439.    In addition to being an inaccurate portrayal of her performance, this lowered rating may be used to justify granting Ms. Celske a smaller merit increase than that to which she would otherwise be entitled, and may be used to hinder her attempts to advance to Executive Sales Consultant.

## H.    VERA SANTANGELO'S FACTUAL ALLEGATIONS

440.    Ms. Santangelo is a current employee of Bayer.  She holds the title of Financial Specialist, Global Analgesics Controller in the Global Business Planning and Administration Division of Bayer HealthCare Consumer Care.  She went on Short Term Disability leave in May 2011 and remains on Long Term Disability leave today.

441.    Throughout her employment with Bayer, Ms. Santangelo has achieved superior performance results.  She has received strong ratings on her annual performance reviews. Specifically, she has received a rating of "meets expectations" in all of her performance reviews except for one year when poor management led to a disputed rating.  In 2010, she received four "On the Spot" Awards for her exceptional performance on various projects.

442.    Despite her strong performance, her career has stalled on account of Bayer's discriminatory employment practices.  Company management has, among other things, subjected her to discrimination and retaliation by paying her less than similarly-situated male employees, denying her career-enhancing opportunities and promotional opportunities in favor of less-qualified male employees, and subjecting her to increased scrutiny.

443.    Bayer also has subjected her to sexual harassment and a hostile work environment.  She endured retaliation directed by Company management after she reported the sexual harassment and hostile work environment to the Company.

### 1.    Ms. Santangelo's Work Background Prior to Her Employment at Bayer

444.    Ms. Santangelo received a Bachelor of Arts Degree in Accounting from Richard Stockton College of New Jersey.  Prior to joining the Bayer in 2006, Ms. Santangelo had worked in the finance industry for approximately twelve years.   She demonstrated strong performance at each of her prior employers.

2.      **Ms. Santangelo's Employment with Bayer**

a.      **Global Business Planning and Administration – Financial Specialist: 2006 to 2008, Morristown, New Jersey**

445.    Ms. Santangelo began her employment at Bayer on April 23, 2006 as a Financial Specialist in the Morristown, New Jersey location.

b.      **Global Business Planning and Administration – Financial Specialist/Global Analgesics Controller: 2008 to Present, Morristown, New Jersey**

446.    Ms. Santangelo became a Financial Specialist/Global Analgesics Controller in 2008. This represented a lateral change in her employment. She continues to hold this position today.

3.      **Bayer's Retaliatory and Discriminatory Acts Against Ms. Santangelo**

a.      **Discriminatory Compensation**

447.    During her employment at Bayer, Ms. Santangelo's supervisors have denied her pay equal to that of her male counterparts and refused to address pay disparities.

448.    Bayer's compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress or challenge that would otherwise have ensured that there was no disparate impact on or disparate treatment of female employees. As a result of these flaws in the system and/or because Bayer management systematically took advantage of these flaws in the system, female employees continue to be paid less than similarly-situated male employees even after demonstrating evidence of disparities in pay.

449.    Ms. Santangelo has received minimal merit increases which do not reflect the strong quality of her performance.

450.    Ms. Santangelo has received a rating of "meets expectations" almost every year.

For each year she has received this rating, she has received a minimal salary increase of 1 to 2 percent.  For example, in her most recent review, she was given a merit increase of no more than 1.5 percent.  Upon information and belief, men with similar performance received higher ratings and/or received larger raises, even if at higher ranges of the salary scale.

451.    At each review during her five years at Bayer, management has justified her low increases by stating that she was already paid "high" on the salary scale for her position.  Despite her managers' representations that she was being overpaid, upon information and belief, Ms. Santangelo's current base salary is at least $24,000 below the upper range base salary for her position.

### b.    Discriminatory Denial of Promotional Opportunities

452.    Ms. Santangelo joined Bayer in 2006 as Financial Specialist for Bayer's Consumer Care Division in Morristown, New Jersey.  She entered the Company at a level of VS 1.1.

453.    However, this Financial Specialist position was intended to correspond with a level of VS 1.2.

454.    Indeed, during her mid-year performance review in October 2006, Ms. Santangelo's manager, Director of Global Planning and Reporting Dorothy Lynn ("Director Lynn"), told Ms. Santangelo that she should have been brought in at a VS 1.2 level given the responsibilities and expertise that her position required.  Director Lynn showed her a job description for a position at the VS 1.2 level and pointed out to her that she was performing the same type of work even though she was at a lower level.

455.    Director Lynn further told Ms. Santangelo that she was qualified for a promotion and that Director Lynn would try and get her superior, Defendant Knapp, to promote her. However, Defendant Knapp presumably rejected this promotion, as nothing ever came of this.

456.    After this initial conversation with Director Lynn and throughout her employment, Ms. Santangelo has expressed interest in a leveling calibration or promotion to a position at the level of VS 1.2.  Despite her interest and qualifications, Bayer has failed to consider her for promotional opportunities.  After five years at Bayer, she has remained in the same VS level and has received only minimal merit increases.  Bayer has failed to adjust her title, VS level, and compensation in order to reflect her workload, responsibilities, and performance.

c.      **Sexual Harassment/Hostile Work Environment**

457.    In January 2009, Ms. Santangelo assumed her current position as the Global Analgesics Controller for the Global Business Planning and Administration Division of Bayer HealthCare Consumer Care.  This position represents a lateral move from her previous title, and it corresponds with a level of VS 1.1.  In this position, Ms. Santangelo reported to Director of Global Reporting and Strategic Planning Thomas Sredojevic for the first year.  In January 2010, she began reporting to Research and Development Manager Michael Brachfeld ("Manager Brachfeld").

458.     Beginning around the time that she began reporting to Manager Brachfeld, she has experienced sexual harassment perpetrated by Defendant Scott, an attorney for Bayer HealthCare who is far more senior than Ms. Santangelo in the Company.

459.    At least once per week in 2010, Defendant Scott approached Ms. Santangelo in the common areas of the office building, such as the elevator, copy room, or cafeteria, and made

comments about her body and attire.  For example, on one occasion, he stared at her chest, grabbed her forearm, and stated, "Thank you *very* much for wearing that shirt today."  On another occasion, he placed his hand on her backside and said, "Vera, you can eat whatever you want as long as you don't lose that girlish figure of yours."  Although Ms. Santangelo did her best to brush off these comments, she was deeply upset by them.  She found herself unable to focus and was constantly stressed and anxious while at work.

460.    One morning in September 2010, Defendant Scott approached Ms. Santangelo while she was in the cafeteria.  As she headed towards the elevator, he came up behind her, tapped her on the shoulder and said, "I'm going to join you for the ride."  He then followed her into the elevator where the two of them were alone.  During the elevator ride, Ms. Santangelo could see Defendant Scott eyeing her body and the oblong-shaped donut in her hand.  When the elevator reached her floor, she told Defendant Scott to have a nice day.  At that point, he grabbed her arm and whispered, "Not as nice of a day as if I could watch that whole donut slide down your throat."

461.    Defendant Scott's office is on the same floor as the cafeteria, so the ride in the elevator was solely for the purpose of harassing her.  In fact, Defendant Scott promptly took the stairs back down to his floor after the elevator ride had finished.

462.    Ms. Santangelo was extremely distraught after she walked out of the elevator and could not focus on her work for the rest of the day.  Soon following this incident, she began to see the Company nurse.  In fact, over the next several months, Ms. Santangelo visited the Company nurse and the on-site counselor numerous times.  During these visits, she would cry and recount to the nurse the sexual harassment that she was experiencing.  The nurse recommended that Ms. Santangelo seek therapy to deal with the emotional trauma she was

undergoing due to the harassment.

463.   This stress and anxiety was heightened because Defendant Scott is a close personal friend of Manager Brachfeld, and the two of them eat lunch together in the cafeteria nearly every day.  As a result of their close personal friendship, Ms. Santangelo was reluctant to report Defendant Scott's behavior to Manager Brachfeld because she feared retaliation directed from Manager Brachfeld.

464.   Despite Ms. Santangelo's initial reluctance to report Defendant Scott's behavior, the particularly upsetting incident in the elevator led her to call Bayer's integrity hotline and make an anonymous report on October 10, 2010.  The hotline representative provided a case number and instructed her to follow up in two weeks.

465.   When Ms. Santangelo called back two weeks later, the hotline representative informed her that Bayer had received her report and "would address it in accordance with its procedures."  At that time, she informed the hotline representative that she was disappointed by this vague response to her detailed complaint.  The hotline representative replied that she could call in another two weeks for more information.

466.   Over the course of the next month, she called the hotline every two weeks.  Each time she called, the hotline representative had nothing to report.  During this period, Defendant Scott continued to sexually harass Ms. Santangelo.

467.   When her third or fourth call yielded no additional information, Ms. Santangelo asked the hotline representative to share her report anonymously with Bayer Corporation's Ombudsman Melissa Cameron.

468.   Approximately one week later, and almost two months after her initial complaint, Ms. Santangelo contacted Ombudsman Cameron directly and asked her how the Company was

responding to her complaint.   Ombudsman Cameron informed Ms. Santangelo that Director

Scott was participating in "sensitivity training."   Ombudsman Cameron provided no further

information, including whether that training was in response to Ms. Santangelo's complaints, the

complaints of others or any complaints at all; whether her concerns were being investigated; or

what additional steps, if any, Bayer might take to address the ongoing harassment that she was

experiencing.

469.     Despite this alleged training, Defendant Scott's inappropriate behavior toward

Ms. Santangelo continued.  Desperate for a resolution, around November 2010, she went to HR.

During her initial conversation with HR Representative Egor Zhelezniak ("Mr. Zhelezniak"), she

informed him that she wanted to remain anonymous.   However, Mr. Zhelezniak informed her

that she would have to reveal her identity if she wanted the harassment to stop.   Specifically, he

stated, "If you want [Defendant Scott] to stop approaching you, we have to be able to tell him to

stop approaching *you* in particular."   His comment made clear to her that HR did not feel it

necessary to demand that Defendant Scott stop his behavior in general.  By this point, she was so

desperate for a resolution that she agreed to reveal her identity in the HR complaint.   However,

even after she did so, the harassment did not stop.

470.     Upset by the way that HR had handled her complaint, in December 2010 Ms.

Santangelo decided to confide in Manager Brachfeld.   Manager Brachfeld dismissed or

diminished her concerns and otherwise made it seem like the sexual harassment she was

experiencing was her fault or her problem.  For example, when she explained to Manager

Brachfeld that being in an elevator with Defendant Scott made her uncomfortable, he replied,

"Why don't you just stop taking the elevator?"  His reactions during this conversation made clear

to her that Manager Brachfeld was unwilling to address her concerns in any way.   Indeed,

Defendant Scott's harassment of her continued, creating a hostile working environment for her on a daily basis. Upon information and belief, Manager Brachfeld did nothing about the problem.

471. Around this same time, Ms. Santangelo also reached out to the head of the department, Defendant Knapp. She told him that she was uncomfortable reporting to Manager Brachfeld due to the sexual harassment she was experiencing with Defendant Scott. She further told him that she was not the only one going through this treatment, and that she had spoken to other women who were being harassed by Defendant Scott. Ms. Santangelo brought to his attention that his own administrative assistant Karin Valentine ("Ms. Valentine") had suffered sexual harassment. She further mentioned that both she and Ms. Valentine had informed HR about this harassment. Director Knapp showed no interest in her concerns. Indeed, his responses were limited to shrugging his shoulders and making comments to the effect of, "That sucks." His reaction indicated to Ms. Santangelo that he was not interested at all in protecting her or other women from the ongoing sexual harassment taking place in his own department.

472. On January 20, 2011, Ms. Santangelo contacted Defendant Scott's direct supervisor, former Vice President and Assistant General Counsel of Bayer HealthCare William Hawxhurst ("General Counsel Hawxhurst"). She sent an email to HR and General Counsel Hawxhurst that recounted several specific instances of sexual harassment directed by Defendant Scott over the past year. She did not hear any response from General Counsel Hawxhurst regarding her email and so she approached him a few days later while he was on his way out of the office. When she explained to him what she was going through, he told her, "Well, some people just don't appreciate other people's senses of humor."

473.    On January 21, 2011, Ms. Santangelo received an email from Defendant Platkin. Defendant Platkin stated in his email that "an investigation was immediately undertaken and that five employees were interviewed."  He concluded that, "based upon those interviews, the allegations of sexual harassment were not substantiated."

474.    Ms. Santangelo was extremely frustrated by Defendant Platkin's response.  She replied to his email and conveyed her concern that the investigation was inadequate.  Simply put, it was clear that the Company was not invested in treating the matter seriously or otherwise protecting her.  In her reply, she asked Defendant Platkin to contact her for more information to aid in the investigation of her complaint.  However, Defendant Platkin never contacted Ms. Santangelo for more information, for her responses to any defenses offered by her harasser or his friend, her boss, or for a conversation regarding her concerns with Bayer's cursory investigation.

475.    After she learned of the conclusion of Bayer's investigation, Ms. Santangelo reached out to HR again to ask them about how the investigation had been conducted.  Mr. Zhelezniak informed her that Bayer had randomly interviewed five of Defendant Scott's peers and did not confirm whether these individuals were male or female.  When Ms. Santangenlo expressed her frustration specifically about the fact that she was still under the management of Manager Brachfeld, Mr. Zhelezniak responded by telling her that the Company couldn't "control who was friends with who."  Based on the tone of the conversation, Ms. Santangelo took Mr. Zhelezniak's comments to mean that HR would not take any further steps to protect her.

476.    Ms. Santangelo was not the only employee who endured or observed sexual harassment perpetrated by Defendant Scott.  In fact, when she asked a male colleague if he was familiar with Defendant Scott's reputation, he confirmed that Defendant Scott was a "womanizer." Defendant Scott harassed other female employees in the office frequently and with

93

impunity.  Ms. Santangelo has spoken to three other women at Bayer and learned from each of them that they had experienced similar harassment at the hands of Defendant Scott.

477.    For example, Ms. Santangelo learned from Ms. Valentine that Director Scott had subjected her to similar treatment.  Specifically, Ms. Valentine told Ms. Santangelo that she and Director Scott had attended the same CPR training course and that during the course, Director Scott had commented that he wished he and Ms. Valentine could be partners and "practice on each other rather than the dummies."  At one point, when Ms. Valentine was kneeling over the dummy, Director Scott looked at her from behind and said, "I really like how you look on all fours."

478.    Ms. Valentine informed Ms. Santangelo that she had been interviewed by the Company in response to Ms. Santangelo's sexual harassment complaint around January 2011.  Prior to Ms. Valentine's interview, Defendant Knapp had tried to dissuade her from testifying by telling her that she should "stay out of it."  Ms. Valentine further confided in Ms. Santangelo that the Company had made her feel extremely uncomfortable during the interview.  Specifically, she felt that Mr. Zhelezniak's behavior had been "out of line."  She informed Ms. Santangelo that, during the interview, Mr. Zhelezniak had continuously rolled his eyes and made her feel as though he did not believe her claims.

479.    On March 28, 2011, Ms. Santangelo sent an email to former President of Bayer HealthCare Consumer Care Gary Balkema ("President Balkema") and to General Counsel Hawxhurst.  In this email, she described the sexual harassment she suffered, her numerous reports the Company, and her recent efforts to improve the hostile work environment.  Neither President Balkema nor General Counsel Hawxhurst replied to acknowledge her concerns.

480.    Upon information and belief, Defendant Scott did not experience any disciplinary

actions as a result of his treatment of Ms. Santangelo and of other female employees.

481.    Indeed, even during Defendant Platkin's supposed investigation of her claims, Defendant Scott's harassment of her continued.  When Ms. Santangelo returned to the office after the holidays, Defendant Scott approached her with his arms outstretched, moving in for what he proclaimed was a "New Year's hug" while staring at her chest.  She turned around and ignored him.  This incident caused her tremendous stress, as she realized that her repeated attempts to go through Bayer's compliance channels had led to no improvement.

482.    Although Ms. Santangelo had no further direct interaction with Director Scott after this point, she began to experience increasing levels of retaliation.

### d.    Retaliation

483.    In fact, Bayer has subjected Ms. Santangelo to an escalating campaign of retaliation since she openly reported the sexual harassment.

484.    Following her report of sexual harassment, Manager Brachfeld has constructively demoted Ms. Santangelo by replacing her high-level duties with work that is appropriate for employees at significantly lower grade levels.  Specifically, he assigned her to working with very basic data entry systems while simultaneously transferring her previous responsibility of drafting reports to a less qualified male, Peter Jain ("Mr. Jain"), even though Mr. Jain has received numerous complaints regarding his performance.   No other employees have had their responsibilities similarly downgraded. This change in her responsibilities has negatively impacted her opportunities for promotion.

485.    In addition, at the end of 2010, Ms. Santangelo began asking Manager Brachfeld to let her move to a different floor so that she would not have to encounter Defendant Scott. Manager Brachfeld denied her request numerous times even though she informed him that this

move was to help her recover from the emotional stress she had experienced due to the events of the past year.

486.    Thus, at the beginning of 2011, Ms. Santangelo reached out to HR in hopes of getting a more positive response.  She informed HR that there was an open cubicle on another floor in the office.  HR responded to this request by demanding a doctor's note stating a specific medical reason for the move.  When Ms. Santangelo obtained a note from her psychiatrist confirming that the move was necessary for her emotional wellbeing, Bayer nonetheless refused her request, stating vaguely that it wanted to "avoid disruptions."  The Company's continued refusal to grant her move communicated to her that it had no interest in helping her leave the hostile work environment to which she was subjected.

487.    Finally, in January 2011, Manager Brachfeld delivered Ms. Santangelo's annual performance review for 2010.  During the review meeting, Manager Brachfeld stated that he had wanted to assign a rating of "partially meets expectations" to her performance because she was "too emotional."  He made this comment both verbally and in writing.  Further, he threatened that if she continued to be "too emotional" in the next year, her rating would be lowered.

488.    A rating of "partially meets expectations" would result in a denial of salary increase, make her ineligible to apply for other positions within the Company, and effectively halt her progress towards obtaining a promotion to the VS 1.2 Level.  In addition, it could have led to disciplinary steps, including ones that might ultimately lead to termination.

489.    This was the first time anyone had ever commented in any way on Ms. Santangelo's "emotional" nature or professionalism.  The only times she ever had been emotional or otherwise upset in the office was after she had experienced harassment by Defendant Scott or had been dismissed or otherwise minimized by HR and management in

96

reporting her claims.

490.    On May 2, 2011, Ms. Santangelo met with Director of Human Resources at Bayer HealthCare Megan Krueger ("Director Krueger").    During this meeting, Ms. Santangelo informed Director Krueger that she had no choice but to take medical leave until Bayer could provide her with a work environment free of sexual harassment, hostility, and retaliation.  Ms. Santangelo recounted all of the events of the past year, including her multiple and futile attempts at obtaining support from the Company.  She further informed Director Krueger of the immense emotional toll that this experience had had on her.  When Ms. Santangelo described the ongoing hostility and retaliation she began experiencing after her complaints about the sexual harassment, Director Krueger replied, "Well, it was your conscious decision to lose your anonymity."  Ms. Santangelo was shocked by Director Krueger's comment and pointed out that she had only revealed her anonymity because HR had told her that she would have to identify herself if she wanted the harassment to stop.    However, Director Krueger continued to dismiss Ms. Santangelo's concerns.  Ms. Santangelo was devastated by Director Krueger's attitude towards her.  This meeting confirmed to Ms. Santangelo that Bayer would not take any steps even at this point to protect her.

491.    On May 3, 2011, Ms. Santangelo formally announced her medical leave in an email to Defendant Platkin, Defendant Knapp, President Trudeau, and current President and CEO of Bayer HealthCare Consumer Care Erica Mann ("President Mann").  She also informed them that she was suffering extreme emotional trauma and physical stress due to the ongoing harassment and the lack of support from the Company.  Moreover, Ms. Santangelo pointed out to them that she knew of four women who had been subjected to similar harassment by Defendant Scott.    Finally,  she  notified  him  that  she  had  experienced  retaliation  directed  by  Manager

Brachfeld due to her complaint about the sexual harassment.  She has received no response.

492.    Ms. Santangelo commenced Short Term Disability leave on May 3, 2011 and began Long Term Disability leave in August 2011.  She remains on medical leave today.

### I.    GRETCHEN LIENHOP'S FACTUAL ALLEGATIONS

493.    Ms. Lienhop is a current employee of Bayer.  She holds the title of Key Account Manager in Bayer Animal Health in its Pet Specialty group in Shawnee, Kansas.

494.    Ms. Lienhop has consistently achieved superior performance results, receiving "meets expectations" or "exceeds expectations" on performance reviews for every year of her employment with Bayer Animal Health.  During her time at Bayer, she has received two Vendor of the Year Awards, two "On-the-Spot" Awards, the Bayer Council Award, multiple Education Partner of the Year Awards, a STAR Award, and a Driving Business Award.

495.    Despite her consistently strong performance, Ms. Lienhop has been denied opportunities for advancement and promotion on the basis of her gender.  Over the course of her employment, Bayer has denied her promotional and career-enhancing opportunities, and denied her pay comparable to that of her male counterparts.

### 1.    Ms. Lienhop's Educational And Work Background Prior to Her Employment at Bayer

496.    Ms. Lienhop obtained a Bachelor of Science/Marketing from Millikin University.

497.    After obtaining her Bachelor's degree, Ms. Lienhop worked for JC Penney as a Merchandise Manager in Kansas City, Kansas.

498.    On December 14, 1981, Ms. Lienhop joined Kraft General Foods as a Sales Representative.  During her tenure, Ms. Lienhop demonstrated exceptional performance, moving up quickly within Kraft.  At the time she left Kraft in 1994, her title was District Category Sales Planner.

2.    **Ms. Lienhop's Employment With Bayer**

      a.    **Bayer HealthCare Consumer Care – Customer Business Manager: 1994 to 1999, Orlando, Florida**

499.    In 1994, Ms. Lienhop began her employment at Bayer in its Consumer Care business, known as Miles Laboratories until 1995, as a Customer Business Manager in Orlando, Florida.

      b.    **Bayer HealthCare Consumer Care – Team Leader: 1999 to 2000, Orlando, Florida**

500.    In 1999, Ms. Lienhop was promoted to Market Manager/Team Leader.

      c.    **Bayer HealthCare Consumer Care – Market Manager I: 2000 to 2001, Orlando, Florida**

501.    From 2000 to 2001, Ms. Lienhop served as Market Manager.

      d.    **Bayer HealthCare Consumer Care – Market Manager II: 2001 to 2004, Orlando, Florida**

502.    In 2001, Ms. Lienhop was promoted to Market Manager II and served in that position until 2004 when she joined Diabetes Care.

      e.    **Bayer HealthCare Diabetes Care – Regional Account Manager: 2004 to 2006, Orlando, Florida**

503.    In 2004, Ms. Lienhop joined Bayer Diabetes Care as a Regional Account Manager in Orlando, Florida.

      f.    **Bayer HealthCare Animal Health, Companion Animals – Key Account Marketing Manager: 2006 to 2011, Shawnee, Kansas**

504.    In 2006, Ms. Lienhop began working with Animal Health in its Companion Animals group as Key Account Marketing Manager.

g.      **Bayer HealthCare Animal Health, Pet Specialty – Key Account Manager: 2011 to Present, Shawnee, Kansas**

505.    In 2011, Ms. Lienhop was transferred to the Pet Specialty Division of Animal Health to work in the role of Key Account Manager.  She continues to hold this position today.

3.      **Bayer's Retaliatory and Discriminatory Acts Against Ms. Lienhop**

a.      **Discriminatory Compensation**

506.    During her employment at Bayer, Ms. Lienhop's supervisors have denied her salary increases equal to that of her male counterparts for similar performance.

507.    Bayer's compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress or challenge that would otherwise have ensured that there was no disparate impact on or disparate treatment of female employees.  As a result of these flaws in the system and/or because Bayer management systematically took advantage of these flaws in the system, female employees continue to be paid less than similarly-situated male employees even after demonstrating evidence of disparities in pay.

508.    For example, Bayer's policy governing merit increases to salary, which emanates from Bayer's corporate office, has a discriminatory disparate impact on female employees.  Each year the Company determines the merit increase percent that serves as the average increase a manager can give to direct reports.  Thus, a manager who wants to give one employee a merit increase above the yearly corporate average must grant another employee a merit increase below the corporate average in order to stay in compliance with Company policy.  Upon information and belief, this policy and practice has been in place for as long as Ms. Lienhop has been employed at Bayer.

509.    Upon information and belief, Bayer paid Ms. Lienhop at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

510.    In April 2010 Ms. Lienhop received a minimal salary increase that did not reflect the quality of her performance.  Specifically, she received a salary increase of 1.7 percent for meeting expectations, which was below the average for that year.  Upon information and belief, Ms. Lienhop's male colleagues received greater increases for equal or inferior performance for that year and the other years of her employment.

511.    Over the course of her employment, suspicions that her merit increases were not appropriately calculated prompted Ms. Lienhop to ask her managers what the merit increase averages were for particular years.  On several occasions, her managers declined or avoided disclosing to her the merit increase averages.  For instance, in early 2010 Ms. Lienhop asked her direct supervisor Director Roy Brackett ("Director Brackett") what the average had been for 2009 because she had concerns that her salary increase was below what her performance merited.  Director Brackett avoided disclosing it to her, and she ultimately had to seek out the information from a female employee in the Sales Department.

512.    Further, Bayer policies also allow for "lump sum" payments that managers can award their employees.  These payments are not calculated as part of the merit increase percentages and are distributed at the discretion of managers.  Over the course of her employment, Ms. Lienhop has never received a lump sum payment to offset low merit increases.

513.    Ms. Lienhop received a minimal salary increase of 1 percent in connection with her transfer to the Pet Specialty division in October 2011.

514.    Upon information and belief, after almost 18 years with the Company, she is earning at least $20,000 below the maximum for the VS 1.3 salary grade, and receives less compensation than what a male employee with similar tenure, experience, and performance would receive.

### b.    Discriminatory Denial of Promotional and Career-Enhancement Opportunities

515.    Ms. Lienhop has been employed at Bayer and its predecessor company for approximately eighteen years.  Throughout her employment, she has expressed interest in being considered for promotional and career-enhancement opportunities. For years, she consistently communicated her desire to be promoted into a higher management position or into a lateral position in Bayer's new and flourishing Pet Specialty division.

516.    When Bayer announced a plan to increase direct sales and marketing with pet retailers, thereby increasing its number of Pet Specialty positions, Ms. Lienhop repeatedly asked to be considered for a lateral promotion into one of these positions.  Because Pet Specialty was a thriving division at Bayer Animal Health, a promotion to a Pet Specialty position would have resulted in more career-enhancing opportunities, increased exposure in dealing with new vendors, and increased bonus.  Ms. Lienhop was particularly well-qualified for the Pet Specialty division because of her more than 20 years of experience dealing with retailers.

517.    Ms. Lienhop's tenure and performance results made her a highly qualified candidate for this promotion.  She had exceptionally strong relationships and many years of experience working with retailers much larger than any of Bayer Animal Health's pet retailers, and had consistently demonstrated her qualifications for this position through her superior job performance in her prior roles.

518.    Employees at Bayer are promoted within a system that lacks sufficient standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress. Amid this insufficiently designed system, Bayer consistently denied Ms. Lienhop promotions and desirable lateral transfers.  Despite her qualifications and her clearly articulated interest in a promotion, Bayer continuously passed her over for each available position.  Rather than select a highly qualified and tenured female employee for the role, Bayer granted the positions to males, many of whom were less qualified and less experienced.

519.    For example, in early 2010, Bayer posted a position for Key Account Manager for Petsmart.  This position would have been a lateral promotion for Ms. Lienhop, in that she would have been handling substantially similar duties but in the more promising Pet Specialty division. Ms. Lienhop spoke with Vice President of the Companion Animal Business Peter Ryan ("VP Ryan") to express her continued interest and strong qualifications for the role.  However, despite her many qualifications, she was not seriously considered for the role and was given only a courtesy interview.  In fact, Human Resources Director Jamie Jackson ("HR Director Jackson") informed her that Bayer had already set their sights on another candidate.  Not long after, she learned that an external male candidate man named Ken Bendon ("Mr. Bendon") was hired for the role, despite Ms. Lienhop's tenure at the Company and more extensive experience working with retailers.   In fact, upon information and belief, Mr. Bendon's inability to meet the expectations of his role led Bayer to shift portions of his job duties to Ms. Lienhop and ultimately resulted in his termination in April 2012.

520.    Upon information and belief, Bayer does not post all available opportunities.  A few months later, in May 2010, Ms. Lienhop was passed over again for a promotion for which she was not even given the opportunity to apply.  Without posting the job, Bayer announced that

another male employee, Dan Peizer ("Mr. Peizer"), would assume the position of Sales Manager of Pet Specialty.  This position would have been a promotion for her, both because it was in the more desirable Pet Specialty division and because (a) it required management of four or five subordinates; (b) it provided better access to vendors; and (c) it had a better compensation scale.

521.    Promotions at Bayer are not based on objective criteria.  Mr. Peizer lacked the basic qualifications required for this position.  He had no experience working with retailers and did not have the necessary management skills for the position.  Indeed, one of his two reports had made complaints about his poor management style.  Ms. Lienhop, on the other hand, had almost 30 years of relevant experience, including six years of experience successfully managing up to nine direct reports.  However, she was never made aware of the job opening nor considered for the position, despite the fact that she continuously expressed interest.

522.    After witnessing Bayer promote two male employees into positions for which she regularly had expressed interest, in June 2010, she contacted Bayer's Human Resources department ("HR") to discuss her concerns about Bayer's promotion practices.  HR Director Jackson dismissed her concerns.

523.    Bayer utilizes on a highly opaque "deployment" process to develop and promote employees without having to administer the full recruitment process.  Male employees are deployed into promotions or desirable lateral transfers as a way to groom them for managerial roles, while female employees are passed over for developmental roles or are otherwise assigned to less desirable positions.  When Ms. Lienhop discussed her concerns, HR justified Mr. Peizer's promotion as a "deployment," claiming that it was a part of Mr. Peizer's "career path."  When Ms. Lienhop inquired about her own "career path" and why she would not have been better for the position, HR did not have sufficient answers.  By the close of the conversation, it was clear to

her that Bayer prioritized the career advancement of a male employee, even at the expense of a female employee who consistently outperformed her male peers.

524.    In addition, on June 14, 2010, Ms. Lienhop contacted Bayer's HR recruiter and asked the recruiter why the Sales Manager position had not been posted prior to Mr. Peizer's deployment.  She received no response to her inquiry.

525.    In July 2010, Ms. Lienhop learned that Mr. Peizer had been moved from the Sales Manager position and that it again was available.  However, after she saw that this position was posted, HR Recruiter Lynn Brooks ("HR Recruiter Brooks") informed her that it had been posted in error.  Ms. Lienhop emailed Ms. Brooks and asked if she could apply for the position.  Bayer did not respond to her inquiry and instead appointed an external male candidate named Ken Allen ("Mr. Allen") for the role.  Even though she was much more tenured than Mr. Allen and had greater knowledge of the products, Ms. Lienhop was never contacted regarding the opening.

526.    During this period of time and despite her frustrations, Ms. Lienhop continued to express interest in a promotion.  In July 2010, another Key Account Manager position – a lateral position – became available.  However, when she approached HR Director Jackson to inquire about this opening, he told her that Bayer had already set its sights on an outside candidate. Moreover, he stated that he had focused on outside candidates because he had not known that she was interested in the promotion, even though she had repeatedly made her career desires clear over the course of several years. Upon information and belief, management purposefully did not consider Ms. Lienhop for these positions because of her gender.  Indeed, this position was given to a male.

527.    In August 2010, she met with HR Director Jackson to further discuss her concerns about the way Bayer treats its female employees.  When she pointed out that a disproportionate

amount of women were leaving Bayer, HR Director Jackson stated, "I can't figure out why they're leaving." She informed him that the problem was a result of Bayer having no clear vision for women in its future. Despite the clear iteration of her concerns, upon information and belief HR Director Jackson did not conduct any further investigation on the discrimination experienced by females at Bayer.

528.    In October 2010, several months after meeting with him, she received a call from HR Director Jackson. He told her that he was going to "deploy" her into a Pet Specialty position under Sales Manager Mr. Allen (hereinafter "Manager Allen"). Still unclear as to the process of a "deployment," Ms. Lienhop inquired about the timing and whether or not she would have to interview formally for the position. In response, HR Director Jackson told her to have an informal lunch interview with Manager Allen, and assured her that she would understand everything after the lunch.

529.    In November 2010, Ms. Lienhop met with Manager Allen regarding the deployment. Contrary to HR Director Jackson's indications, she learned during this conversation that the position had already been filled by a white male. Manager Allen further informed her that another position of Key Account Manager in Pet Specialty that would soon become available. He told her that she would be hired for the role once the position was approved.

530.    Soon after she met with Manager Allen, Ms. Lienhop learned from Animal Health Consultant Julian Gandolfo ("Mr. Gandolfo") that Bayer had interviewed him for the Key Account Manager Pet Specialty role earlier that year. Mr. Gandolfo was less experienced and was several VS levels below Ms. Lienhop. Despite the fact that the position had never been posted and Mr. Jackson's indication to her that the position had not yet been "approved," Ms.

Lienhop learned that Bayer had extended an offer to Mr. Gandolfo, which he ultimately declined because he did not want to relocate to Kansas.

531.    In December 2010, Manager Allen informed her that VP Ryan had put the position "on hold."  However, in March 2011, and before the position had been posted, a male colleague of hers named Joey Tomsic ("Mr. Tomsic") with no interest in Pet Specialty informed her that Manager Allen and Mr. Peizer had approached him to ask if he was interested in the role. Despite the fact that Manager Allen and HR Director Jackson had told her in November 2010 that she would receive the position, no one ever contacted her to discuss it.

532.    When she learned that Mr. Tomsic had declined the job offer, Ms. Lienhop sent an email to HR Director Jackson and Manager Allen inquiring about the status of the position and if it had been approved.  In response, Manager Allen told her that he did not want to promote her into the role because of "concerns about [her] salary," claiming that a promotion would bring attention to the fact that her salary was "too high."  However, at the time, she was earning $27,000 below the maximum for her pay grade even after 17 years of employment at Bayer. Moreover, upon information and belief, Bayer does not use "high" salaries to justify denials of promotions of male candidates.

533.    During the same meeting with Manager Allen, Ms. Lienhop stressed her interest and qualifications for the role.  He stated that she could find the job posting and apply for the position if she wished.  Ms. Lienhop informed him that the job in fact was not posted.

534.    A few weeks later, Ms. Lienhop saw that the Pet Specialty position had been posted on the company website, and that a requirement had been added to the position that made her ineligible. Specifically, the posting required eight years of veterinary business experience, and she only had five at that time.  She had never seen this requirement on any other postings for

similar positions.  She applied for the position, and her application was automatically rejected due to this requirement.

535.    In May 2011, she met with HR Director Jackson and her direct supervisor Area Business Director Kirk Gutekunst ("Director Gutekunst") to inquire again about her career development at Bayer.  HR Director Jackson informed her that Bayer considered her a "valued" employee, but that she would likely stay at her level for the remainder of her tenure or, at best, move up one level.  Ms. Lienhop was frustrated by HR Director Jackson's evaluation of her future career at the Company and asked him how this decision had been made.  He informed her that the decision had been made by Bayer's Personal and Organizational Conference "talent management" committee ("POC Committee").

536.    Bayer's development and promotion polices, practices, and procedures lack meaningful standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress that would otherwise ensure that female employees are developed and promoted commensurate with their abilities.  As an example of these flaws in the system, each of Bayer's businesses has a centralized POC Committee that is responsible for selecting which employees receive opportunities to move ahead within the business.  The POC Committee of Bayer Animal Health is made up of top executives within Animal Health, which include President Ian Spinks, Vice President Kent Luther, former Vice President Peter Ryan, Vice President Gilles Guillemette, Vice President Ernst Heinen, Vice President Steven Meeker, and Director Dr. Cary Christiansen.  All of the Animal Health executives sitting on the POC Committee are male.

537.    During her May 2011 conversation with HR Director Jackson and Director Gutekunst, Ms. Lienhop asked him to explain how the POC Committee had evaluated her

potential to advance within the Company.  In response, HR Director Jackson stated that they had examined her skills, performance, and her "career path."  However, when she asked Director Gutekunst, her direct supervisor, if the POC had ever contacted him to discuss her performance, he stated that they had not.

538.    Upon information and belief, the POC Committee does not sufficiently rely on objective measures of performance, tenure, or other relevant qualifications. As a result, disproportionately cultivates the careers of male employees at the expense of the careers of equally or more qualified female employees.  Indeed, over the course of her tenure at Bayer, Ms. Lienhop has witnessed male employees receive promotions more quickly than their female counterparts.  She has heard of women being told they can "go no higher" or that they cannot be considered for promotions due to taking maternity leave.  She has observed fourteen female employees leave Bayer because of their inability to advance their careers within the Company. For example, she personally witnessed Vice Presidents Peter Ryan and Gilles Guillemette – two members of Animal Health's POC – stall the career advancement of a female Vice President, Christine Pierson, and eventually force her out of the company with an unreasonable workload and hostile work environment.  Upon information and belief, HR did not conduct a thorough investigation or otherwise take steps to address her claims.

539.    In addition, in February 2010, Ms. Lienhop observed a male employee named Dr. Paris Revoir ("Dr. Revoir") being promoted laterally into the position of Pet Specialty Training Manager -- even though he had demonstrated difficulty meeting expectations in the past.  In fact, she was asked to manage Dr. Revoir while he was on a performance improvement plan, which is a development tool used for the lowest performing employees in danger of demotion, discipline

and termination.  She had to work with Dr. Revoir on a daily basis to support him and to help him address his performance issues.

540.    Unlike Dr. Revoir, Ms. Lienhop has never been placed on a performance improvement plan.  However, Bayer nonetheless prioritized his "career path" and development. Accordingly, Bayer selected him for the deployment and, furthermore, instructed Dr. Revoir not to discuss his deployment with her.

### c.    Insufficient Responses from Human Resources and Retaliation

541.    After her May 2011 conversation with HR Director Jackson, Ms. Lienhop was extremely upset by his prediction that she would not be able to move up much further, if at all, within the Company.  Thus, in June 2011, she again contacted HR Director Jackson to express her increasing concerns about Bayer's repeated refusal to consider her for promotions and career-enhancing opportunities and specifically why she had been rejected for the Key Account Manager Pet Specialty position.

542.    In June 2011, she met with Senior Counsel William Klemmick ("Senior Counsel Klemmick") to request that Bayer file a formal investigation into her complaints.  In this conversation, she informed him about her frustrations concerning the deployment that HR Director Jackson had promised her in 2010, including; the fact that Manager Allen and Mr. Peizer had offered a position to her male colleague Joey Tomsic while informing her that it was still subject to a hiring freeze; Manager Allen's comment that he was unable to promote her because her salary was "too high"; and her general sense that Bayer was unfairly shutting her out of opportunities for advancement because of her gender.  In addition, she provided Senior Counsel Klemmick with a list of approximately twelve women who she was concerned had left

Bayer due to lack of advancement opportunities.  Several of the women on this list had informed her that VP Ryan had told them that they would "go no higher" in the Company.

543.     In August, Ms. Lienhop met with HR Director Karen Barnes ("HR Director Barnes") regarding the findings of Bayer's investigation conducted by Senior Counsel Klemmick.  With respect to the "deployment" that HR Director Jackson had promised her in 2010, Ms. Barnes stated that these "deployments" were a part of Bayer policies concerning "talent management."  However, HR Director Barnes commented that they were being "abused" within the Company.

544.     As to Manager Allen's comment that he was unable to promote Ms. Lienhop because her salary was "too high," HR Director Barnes confirmed that salary could not be used to disqualify someone from a position.

545.     With respect to why the recent job posting for Key Account Manager had contained the atypical requirement of eight years minimum experience only after her interest in the position was confirmed, HR Director Barnes reported that they did not know why the requirement had been added to the job posting.  HR Director Barnes stated that she would follow up with Senior Counsel Klemmick to get more information as to how and why the requirement had appeared.  However, weeks later and after Ms. Lienhop had filed her complaint with the EEOC, HR Director Barnes told her that she could not comment on this particular matter anymore because Ms. Lienhop had sought legal guidance.

546.     During the meeting about the investigation findings, HR Director Barnes agreed to repost the position without the pretextual requirement and informed Ms. Lienhop that she could apply if she was interested.  Further, HR Director Barnes acknowledged that she was in

fact qualified for the position based on the actual requirements and that she was entitled to receive an interview.

547.    In this same conversation, Ms. Lienhop informed HR Director Barnes that there was another available position as Area Business Director for which she wanted to apply.  This position would place her into a higher role at a better compensation scale and with increased job responsibilities and opportunities.  She informed HR Director Barnes that she was qualified for the position as she had over seven years of experience in managing direct reports, as well as a strong background in finance, marketing, and sales.  HR Director Barnes acknowledged that Ms. Lienhop's extensive experience qualified her for this position and stated that she was entitled to an interview.

548.    Upon information and belief, HR did not take steps to discipline HR Director Jackson or investigate further the concerns she raised, nor did HR take any steps to discipline Manager Allen.  Further, when Ms. Lienhop asked Ms. Barnes if she could see a written copy of the investigation report, Ms. Barnes replied that the report was private and could not be shared with her.

549.    On August 5, 2011, Ms. Lienhop submitted applications for the Key Account Manager and the Area Business Director East position.

550.    On August 21, 2011, she also submitted an application in response to a Director of Area Sales job posting.  However, when she followed up with Ms. Barnes about this new opportunity, HR Director Barnes stated that the Director of Area Sales position was the same as the Area Business Director East job for which Ms. Lienhop had already applied. When Ms. Lienhop inquired as to why it had been reposted, HR Director Barnes stated that it was to allow

one of the other candidates—a male—to apply for the position after the first job posting had expired.

551.   HR Director Barnes' explanation was in direct contrast with the treatment Ms. Lienhop had received previously.  Specifically, in May 1, 2011, Bayer published a job posting for an Area Business Director position, for which she had been unable to apply because she had been out of town.  When she asked HR Recruiter Brooks if HR could repost the job so that she could submit an application, HR Recruiter Brooks denied her request outright.  HR Recruiter Brooks' response indicated to her that Bayer did not allow positions to be reposted for potential candidates to submit applications after the expiration of the posting.  However, following Ms. Lienhop's conversation with HR Director Barnes, she discovered that this was not the case and that Bayer had been willing to provide this exception to a male candidate.

552.   On September 1, 2011, Ms. Lienhop was interviewed by President of Animal Health Ian Spinks ("President Spinks"), VP of Companion Animal Business Ryan, Director of Food Animal Business Dr. Cary Christiansen, Area Business Director Jim Van Prosney and HR Director Barnes for the Area Business Director East position.  During her interview, she emphasized to Bayer her interest in the role and informed them that she met and exceeded all of the requirements for the position.  Following her interview, President Spinks stated that he had not been aware of the extent of her experience and background.

553.   Upon information and belief, the other candidates for the position being interviewed were three male Bayer employees.

554.   Later that day, Ms. Lienhop learned from one of the male candidates, John Ehlman ("Mr. Ehlman"), that he was told by HR Recruiter Brooks that his application and interview would be considered for two ABD positions.

113

555.     In her in-depth conversations with HR Director Barnes and her interviewers, Ms. Lienhop never received any indication that her application and interview for this position could potentially qualify her for this second Area Business Director position.   Immediately after learning about this fact from Mr. Ehlman, she sent an email to her interviewers stating that she met the requirements for the second role and thus wanted to be considered for both positions. She did not receive a reply to her inquiry.

556.     On Friday, September 16, 2011, VP Ryan came into her office and told her that she had not been selected for the first Area Business Director position for which she interviewed. She later learned that Bayer had selected a male employee, Kent Luther ("Mr. Luther"), for the position.

557.     Upon information and belief, Mr. Luther had been pre-selected for the role prior to the interviews.   Mr. Luther's interview was held on a separate day and at a different location than the rest of the candidates.   Further, Ms. Lienhop observed him participating in a Sales Leadership Meeting prior to his interview.   A Sales Leadership Meeting typically is not open to employees such as Mr. Luther, and instead is reserved for upper management, including the Area Business Director.   Thus, his participation in this meeting indicated to her that Bayer had pre-selected him for the position before interviewing all of the candidates and was already beginning to groom him for the role.   An invitation to attend a Sales Leadership Meeting would have provided Ms. Lienhop with an opportunity to develop her skills and gain additional insight to the Area Business Director East position prior to her interview.   However, she received no comparable opportunity.

558.     During her conversation with VP Ryan, Ms. Lienhop asked him why Mr. Luther had been selected for the position.   VP Ryan replied that Mr. Luther had given better answers in

his interview.  When she inquired as to whether anything she said during her interview had disqualified her or made her appear less qualified for the position, VP Ryan replied no.  Ms. Lienhop subsequently asked VP Ryan if there was any way she could have improved the responses she gave in her interview.  VP Ryan again said no, and repeated that Mr. Luther had given better responses to the interview questions.

559.  In that same conversation, Ms. Lienhop asked VP Ryan if Bayer was still recruiting for the second Area Business Director position, to which VP Ryan replied that the Company was not recruiting for that position and that the only position available to her now was a lateral one.  She pointed out to VP Ryan that, in fact, Bayer had posted the second Area Business Director position online.  He appeared surprised, and then restated that the Company was not intending to fill that position.

560.  VP Ryan then diverted the conversation from the promotional Area Business Manager positions to the lateral Key Account Manager position for which she had also applied. He asked her if she was still interested in that role, to which she replied that she was still interested, but would prefer to be considered for an opportunity to move upwards and advance her career.  She then emphasized that she wanted to be considered for the second Area Business Director position.  VP Ryan provided no response to this and walked out of her office.  His reaction indicated to her that he did not want to give her serious consideration for a promotion to Area Business Director.

561.  On September 23, 2011, Ms. Lienhop emailed HR Director Barnes to express concerns about the fact that she was not being considered for the second Area Business Director position.  In response, HR Director Barnes denied that any candidate had been informed during the interview that they were interviewing for both positions.  However, she acknowledged that

Bayer could select a candidate for a position without a formal interview, if that candidate had previously interviewed for a similar job.

562.    On September 29, 2011 (after Bayer was already aware that Ms. Lienhop had filed an EEOC Charge), Bayer interviewed her for the lateral Key Account Manager Pet Specialty position.  Her interview was conducted by Mr. Luther (hereinafter "Director Luther"), Manager Allen, and HR Director Barnes.  She was notified on October 4, 2011 that Bayer had given her the role.  This is the same position for which she had applied and repeatedly been denied over the course of the last couple of years.  She assumed this position on October 17, 2011.  This position is a lateral move within the same salary grade, and she now reports to Manager Allen, who in July 2010 had been appointed to the role of Sales Manager Pet Specialty, a position for which Ms. Lienhop had been qualified and had expressed interest in more than a year ago.

563.    Two years have passed since Ms. Lienhop first contacted HR about her concerns regarding gender discrimination.  It was only after two years of raising concerns and after seeking legal representation and filing an EEOC charge that she was formally interviewed for any lateral or promotional opportunities.  However, as described above, even then she was not given serious consideration for the promotional Area Business Director positions and was, instead, steered into a lateral position that is at the same reporting level and falls in the same salary grade.

564.    As a result of the discrimination to which Ms. Lienhop was subjected, she has remained in positions at the VS 1.3 salary grade for over six years despite having almost eighteen years of tenure at Bayer.  By contrast, her male counterparts have reached her salary grade after only two to five years at the Company and many of Ms. Lienhop's male counterparts

with less experience, tenure, and inferior performance are at VS 1.3 or above.  The Pet Specialty Manager position she wanted in 2010 would have placed her at the salary grade VS 2.0, and the Area Business Director positions would have placed her at the salary grade VS 3.0, with a higher corresponding salary and accelerated advancement opportunities.

565.    Overall, Ms. Lienhop has seen no significant advances in response to her particular concerns, nor has she seen any proof that HR has taken any steps to rectify the discriminatory treatment that other women experience – discrimination that appears to emanate at least in part from the talent management committee of Bayer Animal Health.

566.    In fact, in April 2012, Ms. Lienhop received a retaliatory performance review that did not accurately reflect her superior performance in 2011.  Despite having received a rating of "exceeds expectations" in her mid-year review in August 2011, Ms. Lienhop received electronic notification in April 2012 that Bayer had decided to lower her rating to "meets expectations." The notification was not accompanied by a written performance evaluation and did not specify who had given her the rating.

567.    Immediately after she learned that her rating had been lowered, she reached out to her direct supervisor Manager Allen to ask about how the decision had been made.  Manager Allen told her that he had not determined her rating for that year as he had only been her supervisor for a few weeks.

568.    Ms. Lienhop then scheduled a meeting with HR Director Barnes and HR Manager Brenda Avery-Byers ("HR Manager Avery-Byers") to discuss her performance rating.  She specifically asked HR Director Barnes who had made or approved the decision to give her a "meets expectations" rating, to which HR Director Barnes replied that she did not know but would look into the issue.

569.     When Ms. Lienhop stated that she was worried that the lowered performance would result in a lowered merit increase, HR Director Barnes replied that her performance rating would have less of an impact on her merit increase for 2011 than where she fell in her salary grade.  In response, Ms. Lienhop expressed concerns that this would have a negative impact on her as she previously had been told that her salary was already "high" for her salary grade.  HR Director Barnes did not reply to her concern and stated that determining her salary increase for the upcoming year was Manager Allen's responsibility.

570.     On April 10, 2012, HR Director Barnes informed Ms. Lienhop that Vice President (formerly, "Director") Kent Luther would contact her to discuss the rating.  She did not provide answers to Ms. Lienhop's questions about how the rating was determined or what her salary increase would be.

571.     Upon information and belief, the retaliatory performance rating will result in a merit increase less than what Ms. Lienhop is entitled to receive and would have received had she not expressed concerns to HR and the EEOC about the discrimination she faced at Bayer.

## J.    MS. SAWYER'S FACTUAL ALLEGATIONS

572.     Ms. Sawyer is a current employee of Bayer.  She holds the title of Senior Technical Project Manager in Bayer HealthCare Consumer Care's Global Product Development group in Morristown, New Jersey.

573.     Ms. Sawyer has consistently achieved superior performance results, receiving "meets expectations" or "exceeds expectations" on performance reviews for every year of her employment.  She completed a 360 feedback session in February 2010 with an external consultant hired by Bayer to assist in developing talent who described Ms. Sawyer as having "one of the best [reviews she had] seen in a long time."

574.   Bayer's development and promotion polices, practices, and procedures lack meaningful standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress that would otherwise ensure that female employees are developed and promoted commensurate with their abilities.  Despite her consistently strong performance, Ms. Sawyer's advancement at the Company has artificially stalled while she has been transferred into positions that are downgraded in VS level immediately prior to her assumption of the position. She has also been denied promotional opportunities and given unfair performance evaluations on the basis of her gender.

### 1.   Ms. Sawyer's Educational and Work Background Prior to Her Employment at Bayer

575.    Ms. Sawyer obtained a Bachelor of Science Degree from Eastern Connecticut State University. She then completed two years of graduate studies at the University of New Hampshire, focusing on analytical chemistry.

576.   After completing her studies at the University of New Hampshire, Ms. Sawyer joined the Sterling Winthrop Research Institute.

577.   Ms. Sawyer worked at Sterling Winthrop as a Research Scientist from 1982 until 1988.  In 1992, Ms. Sawyer rejoined Sterling.

### 2.   Ms. Sawyer's Employment with Bayer

#### a.   Research and Development, Global Product Development Division – Senior Research Scientist/Clinical Research Manager: 1994 to July 2005, Morristown, NJ

578.   Ms. Sawyer began her employment with Bayer in its Morristown location as a Senior Research Scientist in 1994 when it acquired Sterling Winthrop.  She held this position until 1998.  In 1998, she assumed the position of Clinical Research Manager and held that

position until 2000, when she resumed her role as Senior Research Scientist.  During this period, her research was patented, and she received an award from Bayer in 2002 for her work.

**b.      Research and Development, Global Product Development – Technical Documentation Manager: July 2005 to May 2007, Morristown, NJ**

579.    Ms. Sawyer was promoted in July 2005 to Technical Documentation Manager. She held this position until May 2007.

**c.      Research and Development, Global Project and Portfolio Management – Global Project Manager: May 2007 to June 2010, Morristown, NJ**

580.    In 2007, Ms. Sawyer was transferred to the position of Global Project Manager in the Global Project and Portfolio Management Division, a lateral move from her previous position.  In this position, she received an "On the Spot" Award for achieving publication of her research.  In further recognition of her strong performance on a global project, she was awarded a Special Recognition Award in 2008.

**d.      Research and Development, Global Product Development – Technical Project Manager: June 2010 to November 2011, Morristown, NJ**

581.    Ms. Sawyer transferred laterally to Technical Project Manager within the Global Product Development Division in June 2010.  Her research was published in 2010.

**e.      Research and Development, Global Product Development – Senior Technical Project Manager: November 2011 to Present, Morristown, NJ**

582.    In November 2011, Ms. Sawyer was promoted to Senior Technical Project Manager within the Global Product Development Division and presently holds this position.

### 3. Bayer's Discriminatory Acts Against Ms. Sawyer

#### a. Discriminatory Denial of Promotion

583.    During her employment at Bayer, Ms. Sawyer has been denied promotional opportunities on account of her gender.  For a six-year period from July 2005 until November 2011, she was artificially stalled at VS level 1.2.  Rather than promote Ms. Sawyer into a VS 1.3 level, as commensurate with her job duties and performance, Bayer systematically assigned her 1.3 level jobs, but maintained her 1.2 level status. To that end, Bayer shuffled her into different positions, downgrading each from VS level 1.3 to 1.2 before it was offered to Ms. Sawyer and subsequently restoring it to the VS 1.3 level before filling it with a male performing the same work.

584.    A higher VS level confers larger potential compensation, increased access to career enhancement opportunities, and is one of the primary measures of career advancement within Bayer.  Upon information and belief, Bayer does not require that VS levels correspond in a consistent way to responsibilities or performance objectives.  Instead, VS levels may be increased or decreased when a new employee assumes a position.

585.    The VS levels of male employees are increased faster and in larger intervals than those of female employees.  For example, male employees typically move from VS 1.2 to VS 1.3 in one to three years as long as they meet expectations. This practice has a disparate impact on the advancement and promotion of female employees.  Further, on information and belief, upper managers and HR personnel at Bayer take advantage of this flexibility in job classification to deliberately stall the careers of high-achieving female employees.

586.    Thus, the repeated denial of promotion from VS level 1.2 to 1.3 decreased Ms. Sawyer's earning potential, her exposure to career-enhancing opportunities, and slowed her career growth.

587.    In early 2007, Ms. Sawyer applied for a newly-created position, Senior Global Project Manager, which had been advertised at the VS 1.3 level. However, after Ms. Sawyer was identified as the person to fill the position, HR lowered its classification to a 1.2 and altered the title to "Global Project Manager" without changing the job responsibilities.  Ms. Sawyer was given no explanation for why the position's title and VS level had been downgraded when the scope and responsibilities had not.

588.    As Global Project Manager, Ms. Sawyer received positive performance reviews. In 2008, Ms. Sawyer fully met expectations for both Leadership and Business Objectives, and Senior Associate Director Angelo Petrillo ("Associate Director Petrillo") praised Ms. Sawyer for being "a very collaborative worker" who was "a trusted Project Manager for her teams and within the PM [Project Management] group."  However, despite performing the duties of a VS 1.3 role and meeting the expectations of her position, she was never upgraded to VS level 1.3.

589.    During a departmental reorganization in April 2010, Ms. Sawyer was told her position as Global Project Manager would be given to a less experienced male, Henri Marion ("Mr. Marion").  In this transition, her former position was immediately restored to VS 1.3, though, on information and belief, the job duties of the position remained substantively unchanged. Upon information and belief, the job was never posted.

590.    As part of this reorganization, Ms. Sawyer assumed a new role of Technical Project Manager, which had been created at the VS 1.3 level. However, when she inquired further into the details of the position's salary grade, Senior Director of Product Development

Jerry Meisel ("Director Meisel") told her that it would actually be at the "VS 1.2/1.3 level," and that she would have to begin at the VS 1.2 level.

591.    On information and belief, Bayer classifies positions as hybrid levels to allow management to circumvent formal hiring and promotion protocols.  Upon information and belief, this practice has a disparate impact and/or a discriminatory effect on women, who are more often assigned to lower VS levels when a position is classified at a hybrid level.  Indeed, by the time Ms. Sawyer moved in to the position, it was categorized as a VS 1.2.

592.    When Ms. Sawyer expressed concerns to Director Meisel about taking yet another lateral transfer, he informed her that she would be required to accept it with no change in salary or VS level.  Ms. Sawyer then asked Associate Director Petrillo why she was being instructed to take this position, to which he replied that her performance was "inadequate" and that she was "not a good fit" in her present position.  These comments directly contradicted the positive reviews Associate Director Petrillo had given Ms. Sawyer in previous years.

593.    Citing her previous performance and positive reviews, Ms. Sawyer requested a salary or VS level increase in her new role.  Director Meisel denied her request.  When she inquired as to whether or not there was a possibility for promotion in her future, Director Meisel stated that she would have to work in her new role for at least one year before she could be eligible for consideration.  At this point, Ms. Sawyer had been at VS level 1.2 for five years.

594.    In contrast to Ms. Sawyer's stalled progress, several male employees received upgrades in their VS levels and new titles as part of the reorganization.  Associate Director Petrillo was promoted from Associate Director, VS 2.0, to Director, VS 3.0.  Another male employee, Ken Bodnar, was promoted from Senior Project Manager, VS 1.3, to Associate Director, 2.0. Notably, neither Associate Director Petrillo (hereinafter "Director Petrillo") nor

Mr. Bodnar's "previous" positions were filled.  In fact, Director Petrillo and Mr. Bodnar were simply expected to perform the same functions but with a higher title and VS level.

595.    Ms. Sawyer continued to excel in her new role as Technical Project Manager.  In 2010, her review noted that she fully met Business Objectives and exceeded expectations for Leadership.   Director Meisel stated that she had "shown great leadership" and "tak[en] sometimes ambiguous tasks and deliver[ed] concise and accurate output."

596.    Despite her success, Ms. Sawyer's VS level was not upgraded from 1.2 to 1.3.  In addition, her inquiries regarding promotional opportunities were deflected by her supervisors with responses such as, "You haven't been here long enough," and, "We've decided to promote someone else."  When she approached Director Meisel about a promotion after she had fulfilled the supposed one-year requirement imposed by Bayer, Director Meisel acknowledged that she had demonstrated strong performance over the past year, but stated that she could not be promoted until she could demonstrate "proven sustainability" in her role.

### b.    Discriminatory Performance Evaluations

597.    In January of 2010, Ms. Sawyer received a discriminatory performance review from Director Petrillo and his manager Director of Global Project and Portfolio Management Graeme Smith ("Director Smith") for her performance in 2009.  Prior to this review, Ms. Sawyer had always met or exceeded expectations.  On her 2009 review, Director Petrillo and Director Smith acknowledged that Ms. Sawyer had fully met expectations with respect to her business objectives, but gave her a rating of "partially meets expectations" with respect to her leadership performance, stating that she needed to develop a "broad business sense" and "positive credible leadership abilities."  When she asked how she could address some of these alleged leadership deficiencies, Director Petrillo simply stated that they could be "master[ed] with more

experience." Ms. Sawyer's managers relied on poorly defined categories of "soft skills" to justify their failure to promote her yet again.

598. Based on her managers' feedback, Ms. Sawyer took the initiative to participate in a 360 feedback session in February 2010, which she was required to do in order to be eligible to work with Bayer-sponsored career coach Shelley Abramson, who had been hired by the Company to cultivate management talent. Ms. Sawyer hoped that participating in a 360 review would enable her to be considered for promotions and other developmental opportunities. Eighteen different people, consisting of peers, customers and managers, participated in the review.

599. Bayer's 360 feedback evaluations allow respondents to provide gendered and unfounded criticism that does not reflect objective measures of performance or previous reviews. Such criticism is then given undue weight, often at the expense of positive prior reviews and feedback. The results of the 360 review demonstrated that Ms. Sawyer exceeded expectations for her overall performance – with the exception of the ratings completed by Director Petrillo and Director Smith.

600. Director Petrillo and Director Smith consistently gave Ms. Sawyer many of the lowest ratings of her entire 360 review. Ms. Sawyer felt that the ratings given to her by her managers were discriminatory and inaccurate, particularly because they did not reflect the ratings she had received in previous reviews. The difference was so extreme that when Ms. Abramson reviewed the results, she documented the significant "gap area" between the rating of Ms. Sawyer's managers and those of her peers and customers. Ms. Abramson noted that the overall ratings Ms. Sawyer received in her review were "solid to very strong," and that Ms. Sawyer's was "one of the best 360's [she had] seen in a long time." However, the reviews given by

Director Petrillo and Director Smith stood in such stark contrast that Ms. Abramson concluded, "It's pretty clear they [Director Petrillo and Director Smith] are beating you up." Based on Ms. Abramson's understanding of Bayer's organizational structure and the requirements of VS 1.3 employees, she confirmed that Ms. Sawyer was qualified for promotion to the VS 1.3 level.

601.    The 360 review and her meeting with Ms. Abramson confirmed to Ms. Sawyer that her managers' ratings were inconsistent with the true level of her performance. However, when Ms. Sawyer brought Ms. Abramson's findings to Director Petrillo, he told her that he did not believe the results and avoided her attempts to discuss her career development at Bayer.

602.    In August 2011, Ms. Sawyer again approached Bayer management to inquire about a promotion opportunity. Director Meisel stated that he was "working on it." It was not until she had spent six years seeking promotions and demonstrating superior performance at the VS 1.2 level that Ms. Sawyer was promoted to Senior Technical Project Manager at VS 1.3 in November 2011. In those six years at the VS 1.2 level, Ms. Sawyer consistently met and exceeded the expectations of her roles.

603.    Upon information and belief, Bayer's non-transparent, inadequately designed, implemented and reviewed assignment, development, promotion and evaluation practices consistently result in the stalling of careers of female employees, while male employees are promoted more rapidly. For example, of the two male employees Ms. Sawyer knew who were at the VS 1.2 level, one was promoted in less than three years, and the other in one year. In general, each of the males promoted in her department were promoted after spending at most one to three years at his respective VS level.

### c.       Discriminatory Compensation

604.    Bayer's compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress or challenge that would otherwise have ensured that there was no disparate impact on or disparate treatment of female employees.  As a result of these flaws in the system and/or because Bayer management systematically took advantage of these flaws in the system, female employees continue to be paid less than similarly-situated male employees even after demonstrating evidence of disparities in pay.

605.    Around May 2010, Ms. Sawyer expressed concerns to Director Meisel that she was not being compensated appropriately for her tenure and experience.   During this conversation, she requested that she receive either an increase in VS level or a salary increase in connection with her transfer to the Technical Project Manager position, which had originally been created for VS level 1.3.

606.    Director Meisel stated that she needed to take the Technical Project Manager position at a VS 1.2/1.3 level because it would then be easier to promote her to the VS 1.3 level later.  He also told her that her compensation was at the upper end of her salary grade and that she made "enough."   Upon information and belief, Ms. Sawyer's salary at the time was at the middle of her pay grade of VS 1.2 – a pay grade at which she had worked for numerous years. Director Meisel suggested that she inquire about an increase in VS level and salary after she had been in the Technical Project Manager for a year.

607.    Ms. Sawyer understood Director Meisel's comment to mean that she was no longer eligible for a substantial salary increase unless Bayer decided to increase her VS level.

608.    In May 2011, a year later, Ms. Sawyer again approached Director Meisel regarding an increase in VS level.  Again, Director Meisel denied her request, responding that she still had not been in her new role long enough to be promoted because the first few months that she had been in the position "did not count," and that she needed to show "proven sustainability." At this time, Ms. Sawyer had been performing highly as a Technical Project Manager for a full year, and at the VS 1.2 level for more than five years.  Upon information and belief, an increase to VS level 1.3 would have allowed Ms. Sawyer to earn significantly more before reaching the maximum of the pay grade.  In addition, upon information and belief, during her employment at Bayer, Ms. Sawyer's supervisors have denied her annual merit increases equal to that of her male counterparts who demonstrated similar performance.

609.    For Ms. Sawyer's performance in 2010, she received ratings of fully meets expectations for her Business Objectives, and exceeds expectations for her Leadership Objectives.  However, she received a minimal salary increase of 1 percent for that year.  Upon information and belief, 1 percent was below the average merit increase guideline for an employee who fully met expectations, and male employees at Bayer received larger salary increases for similar performance at her level that year.

610.    Upon information and belief, her compensation is lower than what a male employee with similar tenure and performance would receive.  Further, because merit increases are based on percentages of an employee's salary, the discrepancy between Ms. Sawyer's compensation and that of her male counterparts widens with each increase.

611.    Upon information and belief, Ms. Sawyer was not the only woman to suffer the effects of the compensation policies and practices at Bayer, which lacked sufficient standards

and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.

### K.   MS. SIMPSON'S FACTUAL ALLEGATIONS

612.   Ms. Simpson is a former employee of Bayer.  At the time she left Bayer, she held the title of Senior Animal Health Consultant for Bayer HealthCare Animal Health.

613.   Throughout her eight years of employment with Bayer, Ms. Simpson was a consistently strong performer and received ratings of "meets expectations" or "exceeds expectations" every year, with the exception of two discriminatory reviews she received from Regional Manager John Ehlman ("Manager Ehlman").  In recognition of her strong performance, she was awarded Sales Consultant of the Quarter in 2007 and was named Century Club Winner in 2007, 2008 and 2009.

614.   Bayer's development and promotion polices, practices, and procedures lack meaningful standards, quality controls, implementation metrics, transparency, oversight, and opportunities for redress that would otherwise ensure that female employees are developed and promoted commensurate with their abilities. Despite her exemplary performance, her career has artificially stalled on account of Bayer's discriminatory employment practices.  Over the course of her employment, the Company has denied her pay comparable to that of her male counterparts, denied her promotional opportunities, given unfair performance evaluations, and subjected her to a hostile work environment on the basis of her gender and her status as a working mother.

615.   No longer able to tolerate the discrimination to which she was being subjected, she had no choice but to resign from her position at Bayer in February 2012.

### 1.     Ms. Simpson's Background Prior To Her Employment at Bayer

616.     Ms. Simpson graduated from Eastern Kentucky University with a Bachelor of Science Degree in Environmental Resources in 1997.

617.     Prior to joining the Company, Ms. Simpson had worked in the sales industry for 2.5 years, during which she consistently demonstrated strong performance.

### 2.     Ms. Simpson's Employment at Bayer

#### a.     Bayer HealthCare Diabetes Care – Diabetes Care Specialist I: May 2004 to May 2005, Lexington, Kentucky

618.     Ms. Simpson began her employment at Bayer HealthCare Diabetes Care as a Diabetes Care Specialist I in Lexington, Kentucky in May 2004.

#### b.     Bayer HealthCare Diabetes Care – Diabetes Care Specialist II: May 2005 to October 2006, Lexington, Kentucky

619.     In May 2005, Ms. Simpson was leveled to Diabetes Care Specialist II.

#### c.     Bayer HealthCare Animal Health – Animal Health Consultant: October 2006 to Fall 2008, Lexington, Kentucky

620.     In October 2006, Ms. Simpson transferred laterally into Bayer's Animal Health business unit as an Animal Health Consultant in Lexington, Kentucky.

#### d.     Bayer HealthCare Animal Health – Senior Animal Health Consultant: Fall 2008 to February 2012, Lexington, Kentucky

621.     In Fall 2008, Ms. Simpson was leveled to Senior Animal Health Consultant.  She held this position until the date of her constructive discharge.

### 3.     Bayer's Discriminatory Acts Against Ms. Simpson

#### a.     Discriminatory Compensation

622.     Bayer's compensation system lacks sufficient standards, quality controls, implementation metrics, transparency, oversight and opportunities for redress or challenge that

would otherwise have ensured that there was no disparate impact on or disparate treatment of female employees.  As a result of these flaws in the system and/or because Bayer management systematically took advantage of flaws in the system, female employees continue to be paid less than similarly-situated male employees even after demonstrating evidence of disparities in pay.

623.    During her eight years of employment at Bayer, the Company has compensated her at the bottom end of the pay ranges for each of her positions.

624.    When she was hired, Bayer compensated Ms. Simpson at a salary lower than those paid to her male counterparts who were hired in with similar levels of experience.  Upon information and belief, her male counterparts were offered base salaries approximately $10,000-15,000 above what was offered to Ms. Simpson.

625.    During a 2006 adjustment undertaken to match industry standards, Bayer nevertheless failed to adjust her salary to make it equal to that of her male counterparts.  In connection with this equity adjustment, Bayer awarded Ms. Simpson and all of her male counterparts proportional salary increases and, upon information and belief, failed to address the pay disparity between her and similarly-situated males.

626.    Further, even with this increase, Ms. Simpson continued to be compensated at the bottom end of her salary grade despite having always met and exceeded the expectations for her position.

627.    Ms. Simpson continued to be compensated at the bottom of her salary grade up until the date of her resignation and was still earning $32,000 below the maximum for her salary grade at the time that she left the Company.  Upon information and belief, male employees demonstrating performance equivalent to hers were more highly compensated.

628.    During each mid-year and annual performance review, Ms. Simpson consistently

expressed concerns to Manager Ehlman that she was being unfairly under-compensated for an employee with her performance record and experience. However, whenever she requested a salary adjustment to bring her in line with her male counterparts, Manager Ehlman would state, "We're not giving out raises at this time."

629.     Moreover, Bayer consistently failed to equalize her salary when awarding merit increases. For instance, in 2007, Ms. Simpson received a salary increase of 0.5 percent for achieving 118 percent of her sales quota. On average, Ms. Simpson received minimal salary increases of 1 to 1.5 percent for meeting or exceeding the expectations of her position and her sales goals. Upon information and belief, males achieving the same performance received higher percentage salary increases.

630.     Furthermore, because her bonus potential and merit increases were tied to her base salary and because she received discriminatory performance ratings from Bayer, the gap between her compensation and her male counterparts' compensation continued to increase until she left Bayer and would have continued to grow had she remained with the Company.

### b.     Hostile Work Environment

631.     Ms. Simpson's direct supervisor, Manager Ehlman, subjected her to a hostile work environment. Specifically, he fostered a working environment in which males were given special privileges, disproportionate access to resources, and greater exposure to decision-makers, while the accomplishments and performance of female employees, particularly those with childcare responsibilities, were consistently minimized and devalued.

632.     During her time at Bayer, Ms. Simpson observed Manager Ehlman frequently holding events from which female Sales Consultants were excluded. For example, during a

regional sales meeting in May 2011, Manager Ehlman hosted a team dinner to which only male Sales Consultants were invited.

633.    In addition, Manager Ehlman demonstrated a misogynistic attitude towards women and women with primary childcare responsibilities. For example, he often made disparaging comments about his wife in the presence of his female reports.  On one occasion, he had a phone conversation with his wife in the presence of Ms. Simpson in which he yelled at his wife and asked her if she was "fucking stupid."  He also made belittling comments to Ms. Simpson about his wife, who stayed home to care for their two young children, complaining that he did not know "what she d[id] all day."

634.    These comments and the treatment to which he subjected Ms. Simpson indicated to her that he had a misogynistic attitude towards women and, in particular, those with primary child-rearing responsibilities.  Overall, his actions fostered an environment in which she and her female colleagues were subjected to increased scrutiny and were expected to perform to higher standards than her male counterparts in order to be judged as "good employees" by their superiors.

### c.    Discriminatory Denial of Promotional and Career-Enhancing Opportunities

635.    Despite Ms. Simpson's strong performance, Bayer denied her promotional and developmental opportunities in favor of less-qualified male employees.

636.    During a national sales meeting in January 2009, Bayer announced that the Equine Specialist position in Ms. Simpson's territory had been granted to her male colleague, Sam Osbourn ("Mr. Osbourn").  The position had never been posted.  Further, even though she was extremely qualified for the role and previously had expressed interest in promotional and developmental opportunities, management never mentioned the job opportunity to Ms. Simpson.

637.   The Equine Specialist position was more prestigious than her own because it involved increased exposure to clients and management, increased leadership opportunities, and higher earning potential.  Ms. Simpson was uniquely qualified for the role, as she had one of the largest equine volume territories and was working with some of the largest equine accounts in the region, if not in the entire country.  Nonetheless, Bayer never contacted her about the position and instead gave it to Mr. Osbourn, who had very little, if any, of the experience and knowledge of equine products required for the role.

638.   After learning that she had been denied an opportunity to apply for the Equine Specialist position, Ms. Simpson reached out to Manager Ehlman to inquire as to why she had not been notified that the job was available.  Manager Ehlman dismissed her concerns and defended the Company's actions by stating, "It is what it is."  The tone of his response indicated to her that he was not willing to take her concerns seriously or to discuss her interest in the position.

639.   After she was unable to get a satisfactory response from Manager Ehlman, Ms. Simpson contacted Bayer's Ombuds to relay her concerns.  However, where HR and Ombuds complaint and compliance policies exist at Bayer, they lack meaningful quality controls, standards, implementation metrics, and means of redress, such that upper management and HR may ignore, disregard, minimize, cover up, mishandle or otherwise fail to properly respond to evidence of discrimination in the workplace.  There is no meaningful separation between complaint reporting channels and the managers who create discriminatory or hostile working conditions for women and mothers, such that victims of discrimination are dissuaded from raising concerns altogether.

640.    For example, during her conversation with Ombuds, Ms. Simpson expressed to Ombudsman Melissa Cameron ("Ombudsman Cameron") that she believed she was being discriminated against because of her gender.  Ombudsman Cameron directed Ms. Simpson to talk to Manager Ehlman to resolve her complaint.  Due to Manager Ehlman's involvement in the treatment about which she had concerns and because she had already attempted to discuss the matter with him, Ms. Simpson informed Ombudsman Cameron that she was not comfortable raising her concerns about discrimination face to face.

641.    Rather than addressing her concerns about retaliation, Ombudsman Cameron simply deflected Ms. Simpson's concerns and suggested that she could instead contact her business' Human Resources department.  At no point did the Ombudsman agree to help Ms. Simpson directly or to otherwise investigate or address the problem.

642.    Ombudsman Cameron's handling of Ms. Simpson's concerns indicated to her that her complaints of gender discrimination were not welcome and would not be taken seriously. Further, because Manager Ehlman often made vindictive comments in the workplace, Ms. Simpson feared that retaliation would result from attempts to escalate her complaint further,  For example, he would boast about arguing with or engaging in physical altercations with people who disagreed with him.  Thus, she only raised concerns with Ombuds and not directly with management out of fear that she likely would be subjected to retaliatory treatment otherwise.

643.    Moreover, upon information and belief, Bayer HR already was aware of and had failed to respond to ongoing concerns about discrimination.  In 2007, 2008, 2009 and 2010, Ms. Simpson had expressed concerns about discrimination anonymously through HR surveys distributed yearly to Company employees.  In these surveys, she informed HR that Manager Ehlman used "fear and intimidation" when managing female employees, that he discriminated

against female employees, and that there were no growth opportunities for women who worked under him.  Each of Ms. Simpson's female colleagues also expressed similar concerns through the anonymous HR surveys every year.

644.    Despite her and her colleagues' consistent reporting of their concerns, at no point during her employment did she observe Bayer taking any steps to improve the working situations of female employees.  In fact, HR ceased collecting employee feedback through these annual surveys altogether after 2010.

645.    Further, upon information and belief, Bayer never disciplined Manager Ehlman for his actions, and instead granted him several management awards during those years and promoted him in late 2011.

646.    In January 2012, Ms. Simpson learned that Mr. Osbourn had stepped down from the Equine Specialist position and that Bayer had passed the job to another male employee, Duane Stubblefield, without posting it.   Even though she had explicitly and consistently expressed interest in promotional or development opportunities such as this one, she was never notified about the job opening and again had no opportunity even to apply.

647.    Bayer also repeatedly and without explanation passed over Ms. Simpson for opportunities to participate on Field Input Teams ("FIT Teams"), which are committees of field employees, such as Sales Consultants, who act as liaisons to the corporate office to provide feedback and strategic solutions regarding how to improve sales and marketing in their respective regions.  Participating on a FIT Team grants a Sales Consultant increased exposure to executive management and is a leadership opportunity that increases a Sales Consultant's eligibility for future promotional opportunities.

648.   Sales Consultants must be selected by their direct managers to participate on a FIT Team.  Upon information and belief, male-dominated management uses a highly subjective "tap on the shoulder" process to select a disproportionate number of male Sales Consultants for FIT Teams at the expense of more or equally qualified female employees

649.   For example, in every year of her employment at Animal Health, Ms. Simpson told her superiors that she was interested in participating on a FIT Team.  However, whenever she expressed interest, Manager Ehlman would simply state, "We'll see what might be available."  When she asked him about the process or eligibility criteria for the role, he evaded her questions.

650.   Even though she continued to inquire about the opportunity to join a FIT Team, Manager Ehlman selected a male candidate over her each year, even though several of them performed at a lower level than Ms. Simpson.  In fact, during the years that Ms. Simpson worked for Manager Ehlman, he never selected a female Sales Consultant for a FIT Team in her region.  Further, on information and belief, like other development opportunities at Bayer, FIT Teams across the country are offered to and comprised of disproportionately of male employees.

### d.   Discriminatory Performance Reviews

651.   Bayer's performance evaluation system lacks sufficient standards, quality controls, implementation metrics, oversight, and opportunities for redress to accurately or reliably reflect true comparative performance.

652.   Even when Ms. Simpson clearly exceeded her sales quota, management never gave her a rating above "meets expectations."  For example, for 2007, she received a rating of "meets expectations" for achieving 118 percent of her quota, while her male counterparts with lower sales performance received higher ratings.

653.    Further, in 2009, Ms. Simpson again exceeded her sales quota, achieving 110 percent.  Despite the fact that she had exceeded her objective sales goals, in 2010 she again was given a performance rating of "meets expectations," while male Sales Consultants ranked lower than her were granted ratings of "exceeds expectations."  Upon information and belief, Manager Ehlman did not grant any female on his team an "exceeds expectations" rating that year.  Indeed, another female Sales Consultant, Robin Reviere ("Ms. Reviere") who had substantially exceeded her quota also received a "meets expectations" rating.

654.    In addition to being evaluated with standard performance evaluations, field employees at Bayer are evaluated with "Skills Sets" reviews administered in conjunction with the standard evaluations on a biannual basis.  "Skills Sets" reviews incorporate subjective criteria, such as "Sales Execution," "Autonomy," and "Decision Making," which supposedly measure a Sales Consultants' sales ability.  Until 2012, "Skills Sets" ratings impacted a Sales Consultants' merit increases and bonus payouts.

655.    Upon information and belief, Bayer requires managers to assign "Skills Sets" ratings according to a forced distribution.  As a result, performance ratings do not correspond to objective measures of performance, and high-achieving female employees receive artificially diminished ratings, stalling their advancement and diminishing their earning potential.

656.    For example, in 2009 Manager Ehlman gave Ms. Simpson a rating of "below expectations" in the "Skills Sets" portion of her mid-year performance review, although she was on track to meet her sales goal for that year.  When she inquired as to the basis for the low rating, Manager Ehlman replied vaguely that she "could do better."  Upon information and belief, this rationale was purely pretextual, as male Sales Consultants with lower sales performance received ratings of "meets expectations" or above.

657.    As she projected, Ms. Simpson achieved her sales goal for that year.  However, because of the "below expectations" rating, she received a minimal salary increase and only about half of the bonus to which she was entitled for her true performance.

658.    Further, Bayer management has also used "unofficial performance plans" to discriminate against female employees.  Upon information and belief, unofficial performance plans can be administered without approval or oversight from HR but may carry the same negative consequences as official performance plans, such as reductions in bonus and salary increases and further disciplinary action up to and including termination.

659.    Specifically, around August 2011, Manager Ehlman placed Ms. Simpson on an unofficial performance plan.  The performance plan required her to do additional trainings for customers and assigned her a higher product placement quota than anyone else on her team.  Further, Manager Ehlman began to copy his supervisor Vice President Peter Ryan on correspondence to Ms. Simpson regarding her performance.

660.    Ms. Simpson and her only female colleague at the time were both placed on these plans even though they had performed better than many of their counterparts who were not subjected to disciplinary measures.  Notably, those counterparts were exclusively male Sales Consultants.  The only male employee subjected to a performance plan was significantly older (in his 60's) and had pushed back on Manager Ehlman's management.

661.    Soon after she placed on the performance plan, Ms. Simpson discovered that Manager Ehlman was informing her colleagues that she had been placed on a performance plan.  This made her extremely uncomfortable and gave rise to concerns that he was damaging her professional reputation.

662.    Thus, around August 2011, Ms. Simpson contacted Ombudsman Cameron to express concerns about the situation.   Again, Bayer's Ombudsman refused to investigate or otherwise respond to the issues she raised.   Instead, the Ombudsman dismissed Ms. Simpson's concerns and pushed her to talk to her manager – the source of her complaint – and rejected her concerns regarding retaliation.

663.    Ms. Simpson remained on the performance plan until December 2011.   Almost immediately thereafter, she received another discriminatory "Skills Sets" performance rating of "below expectations."   When he delivered her performance review in January 2012, Manager Ehlman stated that he was giving her a "below expectations" rating because she had met only 95 percent of her quota for 2011.

664.    Manager Ehlman's stated rationale was again pretextual.   As it had been a particularly difficult year, almost all of Ms. Simpson's counterparts had failed to meet 100 percent of their quotas.   However, she later learned that several of her male counterparts, whose sales numbers were substantially inferior to hers, had received ratings of "meets expectations" or above for that same period.

### e.    Constructive Discharge

665.    Bayer's discrimination against Ms. Simpson caused her extreme stress, anxiety, and depression for which she had to seek medical treatment and that affected her personal relationships.   She was prescribed medication to help treat work-related stress and depression.   During her employment with Bayer, she also suffered from digestive problems, migraines, insomnia, and stress-related ulcers.

666.    By February 2012, the discrimination and hostile environment, including the obvious lack of advancement opportunities for women, had become intolerable.   The

140

discriminatory performance reviews and continued disciplinary action she received despite solid performance made it clear that her future at Bayer was in jeopardy and that professional growth commensurate with her results was never going to happen. Upon realizing that she no longer had a future at Bayer, Ms. Simpson resigned from the Company effective February 27, 2012.

667.   During her time at Bayer, Ms. Simpson has witnessed many female employees leave the Company due to discrimination.  In fact, since joining Manager Ehlman's team, she has observed three female Sales Consultants leave the Company due to a lack of advancement opportunities and/or the hostile work environment perpetuated by Bayer management.  Notably, the number of Sales Consultants on Manager Ehlman's team dropped from four to only one after Ms. Simpson left the Company.

## V.    CLASS ACTION ALLEGATIONS

668.   Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, Ms. Lienhop, Ms. Sawyer, and Ms. Simpson represent a Class consisting of all female employees who are, have been, or will be employed by Bayer HealthCare Pharmaceuticals, Bayer HealthCare Consumer Care, and Bayer HealthCare Animal Health from November 2009 to the date of judgment.   Class Representatives and the Class of Bayer employees they seek to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by Bayer.

669.   These discriminatory practices have subjected female employees to continuing unlawful disparate treatment and have had a continuing, unlawful disparate impact on them and their employment opportunities.   Such gender discrimination includes (a) assigning female employees to lower titles, classifications and VS levels than male employees performing the

same job duties; (b) paying female employees less than their similarly-situated male counterparts; (c) denying female employees development, promotion and advancement opportunities in favor of male employees and resulting in their relegation to lower classification and compensation levels; (d) failing to prevent, respond to, adequately investigate and/or appropriately resolve instances of gender discrimination and pregnancy/caregiving discrimination in the workplace; (e) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers; (f) creation of a hostile work environment; and (g) otherwise subjecting them to disparate treatment with respect to the terms and conditions of their employment through exposure to pregnancy discrimination, sexual harassment, and a hostile work environment with no viable avenues for recourse.  The gender discrimination also involves retaliation against female employees who have complained of wage disparity, gender discrimination, and sexual harassment through internal reporting channels, the filing of EEOC complaints, and participation in this lawsuit, including by unfairly demoting them, taking unwarranted disciplinary measures, subjecting them to increased scrutiny, or otherwise altering their terms and conditions of employment.

670.    Bayer, in effect, bars female employees from better and higher-paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, Bayer's assignment, development, promotion, advancement, training, compensation and performance evaluation policies, practices and procedures.

671.    These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge.  As a result, employees are assigned,

evaluated, compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or fairly manage, develop, or reward employees.

672.    Specific practices have a negative effect on female employees at Bayer.   For example:

a.    Job classifications, known as VS levels, do not correspond in a consistent way to job titles or responsibilities and therefore do not accurately reflect employees' experience and qualifications. VS levels and/or titles may be downgraded immediately prior to a female employee assuming the role, diminishing her advancement and earning potential, while the VS level and/or title may be upgraded when a male employee assumes a role, increasing his compensation.

b.    Bayer managers participate in a "deployment" process to move or promote internal employees without having to administer the formal recruitment process. Managers can "deploy" an employee into an open position without posting the position, holding interviews, or otherwise being held accountable to typical recruiting protocol.  Male employees are deployed into promotions or desirable lateral transfers as a way to groom them for managerial roles, while female employees are passed over for developmental roles or are otherwise assigned to less desirable positions, including those that have been downgraded in compensation, responsibilities, and prestige.

c.    Centralized POC committees, which control career development and advancement, select employees for mentoring and development without the appropriate standards, guidelines, or transparency necessary to ensure an equitable

workplace. The POC committees, which on information and belief are led by disproportionately male management behind closed doors, categorize employees by their supposed "promotability," rather than objective, performance-related criteria. The male-dominated POC committees perpetuate the gender imbalance among Bayer management by disproportionately selecting male employees for advancement, development, and promotion.

d.      Upper management also utilizes a "bidding" process for internal employees who wish to be considered for promotional opportunities. This "bidding" process equates to a "tap on the shoulder" by which the upper-management pool selects other male employees for advancement opportunities. Thus, high-ranking managers groom predominantly junior male employees for leadership positions by granting them disproportionate access to resources and exposure to decision-makers, resulting in fewer opportunities for development and advancement for female employees and mothers.

e.      To the extent that promotions take into account or otherwise reflect performance evaluations, those promotional decisions are still flawed. Promotions are not based on true comparative performance because Bayer requires managers to determine performance evaluations according to a forced ranking system, in which managers must adjust evaluations to correspond to a predetermined distribution along a bell curve. Moreover, performance evaluations lack sufficient standards, quality controls, implementation metrics, oversight, and opportunities for redress to accurately or reliably reflect true comparative performance.

673.    Reflecting and exacerbating these discriminatory development, assignment, and promotion policies, Bayer's compensation policies also lack sufficient standards, quality controls, implementation metrics, transparency and oversight to fairly compensate employees, resulting in a negative effect on female employees. When assigning female employees to new roles, the Company sets the initial rate of compensation of at the low end of the applicable salary grade or even downgrades the position to a lower salary grade altogether.  Because merit increases are awarded as a percentage of base compensation, these initial disparities between the compensation of female employees and their male colleagues are carried forward and continue to grow with each subsequent change in pay.  Yet Bayer cites these same compensation rates as pretext to deny promotions and raises to female employees, citing their pay as being too "high" within their grade to allow for promotions or raises.  Further, performance objectives (including sales quotas) lack sufficient standards and oversight, such that they can be manipulated to artificially depress the performance-based compensation and bonuses of women and mothers.

674.    Where HR and Ombuds complaint and compliance policies exist, they lack meaningful quality controls, standards, implementation metrics, and means of redress, such that upper management and HR may ignore, disregard, minimize, cover up, mishandle or otherwise fail to properly respond to evidence of discrimination in the workplace.  There is no meaningful separation between complaint reporting channels and the managers who create discriminatory or hostile working conditions for women and mothers, such that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether.  Moreover, HR and management have contributed to and failed to curb a corporate culture that presumes that caretaking responsibilities make an employee less dedicated or productive.

675.     Bayer tolerates and cultivates a hostile environment in which female employees and mothers are routinely and openly devalued and where retaliation for voicing complaints of gender discrimination is the norm.  Amid and as a result of this environment, female employees who question these norms or raise concerns are routinely pushed out of the Company.

676.     Bayer demonstrates a reckless disregard—a deliberate indifference—to its female employees by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

677.     Defendants' assignment, development, compensation, promotion, training, evaluation, personnel management, termination, maternity/JobShare, and complaint policies, practices and procedures have a disparate impact on the Class Representatives and the Class they seek to represent.  Such policies, practices, and procedures are not valid, job-related, or justified by business necessity.

678.     Indeed, the facts above and herein demonstrate that it is Bayer's standard operating procedure to discriminate against female employees on a mass scale.  Bayer's assignment, development, compensation, promotion, training, evaluation, personnel management, termination, maternity/JobShare, and complaint policies, practices and procedures form a part of the Defendants' overall pattern and practice of keeping women in the lower classifications that carry less desirable terms and conditions of employment.

679.     Because of Defendants' systemic pattern and practice of gender discrimination, the Class Representatives and class they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay, and employment benefits as well as physical and emotion pain and suffering.

146

680.    Bayer has failed to impose adequate discipline for managers and employees who violate the Company's fair employment policies and equal employment opportunity laws and has failed to create adequate incentives for its managerial and supervisory personnel to comply with such policies and laws.

681.    Rather than taking remedial action to correct this discrimination, Individual Defendants ratified, perpetuated, and often escalated the discriminatory policies and practices of Bayer to the detriment of the Class.

682.    The Class Representatives and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and the Class are now suffering, and will continue to suffer, irreparable injury from Bayer's ongoing, unlawful policies, practices, and procedures as set forth herein unless those policies, practices, and procedures are enjoined by this Court.

**A.    General Facts Relevant To Class Claims And Class Definition**

683.    Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, Ms. Lienhop, Ms. Sawyer, and Ms. Simpson seek to maintain claims on their own behalf and on behalf of a Class of female employees at Bayer HealthCare Pharmaceuticals, Bayer HealthCare Consumer Care, and Bayer HealthCare Animal Health employed from November 21, 2009 to the present.

684.    Upon information and belief, the members of the proposed Class number in the hundreds.

685.    The Class Representatives seek to represent all of the female employees described above.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

## B.  Efficiency Of Class Prosecution Of Common Claims

686.    Certification of a class of female employees is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representatives and the Class.   The individual claims of the Class Representatives require resolution of the common questions concerning whether Bayer has engaged in a systemic pattern and/or practice of gender discrimination against female employees and/or whether its facially neutral policies have an adverse effect on the Class.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, career and working conditions and in the lives, careers and working conditions of the Class members, and to prevent continued gender discrimination in the future.

687.    Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, Ms. Lienhop, Ms. Sawyer, and Ms. Simpson have standing to seek such relief because of the adverse effects that such discrimination has had on them individually and on female employees generally.  Bayer caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures, as well as its disparate treatment of employees who are female, pregnant, and/or have caregiving responsibilities.

688.    These injuries are redressible through systemic relief, such as an injunction, and other appropriate class-wide and individual remedies sought in this action.  In addition, proper relief for Plaintiffs' individual constructive discharge and wrongful termination claims can include reinstatement.

689.    In order to gain relief for themselves, as well as for the Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.

148

690.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed class of females is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed Class, and the Bayer Defendants.

### C.    Numerosity And Impracticability Of Joinder

691.    The Class which the Class Representatives seek to represent is too numerous to make joinder practicable.  On information and belief, the proposed Class consists of hundreds or thousands of current and former employees during the liability period.

692.    Bayer's pattern and/or practice of gender discrimination also makes joinder impracticable by discouraging female employees from applying for or pursuing promotional, training, or transfer opportunities, thereby making it impractical and inefficient to identify many members of the Class prior to determination of the merits of Bayer's Class-wide liability.

### D.    Common Questions Of Law And Fact

693.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the Class they seek to represent.  The common questions of law include, *inter alia:* (a) whether Bayer has engaged in a pattern and practice of unlawful, systemic gender discrimination in its assignment, compensation, selection, promotion, advancement, personnel management, training and discipline policies, practices, and procedures, and in the general terms and conditions of work and employment; (b) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in assignment, development, compensation, promotion, training, evaluation, personnel management, termination,

maternity/JobShare, and complaint policies, practices and procedures violates Title VII and/or other statutes; (c) whether the lack of transparency and of opportunities for redress in those systems violates Title VII and/or other statutes; (d) whether the failure of upper management and HR to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and/or other statutes; (e) whether Bayer is liable for a continuing systemic violation of Title VII, and/or other statutes; and (f) a determination of the proper standards for proving a pattern or practice of discrimination by Bayer against its female employees under both a disparate treatment and disparate impact theory of liability.

694. The common questions of fact include, *inter alia*: whether Bayer has: (a) used a system of assignment that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (b) through the use of that system of assignment placed female employees in job titles or VS levels lower than similarly-situated male employees; (c) systematically, intentionally, or knowingly placed female employees in job titles or VS levels lower than similarly-situated male employees; (d) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (e) through the use of that compensation system compensated female employees less than similarly-situated males in salary and/or other perks; (f) systematically, intentionally, or knowingly compensated female employees less than similarly-situated male employees; (g) used a system of development and mentoring that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (h) through the use of that development and mentoring system failed to develop or provide opportunities for development to female employees in a commensurate manner to their similarly-situated male counterparts; (i) systematically, intentionally, or

knowingly failed to develop or provide opportunities for development to female employees in a commensurate manner to their similarly-situated male counterparts; (j) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (k) through the use of that promotion system precluded or delayed the promotion of female employees into higher jobs traditionally held by male employees; (l) systematically, intentionally, or knowingly precluded or delayed the selection and promotion of female employees into higher level jobs traditionally held by male employees; (m) used a system for performance evaluations which lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (n) through the use of that performance evaluation system inaccurately, unfairly, or disparately measured, classified, and compared female and male employee performance; (o) systematically, intentionally or knowingly subjected female employees to inaccurate, unfair, or discriminatorily critical or lowered performance evaluations; (p) used maternity and JobShare policies, practices, and procedures that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (q) through the use of those policies, practices and procedures treated pregnant employees and mothers differently and discriminatorily from non-pregnant employee, male employees, and non-caregivers; (r) systematically, intentionally, or knowingly subjected pregnant employees and mothers to disparate and discriminatory terms and conditions of employment; (s) used HR, EEO, and Ombuds systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (t) relying and using these systems, minimized, ignored, or covered-up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of

discrimination and harassment brought to the attention of senior management or the human resources department; (u) systematically, intentionally, knowingly or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints of gender and pregnancy discrimination (v) retaliated against those who have complained of gender-based discrimination through techniques including but not limited to demotions, unwarranted disciplinary measures, negative performance reviews, and increased scrutiny; and (w) otherwise discriminated against pregnant women and women with child-rearing responsibilities in the terms and conditions of employment.

695.    The employment policies, practices, and procedures to which the Class Representatives and the Class members are subjected are set at Bayer's corporate level and apply universally to all class members.  These employment policies, practices and procedures are not unique or limited to any business unit; rather, they apply to all business units and, thus, affect the Class Representatives and Class members in the same ways irrespective of business unit in which they work.

696.    Throughout the liability period, a disproportionately large percentage of the managers, executives, and officers at Bayer have been (a) men or (b) women without children or primary caregiving responsibilities.

697.    Discrimination in selection, promotion and advancement occurs as a pattern or practice throughout management in all business units of Bayer.  Assignment, selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between male executives and subordinates rather than by merit or equality of opportunity.  These policies, practices, and procedures all suffer from a lack of transparency, adequate quality standards and controls, sufficient implementation

metrics, upper management/HR review, and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or fairly manage or reward employees.

698.    As a result, male employees, and, in some cases, women without primary childcare responsibilities, have advanced and continue to advance more rapidly to better and higher-paying jobs than do female employees.

699.    Bayer's policies, practices, and procedures have had an adverse impact on and have resulted in routine adverse disparate treatment of female employees seeking selection for, or advancement to, better and higher-paying positions. On information and belief, the higher the level of the job classification, the lower the percentage of female employees holding it.

700.    As a result, male managers and managers without primary childcare responsibilities have a disproportionate say in the assignment, development, evaluation and compensation of female employees. Female employees are routinely undervalued and their work product minimized and disregarded, resulting in significant implications not only for their advancement opportunities but also for their compensation.

701.    On information and belief, even within the same jobs and classifications, female employees are systematically underpaid.

702.    Because Bayer's personnel management systems do not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of even facially-neutral policies and procedures, female employees suffering from discrimination are without recourse. In addition, the absence of a check on discrimination

extends to retaliatory actions, leaving victims of discrimination doubly vulnerable.  As such, discrimination is fostered and sometimes even tacitly condoned by Bayer.

### E.    Typicality Of Claims And Relief Sought

703.    The claims of the Class Representatives are typical of the claims of the Class. The relief sought by the Class Representatives for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the Class.

704.    Like the members of the Class, the Class Representatives are in the same protected class and worked at Bayer during the liability period.

705.    Discrimination in assignment, development, selection, training, evaluations, and HR oversight affects the compensation, advancement, and overall treatment of the Class Representatives and all the employee class members in the same or similar ways.

706.    Bayer has failed to create adequate incentives for its executives and managers to comply with its own policies and equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and has failed to discipline adequately its executives, managers and other employees when they violate Company policy or discrimination laws.  These failures have affected the Class Representatives and the Class members in the same or similar ways.

707.    Bayer has further failed to respond adequately or appropriately to evidence of discrimination and harassment, and complaints or concerns raised about the same.  These failures have affected the Class Representatives and the Class members in the same or similar ways.

708.    The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the Class members in this case.  Class Representatives seek the following relief for their individual claims and for those of the members

of the proposed class: (a) a declaratory judgment that Bayer has engaged in systemic gender discrimination against the Class by (1) paying female employees less than their male counterparts, (2) denying female employees promotion and advancement opportunities into better and higher-paying positions (3) discriminating against pregnant women and women with child-rearing responsibilities, and (4) otherwise failing to investigate or respond to evidence of discrimination or harassment in the workplace; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effectuates a restructuring of Bayer's assignment, promotion, training, performance evaluation, compensation, personnel management, complaint, and discipline policies, practices, and procedures—so that women at Bayer will be able to compete fairly in the future for raises and other compensation decisions, promotions, transfers, and assignments to better and higher-paying classifications with terms and conditions of employment traditionally enjoyed by male employees and raise concerns about discrimination without fear of retaliation; (d) back pay, front pay, and/or other equitable remedies necessary to make the employees whole from the Defendants' past discrimination; (e) punitive and nominal damages to prevent and deter Bayer from engaging in similar discriminatory practices in the future; (f) compensatory damages; and (g) attorneys' fees, costs and expenses.

### F.    Adequacy Of Representation

709.    The Class Representatives' interests are co-extensive with those of the Class they seek to represent in this case.  Class Representatives seek to remedy Bayer's discriminatory employment policies, practices, and procedures so that female employees will no longer be prevented from advancing into higher-paying and more desirable higher management positions.

710.    Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, Ms. Lienhop, Ms. Sawyer, and Ms. Simpson are willing and able to represent the Class fairly and vigorously as they pursue their individual claims in this action.

711.    The Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience, and resources of Plaintiffs' counsel to litigate competently the individual and class claims at issue in this case satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

G.    **Requirements Of Rule 23(b)(2)**

712.    Bayer has acted on grounds generally applicable to the Class Representatives and the Class by adopting and following systemic policies, practices, and procedures which are discriminatory.   Gender discrimination is Bayer's standard operating procedure rather than a sporadic occurrence.

713.    Bayer has refused to act on grounds generally applicable to the Class by, *inter alia*: (a) failing to pay female employees on par with similarly-situated male employees or employees without primary caregiving responsibilities; (b) assigning female employees to job titles and classifications lower than appropriate for their actual job duties and responsibilities; (c) denying female employees promotion and advancement opportunities in favor of male employees; (d) failing to prevent, respond to, adequately investigate, and/or appropriately resolve claims of gender, pregnancy, and caregiver discrimination; (e) refusing to adopt and apply assignment, selection, promotion, training, performance evaluation, compensation, Human

Resources, corporate leadership, and discipline policies, practices, and procedures which do not have a disparate impact on, or otherwise systemically discriminate against, female employees; and (f) refusing to provide equal terms and conditions of employment for female employees, for pregnant women, and for women with child-rearing responsibilities.

714.    Bayer's policies, practices, and procedures of assignment, development, promotion, advancement, compensation, and performance evaluations have resulted in gender discrimination and stratification. Bayer's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the Class as a whole.

715.    Injunctive, declaratory, and affirmative relief are the predominant forms of relief sought in this case.  Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of systemic gender discrimination by Bayer.

716.    In addition, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Class of punitive damages.

**H.     Requirements Of Rule 23(b)(3)**

717.    The common issues of fact and law affecting the claims of the Class Representatives and proposed Class members, including, but not limited to, the common issues previously identified herein, predominate over any issues affecting only individual claims. These issues include whether Bayer has engaged in gender discrimination against female employees by (a) assigning female employees to lower job titles and VS levels than their male counterparts; (b) paying female employees less than their male counterparts; (c) denying female employees promotion and advancement opportunities in favor of male employees; (d) treating pregnant employees and mothers differently from non-pregnant employees, male employees,

and non-caregivers; (e) failing to prevent, respond to, adequately investigate and/or appropriately resolve instances of gender discrimination; and (f) tolerating and promoting a culture of gender discrimination directed against such employees.

718.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the proposed class.

719.    The cost of proving Bayer's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed class to prosecute their claims individually.

720.    By virtue of the pattern and practice of discrimination at Bayer, Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including backpay, frontpay, compensatory damages, and other nominal and punitive damages.

## VI.    COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT

721.    Plaintiffs Ms. Barghout, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, Ms. Lienhop, Ms. Sawyer, and Ms. Simpson incorporate by reference the allegations from the previous paragraphs of this Complaint alleging class-based discrimination against female employees.

### A.    Collective Action Standards

722.    Plaintiffs bring collective claims under the Equal Pay Act ("EPA") pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of current, former, and future female employees of Bayer HealthCare Pharmaceuticals, Bayer HealthCare Consumer Care, and Bayer HealthCare Animal Health during the applicable liability period, including until the date

of judgment.  The EPA action includes female employees (a) who were not compensated equally to males who had substantially similar job classifications, functions, titles and/or duties, (b) who were not compensated equally to males who performed substantially similar work, and/or (c) who were denied equal compensation to similarly situated males by being hired into positions at lesser grades than male employees who performed substantially similar work.

723.    Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following: (a) whether Defendant unlawfully failed and continues to fail to compensate female employees at a level commensurate with similarly situated male employees; (b) whether Defendant unlawfully assigned and continues to assign female employees into positions graded at a lower pay and compensation scale to similarly qualified males; (c) whether Defendant's policy and practice of failing to compensate female employees on a par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and (d) whether Defendant's failure to compensate female employees on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

724.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

725.    Plaintiffs Ms. Barghout, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, Ms. Celske, Ms. Santangelo, Ms. Lienhop, Ms. Sawyer, and Ms. Simpson and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles and/or duties; and (c) are subject to Defendants' common policy

and practice of gender discrimination in (i) failing to compensate female employees on par with male employees who perform substantially equal work and/or hold equivalent levels and positions; (ii) failing to provide female employees with job classifications, grades and titles commensurate with male employees who perform substantially equal work and/or have similar duties and responsibilities; (iii) hiring and assigning female employees into lower-level positions than male employees who perform substantially equal work and/or have similar or lesser experience and qualifications; and (iv) failing to provide female employees equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to male employees who perform substantially equal work.

**VII.**   **COUNTS**

**COUNT I**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e, *et seq.***
**Pay Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

726.    The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

727.    This Count is brought on behalf of the Class Representatives and all members of the Class.

728.    Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

729.     Defendants have discriminated against the Class Representatives and all members of the Class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of Title VII.

730.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

731.     As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

732.     By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

733.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"), 42 U.S.C. § 2000e, *et seq.*
## Promotion Discrimination
## (On Behalf of All Class Members Against Corporate Defendants)

734.     The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

735.     This Count is brought on behalf of the Class Representatives and all members of the Class.

736.    Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

737.    Defendants have discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of Title VII.

738.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

739.    As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

740.    By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

741.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT III**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e, *et seq*.**
**Pregnancy and Family Responsibilities Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

742.   The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

743.   This Count is brought on behalf of the Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Simpson and similar all members of the Class.

744.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

745.   Defendants have discriminated against the Class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them to differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotions, discriminatory treatment with respect to work responsibilities and other terms and conditions of employment (including those so intolerable that a reasonable person subject to them would resign), and termination in violation of Title VII.

746.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

747.   As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

748.   By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

749.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT IV**
**VIOLATION OF FAMILY MEDICAL LEAVE ACT ("FMLA")**
**29 U.S.C. § 2601, *et seq.***
**(On Behalf of Ms. Barghout, Ms. Christiansen, and Ms. Feringa Against Corporate Defendants, Defendant Williamson, Defendant Oelrich, Defendant North, and Defendant Cukier.)**

750.   Ms. Barghout, Ms. Christiansen, and Ms. Feringa re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

751.   Bayer discriminated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa on the basis of their pregnancy, childbirth, and related conditions in violation of the Family Medical Leave Act ("FMLA").

752.   Defendants retaliated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa for taking their FMLA-protected leave by adversely and materially changing the terms and conditions of their employment by, *inter alia,* denying them career advancement opportunities, making inaccurate statements harmful to their professional careers, otherwise creating an environment hostile to pregnancy and the taking of statutorily protected leave so intolerable that a reasonable person subject to them would resign, and termination.

753.    Defendants acted willfully, intentionally, and with reckless disregard for Ms. Barghout, Ms. Christiansen, and Ms. Feringa's rights under the FMLA.

754.    As a direct and proximate result of defendants' actions, Ms. Barghout, Ms. Christiansen, and Ms. Feringa suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses and costs, and are entitled to all legal and equitable remedies available.

755.    By reason of Defendants' discrimination, Ms. Barghout, Ms. Christiansen, and Ms. Feringa are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

**COUNT V**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"),**
**29 U.S.C. §206(d)**
**(On Behalf of All Plaintiffs and EPA Collective Action Plaintiffs Against Corporate Defendants)**

756.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

757.    This Count is brought on behalf of the Plaintiffs and all EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

758.    Defendants have discriminated against the Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act ("EPA"), by providing them with lower pay than similarly-situated male colleagues on the basis of their gender, female, even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

759.    Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated males all

perform similar job duties and functions across the Defendants' various U.S. offices.  Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated males all performed jobs which required equal skill, effort, and responsibility, and are or were performed under similar working conditions.

760.   Defendants so discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denial of promotions, and other forms of discrimination in violation of the Equal Pay Act.

761.   The differential in pay between males and female employees was not due to seniority, merit, quantity or quality of production, but was due to gender.

762.   Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

763.   The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

764.   As a result of Defendants' conduct alleged in this complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

765.   By reason of Defendants' discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

766.   Attorneys' fees should be awarded under 29 U.S.C. §216(b).

**COUNT VI**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION,**
**N.J. STAT. § 10:5-1, *et seq*.**
**Pay Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

767.   The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

768.   This Count is brought on behalf of the Class Representatives and all members of the Class.

769.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of the Law Against Discrimination by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

770.   Defendants have discriminated against the Class Representatives and all members of the Class by subjecting them to discriminatory pay, discriminatory denials of pay raises, and discriminatory performance evaluations that affect pay, in violation of the Law Against Discrimination.

771.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

772.   As a result of Defendants' conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm,

including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

773.    By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

774.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT VII**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION,**
**N.J. STAT. § 10:5-1, *et seq*.**
**Promotion Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

775.    The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

776.    This Count is brought on behalf of the Class Representatives and all members of the Class.

777.    Defendants have discriminated against the Class Representatives and all members of the Class in violation of the Law Against Discrimination by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

778.    Defendants have discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly-situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of the Law Against Discrimination.

779.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

780.    As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

781.    By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

782.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT VIII**
**VIOLATION OF THE LAW AGAINST DISCRIMINATION**,
**N.J. STAT. § 10:5-1**, *et seq.*
**Pregnancy and Family Responsibilities Discrimination**
**(On Behalf of All Class Members Against Corporate Defendants)**

783.    The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

784.    This Count is brought on behalf of the Class Representatives Ms. Barghout, Ms. Christiansen, Ms. Feringa, Ms. Simpson and similar all members of the Class.

785.    Defendants have discriminated against the Class Representatives and all members of the Class in violation of the Law Against Discrimination by subjecting them to different treatment on the basis of their gender.  The members of the Class have been disparately impacted

and disparately treated as a result of Defendants' wrongful conduct and its policies, practices and procedures.

786.    Defendants have discriminated against the Class members bringing this claim by treating them differently from and less preferably than similarly-situated male employees and female employees without primary caregiving responsibilities, and by subjecting them differential and substandard terms and conditions of employment including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotions, discriminatory treatment with respect to work responsibilities and other terms and conditions of employment (including those so intolerable that a reasonable person subject to them would resign), and termination in violation of the Law Against Discrimination.

787.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

788.    As a result of Defendant's conduct alleged in this complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

789.    By reason of Defendants' discrimination, the Class Representatives and members of the Class are entitled to all legal and equitable remedies available for violations of the Law of Discrimination, including an award of punitive damages.

790.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT IX**
**VIOLATION OF THE FAMILY LEAVE ACT ("FLA")**
**N.J. STAT. § 34:11B-1, *et seq.***
**(On Behalf of Ms. Barghout, Ms. Christiansen, and Ms. Feringa Against Corporate**
**Defendants)**

791.    Ms. Barghout, Ms. Christiansen, and Ms. Feringa re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

792.    Defendants discriminated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa on the basis of their pregnancy, childbirth, and related conditions in violation of the Family Leave Act ("FLA"). N.J. Stat. § 34:11B-1, *et seq.*

793.    Defendants retaliated against Ms. Barghout, Ms. Christiansen, and Ms. Feringa for taking their FMLA-protected leave by adversely and materially changing the terms and conditions of their employment by, *inter alia,* denying them career advancement opportunities, making inaccurate statements harmful to their professional careers, otherwise creating an environment hostile to pregnancy and the taking of statutorily protected leave so intolerable that a reasonable person subject to them would resign, and termination.

794.    Defendants acted willfully, intentionally, and with reckless disregard for Ms. Barghout, Ms. Christiansen, and Ms. Feringa rights under the FLA.

795.    As a direct and proximate result of defendants' actions, Ms. Barghout, Ms. Christiansen, and Ms. Feringa suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, pain and suffering, expenses and costs, and are entitled to all legal and equitable remedies available.

796.    By reason of Defendants' discrimination, Ms. Barghout, Ms. Christiansen, and Ms. Feringa are entitled to all legal and equitable remedies available for violations of the Family Leave Act, including an award of punitive damages.

797.    Attorneys' fees should be awarded under N.J. Stat. § 34:11B-1.

### COUNT X
### VIOLATION OF THE LAW AGAINST DISCRIMINATION – N.J. STAT. § 10:5-12(e)
### AIDING AND ABETTING
### (On Behalf of All Class Members Against Individual Defendants)

798.    The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

799.    On information and belief, Individual Defendants Cukier, D'Agostino, Hester, Kolb-Hunt, Lamb, North, Oelrich, Rosen, Williamson, Knapp, Platkin, and Scott all actively and knowingly participated in practices that resulted in unfair compensation and promotion, a hostile work environment, and other forms of discrimination based on gender.

800.    By aiding, abetting, inciting, compelling and/or ratifying Corporate Defendant Bayers' discriminatory practices and decisions, each Individual Defendant has aided and abetted both the Corporate Defendants' and each of the other Individual Defendant's discrimination against the Class Representatives and the Class of female employees, in violation of the Law Against Discrimination. N.J. Stat. § 10:5-12(e).

801.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Class Representatives' and the Class members' rights and has damaged Class Representative and the Class.

802.    The Class Representatives and the Class members are therefore entitled to all legal and equitable remedies, as well as punitive damages.

803.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

**COUNT XI**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e, *et seq*.,**
**Retaliation**
**(On Behalf of Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo Against Corporate Defendants)**

804.    Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

805.    Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo engaged in a protected activity by filing EEOC Charges, joining this lawsuit, and otherwise complaining about gender discrimination— including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male employees, derogatory remarks, and sexual harassment—to people in management positions and in Human Resources.

806.    Defendants engaged in adverse employment actions against Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo for engaging in protected activities.  Such adverse employment actions taken have been in the form of subjecting them to unfavorable terms and conditions of employment, including, *inter alia*, denials of promotions, negative performance reviews, unfounded criticism, hostile working environments so intolerable that a reasonable person subject to them would resign, and termination.  The adverse employment actions have materially and adversely affected the plaintiffs overall terms and conditions of employment.

807.   A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

808.   Defendants' retaliatory acts against Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo were a direct, proximate, and pretextual result of the plaintiffs' protected activities.

809.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo, entitling these plaintiffs to punitive damages.

810.   As a result of Defendants' conduct alleged in this complaint, these plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish, and non-economic damages.

811.   By reason of Defendants' discrimination, these plaintiffs are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

812.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT XII**
**VIOLATIONS OF THE LAW AGAINST DISCRIMINATION,**
**N.J. STAT. § 10:5-12(d)** *et seq.*,
**Retaliation**
**(On Behalf of Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci,**
**Ms. Reilly, Ms. Salomon, and Ms. Santangelo Against Corporate Defendants)**

813.    Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

814.    Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo engaged in a protected activity by filing EEOC Charges and otherwise complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male employees, derogatory remarks, and sexual harassment—to people in management positions and in Human Resources.

815.    Defendants engaged in adverse employment actions against Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo for engaging in protected activities.  Such adverse employment actions taken have been in the form of subjecting them to unfavorable terms and conditions of employment, including inter alia, denials of promotions, negative performance reviews, hostile working environments so intolerable that a reasonable person subject to them would resign, and termination.  The adverse employment actions have materially and adversely affected the plaintiffs overall terms and conditions of employment.

816.    A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

817.    Defendants' retaliatory acts against Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo were a direct, proximate, and pretextual result of the plaintiffs' protected activities.

818.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Barghout, Ms. Celske, Ms. Christiansen, Ms. Feringa, Ms. Musumeci, Ms. Reilly, Ms. Salomon, and Ms. Santangelo, entitling these plaintiffs to punitive damages.

819.    As a result of Defendants' conduct alleged in this complaint, these plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

820.    By reason of Defendants' discrimination, these plaintiffs are entitled to all legal and equitable remedies available for violations of the Law Against Discrimination, including an award of punitive damages.

821.    Attorneys' fees should be awarded under N.J. Stat. § 10:5-27.1.

## COUNT XIII
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e-5(f), *et seq*.
### Sexual Harassment
### (On Behalf of Ms. Santangelo against Corporate Defendants Bayer Corporation, Bayer HealthCare Consumer Care)

822.    Ms. Santangelo re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

823.     Bayer has discriminated against Ms. Santangelo by permitting an ongoing, severe or pervasive pattern and practice of sexual harassment against her by creating and maintaining a sexually hostile work environment in violation of Title VII.

176

824.    Bayer's sexual harassment detrimentally affected Ms. Santangelo and altered her conditions of employment by creating a hostile working environment for her.

825.    Bayer's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of her rights, entitling Ms. Santangelo to punitive damages.

826.    As a direct and proximate result of Bayer's aforementioned conduct, Ms. Santangelo was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

827.    By reason of the continuous nature of Bayer's discriminatory conduct, persistent throughout the employment of Ms. Santangelo, she is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

828.    By reason of the sexual harassment suffered at Bayer, Ms. Santangelo is entitled to all legal and equitable remedies available under Title VII, including an award of punitive damages.

## COUNT XIV
## VIOLATION OF THE LAW AGAINST DISCRIMINATION,
## N.J. STAT. § 10:5-12, *et seq*.
## Sexual Harassment
## (On Behalf of Ms. Santangelo against Corporate Defendants Bayer Corporation, Bayer HealthCare Consumer Care)

829.    Ms. Santangelo re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

830.    Bayer has discriminated against Ms. Santangelo in violation of the Law Against Discrimination by subjecting her to an ongoing, severe and pervasive environment of sexual harassment.

831.    Bayer's sexual harassment detrimentally affected Ms. Santangelo and altered her conditions of employment by creating a hostile working environment for her.

177

832.    Bayer's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of her rights, entitling Ms. Santangelo to punitive damages.

833.    As a direct and proximate result of Bayer's aforementioned conduct, Ms. Santangelo was damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

834.    By reason of the continuous nature of Bayer's discriminatory conduct, persistent throughout the employment of Ms. Santangelo, she is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

835.    By reason of the sexual harassment suffered at Bayer, Ms. Santangelo is entitled to all legal and equitable remedies available under N.J. Stat. § 10:5-12, including an award of punitive damages.

## PRAYER FOR RELIEF ON CLASS CLAIMS

WHEREFORE, the Class Representatives, on their own behalf and on behalf of the Class, pray that this Court:

A.    Certification of this case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff Class; designation of the proposed Class Representative as representative of this Class; and designation of Plaintiff's counsel of record as Class Counsel;

B.    Declare and adjudge that the Corporate Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and Class members;

C.    A permanent injunction against Bayer HealthCare and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in

concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

D.      Order Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above; and/or

E.      Order Defendants to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner; and/or

F.      Order Defendants to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in E through F above; and/or

G.      Order Defendants to adjust the wage rates and benefits for the Class Representatives and the Class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures; and/or

H.      Order Defendants to place or restore the Class Representatives and the Class members into those jobs they would now be occupying but for Defendants' discriminatory policies, practices and/or procedures; and/or

I.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law; and/or

J.      Award nominal, compensatory and punitive damages to the Class Representatives and the Class members, in excess of one hundred million dollars; and/or

K.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Class Representatives and Class members; and/or

L.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives and the Class members to be determined at trial; and/or

M.      Order Defendants to make whole the Class Representatives and Class members by providing them with appropriate lost earnings and benefits, and other affirmative relief; and/or

N.      Award any other appropriate equitable relief to the Class Representatives and Class members; and/or

O.      Award any additional and further relief as this Court may deem just and proper.

## VIII.    <u>**JURY DEMAND**</u>

The Class Representatives demand a trial by jury on all issues triable of right by jury.

Dated:   Fort Lee, New Jersey
         April 27, 2012

SANFORD, WITTELS & HEISLER, LLP

By:   _____s/_____
      Katherine M. Kimpel*
      Lauren E. Seffel*
      Katherine E. Lamm*
      David W. Sanford, D.C. Bar No. 457933
      **SANFORD WITTELS & HEISLER, LLP**
      1666 Connecticut Avenue NW, Suite 300
      Washington, DC 20009
      Telephone: (202) 742-7777
      Facsimile:  (202) 742-7776

      Steven L. Wittels (SLW-8110)
      Jeremy Heisler (JH-0145)
      **SANFORD WITTELS & HEISLER, LLP**
      440 West Street
      Fort Lee, NJ  07024
      Telephone: (201) 585-5288
      Facsimile: (201) 585-5233

      Grant Morris*
      **LAW OFFICES OF GRANT E. MORRIS**
      1666 Connecticut Avenue NW, Suite 300
      Washington, DC 20009
      Telephone: (202) 742-7783
      Facsimile: (202) 742-7776

      *Counsel for Plaintiffs*

      *admitted pro hac vice*

181

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiffs' Third Amended Class Action Complaint was served via electronic means on the following counsel of record:

> **Sarah E. Bouchard, Esq.** (<u>sbouchard@morganlewis.com</u>)
> **W. John Lee, Esq.** (<u>jlee@morganlewis.com</u>)
> **Blair Joseph Robinson, Esq.** (<u>blair.robinson@morganlewis.com</u>)
> Morgan, Lewis & Bockius, LLP
> 1701 Market Street
> Philadelphia, PA 19103-2921
> *Counsel for Defendants*

I hereby certify that a true and correct courtesy copy was served via U.S. Mail to:

> **Honorable Dennis M. Cavanaugh**
> United States District Court for the District of New Jersey
> Martin Luther King, Jr. Federal Building & U.S. Courthouse, PO 04
> 50 Walnut Street
> Newark, NJ 07101

Respectfully submitted this 27th day of April, 2012.

> By: _____s/_____
> Katherine M. Kimpel*
> Lauren E. Seffel*
> Katherine E. Lamm*
> David W. Sanford, D.C. Bar No. 457933
> **SANFORD WITTELS & HEISLER, LLP**
> 1666 Connecticut Avenue NW, Suite 300
> Washington, DC 20009
> Telephone: (202) 742-7777
> Facsimile:  (202) 742-7776
>
> Steven L. Wittels (SLW-8110)
> Jeremy Heisler (JH-0145)
> **SANFORD WITTELS & HEISLER, LLP**
> 440 West Street
> Fort Lee, NJ  07024
> Telephone: (201) 585-5288
> Facsimile: (201) 585-5233
>
> Grant Morris*
> **LAW OFFICES OF GRANT E. MORRIS**
> 1666 Connecticut Avenue NW, Suite 300
> Washington, DC 20009
> Telephone: (202) 742-7783
> Facsimile: (202) 742-7776
>
> *Counsel for Plaintiffs*